UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION

| | | |
|---|---|---|
| ROBERT MOSLEY, JR., VINCENT MOSLEY, AND FELICIA MOSLEY, | § § § | |
| Plaintiffs, | § § | |
| v. | § § | Cause No. 5:17-cv-583 |
| BEXAR COUNTY, HENRIETTA JOHNSON, JOHN BENNETT, AND SEAN MACAULEY #2899, | § § § § § | |
| Defendants. | § § § | |

**PLAINTIFFS' THIRD AMENDED COMPLAINT**

Robert Mosley's sole surviving heirs bring this lawsuit to seek justice for their father, who died a sudden and untimely death at age 54 in Bexar County's jail as a result of Defendants' actions. While in jail, Mosley suffered a fall that caused a hip socket fracture, leading to severe internal hemorrhaging, which ultimately caused his death less than a day later.

Although he repeatedly and consistently sought medical attention, Defendants Johnson, Bennett, and MacAuley failed to provide necessary medical care in violation of the Fourteenth Amendment. In addition, Defendant Bexar County, through the actions of Johnson, Bennett, MacAuley and others, discriminated against Mosley based on his disability relating to alcoholism and symptoms of alcohol withdrawal, in violation of the Americans with Disabilities Act and the Rehabilitation Act.

JURISDICTION AND VENUE

1. This Court has subject matter jurisdiction over all of Plaintiffs' federal civil rights claims pursuant to 28 U.S.C. §1331. The Court also has jurisdiction over Plaintiffs' claim brought under 42 U.S.C. §1983, pursuant to 28 U.S.C. §1343.

2. The events giving rise to the claims occurred in Bexar County, Texas, in this district.

Accordingly, this Court is the proper venue, pursuant to 28 U.S.C. § 1391(b)(2).

PARTIES

3. Plaintiff Robert Mosley, Jr. is an adult resident of Nevada. He is one of three children of Robert Mosley. He and his two siblings, Felicia Mosley and Vincent Mosley, are the sole heirs of their father, Robert Mosley. No probate proceedings arose from Mr. Mosley's death, and none are necessary.

4. Plaintiff Felicia Mosley is an adult resident of Arizona. She is one of three children of Robert Mosley. She and her two siblings, Robert Mosley Jr. and Vincent Mosley, are the sole heirs of their father, Robert Mosley.

5. Plaintiff Vincent Mosley is an adult resident of Nevada. He is one of three children of Robert Mosley. He and his two siblings, Robert Mosley Jr. and Felicia Mosley, are sole heirs of their father, Robert Mosley.

6. Defendant Henrietta Johnson was employed by University Health System as a Licensed Vocational Nurse (LVN) at the Bexar County Adult Detention Center (BCADC, or Jail) at all times relevant to this Complaint. As a nurse at the jail, she was the medical professional who was responsible for assessing and did assess Mr. Mosley after his hip socket fracture. The Bexar County Sheriff's Office (BCSO) contracted with University Health System to provide medical care inside the jail. As a nurse in the jail, Defendant Johnson was performing a function traditionally performed by public employees. At all times relevant to this claim, Defendant Johnson was acting under color of state law. Defendant Johnson is sued in her personal capacity and can be served at 6321 Beech Trail Dr., Converse, TX 78109.

7. Defendant John Bennett was employed by University Health System as a Registered Nurse (RN) at the BCADC at all times relevant to this Complaint. Defendant Bennett was the immediate supervisor responsible for overseeing work performed by Defendant Johnson at all

2

times relevant to this claim. The BCSO contracted with University Health System to provide medical care inside the jail. As a nurse in the jail, Defendant Bennett was performing a function traditionally performed by public employees. At all times relevant to this claim, Defendant Bennett was acting under color of state law. Defendant Bennett is sued in his personal capacity.

8. Defendant Sean MacAuley was employed by BCSO as a Correctional Officer (Badge #2899) at the BCADC at all times relevant to this complaint. He was a correctional officer responsible for monitoring Mr. Mosley in his cell for several hours after his fall and before he died. At all times relevant to this claim, Defendant MacAuley was acting under color of state law. He is sued in his personal capacity and can be served at 11830 Twin Oaks Path, San Antonio, TX 78254.

9. Defendant Bexar County is a political subdivision of the State of Texas. The Bexar County Sheriff's Office (BCSO), which is a division of Defendant Bexar County, operates the BCADC, where Mr. Mosley died while in pretrial detention. At all times relevant to this complaint, BCSO was responsible for operating the BCADC in compliance with federal and state law. At all times relevant to this complaint, Bexar County was a public entity that received federal funds. Bexar County can be served through Bexar County Judge Nelson W. Wolff at 101 W. Nueva, 10th Floor, San Antonio, TX 78205.

STATEMENT OF FACTS

10. Robert Mosley was born on February 5, 1961, and he lived with family members in Pima County, Arizona before his death.

11. On July 22, 2015, Mr. Mosley voluntarily turned himself in to the Bexar County Sheriff's Office (BCSO) to resolve an old DWI charge from 2003. BCSO personnel arrested him and booked him into the Bexar County Adult Detention Center (BCADC, or jail). He was incarcerated in the jail at 200 N. Comal Street in San Antonio, in the custody of the BCSO.

12. At the time of his booking and incarceration, Mr. Mosley suffered from alcoholism.

Soon after Mr. Mosley was taken into custody, he began to show symptoms of alcohol withdrawal.

13. Alcohol withdrawal (also known as detoxification, detox, delirium tremens, or DTs) is a condition that directly results from alcoholism. Symptoms of alcohol withdrawal include anxiety, fatigue, irritability, confusion, insomnia, nausea, hallucinations, disorientation, problems with memory, and seizures. Individuals experiencing alcohol withdrawal typically begin to show symptoms one to three days after their last drink.

14. Mr. Mosley's alcoholism, including his alcohol withdrawal, was a physical and mental impairment that substantially limited his ability to walk, stand, communicate, and think clearly.

15. Walking, standing, communicating, and thinking clearly are all major life activities.

16. Soon after Mr. Mosley was booked into the jail, he began to show symptoms of alcohol withdrawal.

17. Shortly after midnight on the morning of July 25, 2015, jail staff transferred Mr. Mosley from Cell No. AA29 to Cell No. CI08. Cell CI08 was typically used as a detox cell, for inmates experiencing alcohol withdrawal or substance use withdrawal.

18. Upon information and belief, jail staff transferred Mr. Mosley to CI08 because they knew he was experiencing and displaying symptoms of alcohol withdrawal.

19. CI08 is an eight-person cell. Jail records indicate that Mr. Mosley shared the cell with seven other occupants.

20. At approximately 10:30 a.m. on July 25, 2015, after Mr. Mosley's transfer to CI08, jail staff noted in their records that Mr. Mosley was behaving in a bizarre manner. According to jail staff, Mr. Mosley appeared to be experiencing "a distorted reality," including talking to people who were not there, stomping on bugs that were not there, and hallucinating that his brother was in the jail's dayroom.

21. Later that same day, at approximately 3:00 p.m., while Mr. Mosley continued

displaying symptoms of alcohol withdrawal, he fell in his cell. As a result of the fall, he suffered an acetabular fracture, which is a fracture to the socket portion of his ball-and-socket hip joint.

22. The hip socket fracture caused internal hemorrhaging in Mr. Mosley's retroperitoneal area, which is an area in the abdomen near the hips. The hip socket fracture also caused Mr. Mosley tremendous physical pain.

23. According to the Journal of Emergency Medical Services, "the most feared complication of a pelvic injury is rapid and uncontrolled hemorrhage into the retroperitoneal space, which is capable of accommodating the patient's entire blood volume."

24. It is well known to nurses and other medical practitioners, including Defendants Johnson and Bennett, that a hip socket fracture carries a heavy risk of internal bleeding that can be fatal. Likewise, it is well known to nurses and other medical practitioners, including Defendants Johnson and Bennett, that individuals who suffer from alcoholism have cirrhotic livers, and that people with cirrhotic livers have a greater chance than others of severe internal bleeding.

25. After the fall, Mr. Mosley could not stand. He remained on the cell floor for several hours.

26. According to jail records, Officer Ponton was assigned to monitor CI08 at the time of Mr. Mosley's fall. Sergeant Jenkins was assigned to supervise Officer Ponton at the time of Mr. Mosley's fall.

27. Officer Ponton and Sergeant Jenkins both conducted at least ten observation checks of CI08, Mr. Mosley's cell, during their shifts that day. Upon information and belief, their shifts began at 3 p.m. and ended at 11 p.m.

28. Upon information and belief, immediately after his fall, Mr. Mosley complained of intense and severe pain in his hip and legs. He asked repeatedly for medical attention. Upon information and belief, Officers Ponton and Jenkins knew that he had fallen, and that he was

complaining of intense and severe pain in his hip and legs. They also knew that he could not stand up, and that he was lying on the floor of his cell. Mr. Mosley had serious medical needs as a result of his fall, as detailed below, and Defendants Johnson, Bennett, and MacAuley knew of his medical needs but deliberately failed to address them, subjecting him to substantial risk of serious harm, including death.

29. Upon information and belief, despite Mr. Mosley's numerous complaints, it took at least three hours for Officers Ponton and Jenkins to respond to his complaints by seeking medical attention.

30. Several hours after Mr. Mosley's fall, at approximately 6:20 p.m., Officer Ponton called a "Code 1," which is a referral to the jail medical clinic, in response to Mr. Mosley's complaint that he could not move his leg or get up.

31. At approximately 7 p.m., Officer Jenkins and jail medical personnel took Mr. Mosley by wheelchair from his jail cell to the jail medical clinic.

32. Upon information and belief, after Mosley arrived in the medical clinic, jail medical personnel made him wait for two hours before he was assessed. During those two hours, medical personnel had him lay on a stretcher.

33. After two hours, Defendant Johnson assessed Mr. Mosley.

34. Before he was taken to the medical clinic, Mr. Mosley hallucinated and showed signs of confusion and distorted reality. Upon information and belief, Mr. Mosley continued to hallucinate, and show signs of confusion and distorted reality while he was in the medical clinic, including during Defendant Johnson's assessment. When he later returned to his jail cell, CI08, his hallucinations, and signs of confusion and distorted reality continued. Mr. Mosley's hallucinations, and signs of confusion and distorted reality, all were symptoms of and the direct result of his alcohol withdrawal. It is well known to nurses and medical practitioners, including

Defendants Johnson and Bennet, that these are common symptoms of alcohol withdrawal for persons with alcoholism.

35. Mr. Mosley's ability to fully communicate and self-report his symptoms was impaired by his hallucinations, confusion and distorted reality.

36. It is well known to nurses and other medical practitioners, including Defendants Johnson and Bennett, that people with a history of alcoholism often have decreased liver functioning, or cirrhotic livers, which causes their injuries to bleed more. It is also well-known to nurses and medical practitioners, including Defendants Johnson and Bennett, that individuals experiencing alcohol withdrawal face a significantly greater risk of serious and life-threatening injuries after a fall than other individuals, including because of their hallucinations, confusion and distorted reality and because of their impaired ability to fully communicate and self-report symptoms.

37. According to her own treatment record, Defendant Johnson knew of Mr. Mosley's alcoholism and alcohol withdrawal at the time he was brought to the medical clinic and at the time she assessed him.

38. Upon information and belief, at the time of Defendant Johnson's assessment of Mr. Mosley, she knew that he had fallen, that he was in extreme pain, had suffered a severe injury, and had sought immediate medical treatment. According to jail records, jail staff who brought Mr. Mosley to the medical clinic told Defendant Johnson that Mr. Mosley had fallen and had been showing signs of severe, extreme, and continuing pain. The registered nurse who initially responded to Officer Ponton's "Code 1" call the evening before he died stated in her notes that Mr. Mosley had told her he "fell and could have fractured [his] hip," as well as that she "gave a shift report for oncoming staff to monitor."

39. Despite her knowledge of Mr. Mosley's history of alcoholism and alcohol withdrawal,

fall, severe injury, and extreme pain, Defendant Johnson did not properly or adequately assess Mr. Mosley's hip fracture nor obtain adequate treatment for that fracture.

40. Upon information and belief, Defendant Johnson did not perform a full head-to-toe assessment on Mr. Mosley. It is well-known to nurses and other medical practitioners, including Defendant Johnson, that a person who has suffered a fall must be given a head-to-toe assessment. A reasonable LVN would have known that a full head-to-toe assessment of Mr. Mosley was required.

41. Upon information and belief, Defendant Johnson referred Mr. Mosley's case to her supervisor, Defendant Bennett, and shared with Bennett the details of her assessment of Mr. Mosley, which would have made it clear to Bennett that Johnson's assessment was inadequate. As a result, Defendant Bennett had a duty to look at Mr. Mosley and independently assess his condition. A reasonable RN would have known that a full head-to-toe assessment of Mr. Mosley was required and that Defendant Johnson's assessment was inadequate, and on information and belief, Bennett drew those conclusions.

42. Although the situation required a head-to-toe assessment, Defendants Johnson and Bennett did not perform it. A head-to-toe nursing assessment is a process that reviews the health of all major body systems. For a patient who has suffered a fall, a head-to-toe assessment includes at least checking vital signs, respiration, circulation, the cranial nerve, the skin, the central nervous system, vision, cognitive ability, and mobility.

43. As any reasonable LVN and RN knows, an assessment is the first step of the nursing process, and a proper and thorough assessment is critical because it is the basis for subsequent interventions and evaluation, including X-rays and CT scans, medication, and further treatment. Upon information and belief, Defendants Johnson and Bennett knew that a full head-to-toe assessment of Mr. Mosley was required, but they declined to do conduct it. They declined to

properly assess the nature and extent of Mr. Mosley's injury. Specifically, they failed to investigate his possible hip socket fracture. They failed to detect that he had internal hemorrhaging. Defendants Johnson and Bennett's failure exposed Mr. Mosley to a substantial risk of harm, including death. Had they done a proper assessment, which they both knew was necessary, they would have noted a possible hip socket fracture.

44. As any reasonable LVN and RN knows, X-rays and a CT scan are required to properly diagnose and treat a possible hip socket fracture, and are part of necessary examination for a person presenting symptoms such as Mr. Mosley's. Upon information and belief, Defendants Johnson and Bennett knew that X-rays and a CT scan were required for Mr. Mosley, and yet they declined to refer him for these and similar procedures. Defendants Johnson and Bennett's failure directly subjected Mr. Mosley to a substantial risk of harm, including death. Had they referred him, the X-rays and CT scan which would have revealed Mr. Mosley's hip fracture and associated internal hemorrhaging. Mr. Mosley would then have received appropriate and timely medical treatment, preventing his death.

45. Upon information and belief, one reason why Defendants Johnson and Bennett declined to properly assess him was that they bore animus toward him on the basis of his disability (alcoholism) and its features (including alcohol withdrawal). His symptoms of alcohol withdrawal included hallucinations, slurred speech, and disoriented reality. Upon information and belief, as a result of these symptoms, Defendants Johnson and Bennett dismissed his symptoms of leg and hip pain, and determined not to conduct a full physical assessment of Mr. Mosley, which they knew was required of any reasonable LVN and RN under the circumstances.

46. After an incomplete assessment, Defendant Johnson, with Defendant Bennett's approval, discharged Mr. Mosley back to his cell at CI08 without even making a follow-up appointment in the morning. After discharging him, neither Defendants Johnson nor Bennett

thereafter inquired about his status over the next sixteen hours.

47. As any reasonable LVN and RN know, a patient who has suffered a fall and shows the symptoms that Mr. Mosley showed should have vital signs monitored for the first 24 hours. This is to address injuries that may become apparent in the hours following a fall. Upon information and belief, Defendants Johnson and Bennett knew that they were required to monitor Mr. Mosley's vital signs after his fall, but they declined to monitor his vital signs over the next few hours, even though the necessity of doing so is well known to nurses and other medical practitioners. Defendant Johnson and Bennett's failure directly subjected Mr. Mosley to a substantial risk of harm, including death. If they had monitored his vital signs, they would have noticed significant changes as Mr. Mosley's internal bleeding progressed. He would have received timely emergency medical treatment before he suffered major organ failure and died just approximately sixteen hours later.

48. Upon information and belief, one reason Defendants Johnson and Bennett declined to monitor Mr. Mosley's vital signs was that they bore animus toward him on the basis of his disability (alcoholism) and its features (including alcohol withdrawal).

49. Moreover, Defendant Johnson falsely noted in Mr. Mosley's medical chart that he had regained the ability to stand and walk. In fact, Mr. Mosley had not regained the ability to stand and walk.

50. Upon information and belief, when jail staff returned Mr. Mosley to his cell from the medical clinic, Mr. Mosley could not stand, walk or climb into his bunk. Upon information and belief, Officer Ponton advised other inmates to place Mr. Mosley's bunk mattress on the floor, and directed Mr. Mosley to lay down on the floor, on top of the mattress.

51. According to jail records, at 11:00 p.m. on July 25, 2015, Defendant MacAuley replaced Officer Ponton as the unit officer assigned to monitor CI08.

52. At the time of that shift change, Officer Ponton informed Defendant MacAuley that

Mr. Mosley had fallen and been taken to the medical clinic. Upon information and belief, he also informed Defendant MacAuley that Mr. Mosley had been complaining of severe pain for several hours after his fall. Upon information and belief, inmates in Mr. Mosley's cell also informed Defendant MacAuley that Mr. Mosley was complaining of leg pain, could not stand up, was talking to himself and hallucinating, and had been dragging himself on the floor.

53. Upon information and belief, Mr. Mosley's behavior indicated that he continued to be in severe pain. From his mattress on the floor, Mr. Mosley continued to hallucinate, show signs of confusion, and complain of pain. According to jail records, Mr. Mosley could not stand or walk, and he dragged himself around the floor, as if "mopping the floor with himself."

54. Upon information and belief, Defendant MacAuley regularly and intermittently saw Mr. Mosley in his jail cell from 11:00 p.m. onward, during his shift. According to jail records, Defendant MacAuley made observation checks of Mr. Mosley's jail cell approximately every half hour. Upon information and belief, Defendant MacAuley saw Mr. Mosley's continued display of pain, and saw him lying on the floor of his cell on a mattress. Upon information and belief, from 11:00 p.m. to 3:00 a.m., even though Mr. Mosley continued to groan in pain, Defendant MacAuley took no steps to address Mr. Mosley's condition.

55. Mr. Mosley's visible symptoms of alcohol withdrawal led jail staff to submit a Psychological Evaluation Request a few minutes before midnight on July 25, 2015, just after Defendants MacAuley and Brown began their shift. The Request indicated that Mr. Mosley's behavior "appear[ed] bizarre or suicidal." The Request also noted that Mr. Mosley was hallucinating, confused, disoriented to places, unable to recall recent events, seeing things that others did not, unable to follow directions, thinking slowly, and jumping from subject to subject in his thoughts.

56. At approximately 3:00 a.m. on July 26, 2015, Defendant MacAuley called Defendant

Johnson to report Mr. Mosley's outward displays of pain and confusion. Defendant Johnson told Defendant MacAuley that Mr. Mosley did not need additional medical attention and that his cell was "the right place" for him.

57. In so doing, Defendant Johnson failed to adequately assess Mr. Mosley's serious medical needs and took no steps to assure those needs were met. She failed to monitor his vital signs; re-assess him after his injury; or refer him for additional screening and treatment despite hearing MacAuley's call. A reasonable LVN would have known that monitoring of vital signs, re-assessment, and referral for additional screening and treatment were necessary for Mr. Mosley in light of his pain and under the circumstances. Defendant Johnson knew that such steps were necessary and yet declined to take them. Defendant Johnson's failure directly subjected Mr. Mosley to a substantial risk of harm, including death. Had she done any of these things, she would have noted his possible acetabular fracture, changes to his vital signs, and Mr. Mosley would have received life-saving emergency treatment.

58. Defendant MacAuley had firsthand evidence of Mr. Mosley's worsening condition because he saw and heard Mr. Mosley writhing on the floor of his cell, moaning in pain. He knew that Mr. Mosley had not been able to stand up since his fall; that Mr. Mosley was confused, disoriented and was hallucinating. Nevertheless, after his phone call with Defendant Johnson, and before Mr. Mosley was found unresponsive at 7 a.m., Defendant MacAuley did not take any additional steps to obtain medical treatment for Mr. Mosley. He failed to notify his supervisors. He did not speak to Defendant Johnson's supervisor. He also failed to more closely observe Mr. Mosley, who stopped breathing at some time between 6:15 a.m. and 7:00 a.m. A reasonable correctional officer would have taken these steps. Defendant MacAuley's failure to do so directly subjected Mr. Mosley to a substantial risk of harm, including death. Had MacAuley done any of these things, Mr. Mosley would have obtained life-saving emergency treatment before he stopped

breathing and experienced multiple organ failure.

59. Later that morning, at approximately 5:00 a.m., Mr. Mosley again complained of hip pain to Defendant MacAuley.

60. At approximately 6:15 a.m., Mr. Mosley told the other inmates in his cell, "Someone call 9-1-1." Upon information and belief, Defendant MacAuley knew of this request. Upon information and belief, one reason why Defendant MacAuley declined to take this reasonable step, or others previously identified were that he bore animus toward him on the basis of his disability (alcoholism) and its features (including alcohol withdrawal).

61. At 7:00 a.m., the end of his shift, Defendant MacAuley found Mr. Mosley unresponsive on the floor of his cell. He was not breathing, and he had no pulse. He was lying in his own urine.

62. Jail personnel attempted CPR on Mr. Mosley, and they called for emergency medical assistance. After an ambulance arrived, Mr. Mosley was transported to Metropolitan Methodist Hospital later that morning. After life-saving measures were attempted at the hospital, Mr. Mosley was pronounced dead shortly after 1:00 p.m. that day.

63. Mr. Mosley died of internal hemorrhaging less than a day after fracturing his hip socket, without ever regaining coherence or the ability to stand. As a direct result of Defendant Johnson's knowing declination to provide necessary medical care in violation of the Fourteenth Amendment, Defendant MacAuley's knowing declination to provide necessary medical care in violation of the Fourteenth Amendment, and Defendant Bexar County's discrimination based on Mr. Mosley's disability in violation of the Americans with Disabilities Act (ADA) and the Rehabilitation Act (RA), Mr. Mosley spent the last day of his life in tremendous physical and emotional pain and suffering, and subsequently died.

FACTUAL SUMMARIES OF EACH DEFENDANT'S ACTIONS AND OMISSIONS

**Defendant Johnson Violated the Fourteenth Amendment**

64. Defendant Johnson intentionally failed to adequately assess Mr. Mosley's hip fracture and medical needs after his fall, which she and other similarly trained medical professionals would have known was necessary. At the time Defendant Johnson examined Mr. Mosley, she knew that he had fallen, he was unable to walk or stand, he was experiencing severe pain, and he was experiencing symptoms of alcohol withdrawal, including hallucinations. She knew that a thorough head-to-toe nursing assessment, followed by appropriate referrals for additional medical screening and treatment were required by the circumstances.

65. Despite knowing all of this, Defendant Johnson failed to do a thorough nursing assessment of Mr. Mosley, or to refer him for follow-up medical screening and treatment. She consciously disregarded the known risk of harm, and subjected Mr. Mosley to substantial risk of serious harm, which resulted in his death.

66. Defendant Johnson intentionally failed to conduct a more thorough nursing assessment of Mr. Mosley based on his altered state, which she knew and other similarly trained medical professionals would have known was necessary. At the time she knew that he was hallucinating and experiencing a distorted reality. Despite this knowledge, she failed to do a more thorough assessment.

67. Defendant Johnson intentionally failed to monitor Mr. Mosley's vital signs for the several hours following his fall, which she knew and other similarly trained medical professionals would have known was necessary under the circumstances.

68. Defendant Johnson also intentionally failed to assess and triage Mr. Mosley when Defendant MacAuley called her at approximately 3:00 a.m. the next morning, which she knew and other similarly trained medical professionals would have known was necessary. At the time

Defendant MacAuley called, Defendant Johnson knew about his fall and injury, his altered state, and she knew from Defendant MacAuley that Mr. Mosley's symptoms were worsening. Despite knowing all of these things, Defendant Johnson refused to assess him again, monitor his vital signs, or call a supervising nurse or a doctor about Mr. Mosley. Defendant Johnson prevented Mr. Mosley from obtaining further medical treatment despite his repeated entreaties for help, despite having all the information she needed to alert her to a possible acetabular fracture and internal bleeding.

69. As an LVN on duty at the time Mr. Mosley was brought to the medical clinic, Defendant Johnson's responsibility was to assess Mr. Mosley's condition to determine whether he needed additional treatment that she was unable to provide, including emergency treatment outside the jail. Defendant Johnson had the obligation and ability to refer Mr. Mosley to a doctor for further assessment, diagnosis, and treatment.

70. Upon information and belief, Defendant Johnson knew the need to conduct a thorough physical assessment of Mr. Mosley, based on her knowledge that he had fallen, was unable to stand or walk, was in severe pain, and was experiencing symptoms of alcohol withdrawal, including hallucinations.

71. A reasonable jail LVN in Defendant Johnson's position, having the aforementioned knowledge and having observed Mr. Mosley's outward displays of pain and confusion, would have known that Mr. Mosley had suffered a severe injury, had deteriorated, and was in serious danger of deteriorating further, and needed a complete assessment, screening, and medical treatment. A reasonable jail LVN would have performed a thorough head-to-toe assessment in the medical clinic, and indeed would have done an even more thorough assessment in light of his altered state. A reasonable jail LVN would have monitored his vital signs after the fall, referred him for additional medical screening and treatment, re-assessed him after receiving a call from Defendant MacAuley at 3 a.m., and informed her medical supervisor of his deteriorating condition to get

further medical screening and treatment. Upon information and belief, Defendant Johnson knew she should do these things, but knowingly declined. Because of Defendant Johnson's actions and omissions in responding to Mr. Mosley's medical needs, his hip fracture and hemorrhage went undiscovered and untreated, directly leading to his death.

72. Defendant Johnson's actions and omissions directly subjected Mr. Mosley to substantial risk of serious harm, including death. Defendant Johnson's conscious disregard of the risk of harm, and her failure to complete a thorough assessment of Mr. Mosley's dire condition, her failure to refer him for additional assessment or treatment or to a doctor, and her failure to monitor his vital signs after his fall constituted deliberate indifference to Mr. Mosley's serious medical needs.

**Defendant Bennett Violated the Fourteenth Amendment**

73. Defendant Bennett intentionally failed to adequately assess Mr. Mosley's hip fracture and medical needs after his fall, which he and other similarly trained medical professionals would have known was necessary. When Defendant Johnson referred Mr. Mosley's case to Defendant Bennett, he knew from Mr. Mosley's medical records and from information from Defendant Johnson that Mr. Mosley had fallen, he was unable to walk or stand, he was experiencing severe pain, and he was experiencing symptoms of alcohol withdrawal, including hallucinations. Defendant Bennett knew that a thorough head-to-toe nursing assessment, followed by appropriate referrals for additional medical screening and treatment were required by the circumstances.

74. Despite knowing all of this, Defendant Bennett failed to do a thorough nursing assessment of Mr. Mosley. He consciously disregarded the known risk of harm and subjected Mr. Mosley to substantial risk of serious harm, which resulted in his death.

75. Defendant Bennett intentionally failed to conduct a more thorough nursing assessment of Mr. Mosley based on Mr. Mosley's altered state, which Defendant Bennett knew and other

similarly trained medical professionals would have known was necessary. At the time Defendant Bennett knew that Mr. Mosley was hallucinating and experiencing a distorted reality. Despite this knowledge, Defendant Bennett failed to do a more thorough assessment.

76. Defendant Bennett intentionally failed to monitor Mr. Mosley's vital signs for the several hours following his fall, which Defendant Bennett knew and other similarly trained medical professionals would have known was necessary under the circumstances.

77. As an RN supervisor on duty at the time Mr. Mosley was being assessed in the medical clinic, Defendant Bennett's responsibility was to assess Mr. Mosley's condition to determine whether he needed additional treatment that Defendant Bennett was unable to provide, including emergency treatment outside the jail. Defendant Bennett had the obligation and ability to refer Mr. Mosley to a doctor for further assessment, diagnosis, and treatment.

78. Upon information and belief, Defendant Bennett knew of the need to conduct a thorough physical assessment of Mr. Mosley, based on his knowledge that Mr. Mosley had fallen, was unable to stand or walk, was in severe pain, and was experiencing symptoms of alcohol withdrawal, including hallucinations.

79. A reasonable jail RN supervisor in Defendant Bennett's position, having the aforementioned knowledge, would have known that Mr. Mosley had suffered a severe injury, had deteriorated, and was in serious danger of deteriorating further, and needed a complete assessment, screening, and medical treatment. A reasonable jail RN supervisor would have performed a thorough head-to-toe assessment in the medical clinic, and indeed would have done an even more thorough assessment in light of his altered state. A reasonable jail RN supervisor would have monitored his vital signs after the fall, and referred him for additional medical screening and treatment. Upon information and belief, Defendant Bennett knew he should do these things, but knowingly declined. Because of Defendant Bennett's actions and omissions in responding to Mr.

Mosley's medical needs, Mr. Mosley's hip fracture and hemorrhage went undiscovered and untreated, directly leading to his death.

80. Defendant Bennett's actions and omissions directly subjected Mr. Mosley to substantial risk of serious harm, including death. Defendant Bennett's conscious disregard of the risk of harm, and his failure to complete a thorough assessment of Mr. Mosley's dire condition, his failure to refer Mr. Mosley for additional assessment or treatment from a doctor, and his failure to monitor Mr. Mosley's vital signs after his fall constituted deliberate indifference to Mr. Mosley's serious medical needs.

**Defendant MacAuley's Actions in Violation of the Fourteenth Amendment**

81. Defendant MacAuley failed to seek additional medical assistance for Mr. Mosley between the hours of 3:30 a.m. and 7:00 a.m. on July 26. During that time, Defendant MacAuley knew that Mr. Mosley had fallen, knew that he was unable to walk or stand, that he was experiencing severe pain, that he continued to complain of severe pain, that his pain was worsening, and that he was experiencing symptoms of alcohol withdrawal, including hallucinations. Defendant MacAuley also personally observed Mr. Mosley's condition deteriorating in front of him. At 5:00 a.m., Mr. Mosley again complained of severe hip pain. At 6:15 a.m., Mr. Mosley requested that someone call 9-1-1. Despite knowing all of this, Defendant MacAuley failed to seek any additional medical assistance for Mr. Mosley, which led to Mr. Mosley's death.

82. Correctional officers in jails have a constitutional duty to provide inmates with necessary medical care. They violate that duty when they are deliberately indifferent to an inmate's serious medical needs. Defendant MacAuley violated this duty when he failed to seek additional medical assistance for Mr. Mosley's serious injury. Defendant MacAuley's decision not to seek additional medical assistance for Mr. Mosley during the three and a half hours between his call to

Defendant Johnson and the time he found Mr. Mosley unresponsive showed deliberate indifference to Mr. Mosley's serious medical needs.

83. A reasonable correctional officer in Defendant MacAuley's position, having the aforementioned knowledge and having observed Mr. Mosley's outward displays of pain and confusion and having heard his cries for medical help, would have recognized that Mr. Mosley had suffered a severe injury, had deteriorated, and was in serious danger of deteriorating further. A reasonable correctional officer would have immediately informed his supervisor and independently sought additional medical attention for Mr. Mosley. Upon information and belief, Defendant MacAuley knew he should do these things, but knowingly declined.

84. Defendant MacAuley's actions and omissions, and conscious disregard of dangers which were obvious to him, directly subjected Mr. Mosley to substantial risk of serious harm, including death. Defendant MacAuley's failure to seek additional medical assistance for Mr. Mosley during the three and a half hours between his call to Defendant Johnson and the time he found Mr. Mosley unresponsive, and his failure to inform his supervisor of Mr. Mosley's declining medical condition, constituted deliberate indifference to Mr. Mosley's serious medical needs. Because of Defendant MacAuley's actions and omissions in responding to Mr. Mosley's medical needs, his hip fracture and hemorrhage went undiscovered and untreated, directly leading to his death.

**Defendant Bexar County's Actions in Violation of the ADA and RA**

85. Defendant Bexar County is a public entity subject to Title II of the Americans with Disabilities Act (ADA). Defendant Bexar County is a recipient of federal funds, and therefore subject to the Rehabilitation Act (RA). As set forth above, Robert Mosley was a qualified individual with a disability because he had alcoholism, which substantially limited his major life activities, including his ability to walk, stand, communicate, and think clearly. At the time of the

relevant incidents, Mr. Mosley was experiencing alcohol withdrawal, which substantially limited his ability to think clearly and communicate, among other things. His symptoms of alcohol withdrawal were known and apparent to Bexar County employees, including Defendants Johnson, Bennett, and MacAuley.

86. Under the ADA and RA, Defendant Bexar County is liable for the actions of its employees and contractors, including the actions of Defendants Johnson and Bennet, who were employees of Bexar County's contractor, University Health System.

87. Defendants Johnson and Bennett discriminated against Mr. Mosley by failing to adequately treat Mr. Mosley's severe hip fracture and resulting hemorrhaging because Mr. Mosley was going through alcohol withdrawal. Defendants Johnson and Bennett failed to provide to Mr. Mosley the same assessment and referral to see a doctor for such a serious injury that they would provide to other inmates who are not experiencing alcohol withdrawal. At the time Defendant Johnson examined Mr. Mosley, she knew that he had fallen, knew that he was unable to walk or stand, knew that he was experiencing severe pain, and knew that he was experiencing symptoms of alcohol withdrawal, including hallucinations. Defendant Bennett was also made aware of the same when he was informed by Defendant Johnson. Despite knowing all of this, Defendants Johnson and Bennett harbored animus toward Mr. Mosley, and on the basis of that animus, they dismissed his statements of pain and inability to walk, failed to do a thorough physical assessment of him, and did not take additional steps to communicate with him. Defendants Johnson and Bennett did these things precisely *because* Mr. Mosley was experiencing hallucinations and a distorted reality as a result of his alcohol withdrawal. As a result of their actions, Mr. Mosley did not obtain life-saving medical treatment, and he died from internal hemorrhaging associated with his hip socket fracture.

88. Had Defendants Johnson and Bennett provided the same assessment and referral to see

a doctor for Mr. Mosley's injury that she would provide to other inmates not experiencing alcohol withdrawal, a doctor would have discovered Mr. Mosley's hip fracture and resulting hemorrhaging and Mr. Mosley would not have died.

89. Similarly, Defendant MacAuley declined to take steps described above that he knew were reasonable and necessary because he bore animus toward Mr. Mosley on the basis of his disability (alcoholism) and its features (including alcohol withdrawal).

CAUSES OF ACTION

**FIRST CAUSE OF ACTION**
**Failure to Provide Care for a Serious Medical Need**
**in Violation of the Fourteenth Amendment to the U.S. Constitution**
**Against Defendant Johnson**

90. Plaintiffs incorporate the foregoing paragraphs as set forth above.

91. Acting under color of state law, Defendant Johnson consciously disregarded danger to which Mr. Mosley was exposed, and was deliberately indifferent to Mr. Mosley's serious medical need, including by failing to assess and triage Mr. Mosley's hip fracture and internal hemorrhaging when he was first brought to the medical clinic, by failing to monitor his vital signs over the next few hours, and by failing to assess and triage Mr. Mosley after Defendant MacAuley called her around 3:00 a.m.

92. As a direct result of Defendant Johnson's failure to provide medical care, Mr. Mosley suffered increasingly severe physical and emotional injuries, and died.

**SECOND CAUSE OF ACTION**
**Failure to Provide Care for a Serious Medical Need**
**in Violation of the Fourteenth Amendment to the U.S. Constitution**
**Against Defendant Bennett**

93. Plaintiffs incorporate the foregoing paragraphs as set forth above.

94. Acting under color of state law, Defendant Bennett consciously disregarded danger to which Mr. Mosley was exposed, and was deliberately indifferent to Mr. Mosley's serious medical

need, including by failing to independently assess and triage Mr. Mosley's hip fracture and internal

hemorrhaging after receiving a referral from Defendant Johnson and by failing to monitor Mr.

Mosley's vital signs after he was discharged from the medical clinic.

### THIRD CAUSE OF ACTION
### Failure to Provide Care for a Serious Medical Need
### in Violation of the Fourteenth Amendment to the U.S. Constitution
### Against Defendant MacAuley

95. Plaintiffs incorporate the foregoing paragraphs as set forth above.

96. Defendant MacAuley consciously disregarded danger to which Mr. Mosely was

exposed, and was deliberately indifferent to Mr. Mosley's serious medical needs. Acting under

color of state law, Defendant MacAuley failed to seek additional medical assistance for Mr.

Mosley, whom he knew had recently suffered a serious injury and whom he observed showing

clear signs of severe pain and symptoms of alcohol withdrawal, and failed to call 9-1-1 when Mr.

Mosley requested it. A reasonable correctional officer would have known, under the

circumstances, that Mr. Mosley required life-saving emergency medical treatment as a result of

his fall, his altered state, and his worsening symptoms and pain.

97. Defendant MacAuley was aware of Mr. Mosley dire circumstances but disregarded

them. As a direct result of Defendant MacAuley's failure to provide care, Mr. Mosley suffered

increasingly severe physical and emotional injuries, and died.

### FOURTH CAUSE OF ACTION
### Discrimination on the Basis of Robert Mosley's Disability in Violation of the
### Americans with Disabilities Act (ADA) and the Rehabilitation Act (RA)
### Against Defendant Bexar County

98. Plaintiffs incorporate the foregoing paragraphs as set forth above.

99.  Mr. Mosley was a qualified individual with a disability under the ADA and RA.

100. Defendant Bexar County is a public entity subject to Title II of the Americans with

Disabilities Act (ADA). Defendant Bexar County is a recipient of federal funds, and therefore

subject to the Rehabilitation Act (RA). Under the ADA and RA, Defendant Bexar County is liable for the actions of its employees and contractors, including the actions of Defendants Johnson and Bennett, who were employees of Bexar County's contractor, University Health System, and the actions of Defendant MacAuley.

101. Defendants Johnson and Bennett discriminated against Mr. Mosley by failing to provide the same medical assessment and referral to see a doctor for a serious injury that they would provide to other inmates who are not experiencing alcohol withdrawal. In addition, Defendants Johnson and Bennett demonstrated animus toward Mr. Mosley on account of his alcohol withdrawal symptoms of hallucinations and a distorted reality, by failing to conduct a thorough physical assessment of Mr. Mosley, failing to refer Mr. Mosley to a doctor for necessary medical treatment, and dismissing Mr. Mosley's statements of severe pain and inability to walk.

102. Similarly, Defendant MacAuley knowingly declined to take reasonable steps to monitor Mr. Mosley, and act on the warnings signs he saw and heard because of animus toward Mr. Mosley on account of his alcohol withdrawal symptoms. He took fewer cautionary steps than he otherwise would have for other inmates who are not experiencing alcohol withdrawal.

103. As a direct result of Defendants Johnson, Bennett, and MacAuley's discrimination on account of Mr. Mosley's disability, Mr. Mosley's hip fracture and severe internal hemorrhage were not discovered, and he suffered physical and emotional injuries, and died. He endured more suffering and harm than similarly situated inmates without alcoholism and alcohol withdrawal.

### DAMAGES

104. Plaintiffs seek compensatory and punitive damages to the extent permitted by law against Defendants Johnson, Bennett, and MacAuley. Plaintiffs seek compensatory damages to the extent permitted by law against Defendant Bexar County.

105. In their capacity as sole heirs to Mr. Mosley's estate, Plaintiffs assert a survival claim

on the estate's behalf. The estate has incurred damages including, but not limited to, conscious pain and suffering, and death.

106. In their individual capacities, Plaintiffs assert wrongful death claims on behalf of all statutory wrongful death beneficiaries. They suffered damages including, but not limited to, past and future mental anguish, loss of companionship, society, services, and affection of their father.

## JURY DEMAND

107. Pursuant to Federal Rule of Civil Procedure 38, Plaintiffs request a jury for all issues triable to a jury.

## ATTORNEY'S FEES

108.  Plaintiffs are entitled to reasonable attorney's fees, costs, and litigation expenses, including pursuant to 42 U.S.C. § 1988, 42 U.S.C. § 12205, and 9 U.S.C. § 794a(b).

## CONCLUSION

THEREFORE, Plaintiffs respectfully pray this Court grant the following relief to the extent permitted by law:

A.  Award compensatory and punitive damages against Defendants Johnson, Bennett, and MacAuley, and compensatory damages against Defendant Bexar County;

B.  Award reasonable attorney fees, litigation expenses, and court costs; and

C.  Grant all other and additional relief to which they are entitled, at law or in equity.

DATED: November 1, 2018

Respectfully submitted,

/s/ Brian McGiverin

Brian McGiverin
Texas Bar No. 24067760
brian@lawcenterofaustin.com

DIETZ, LAWRENCE & MCGIVERIN
2221 Hancock Drive
Austin, TX 78756
Telephone: (512) 387-0718
Fax: (512) 597-0805

Ranjana Natarajan
Texas Bar No. 24071013
UNIVERSITY OF TEXAS SCHOOL OF LAW
727 East Dean Keeton Street
Austin TX 78705
Tel: 512-232-7222
Email: rnatarajan@law.utexas.edu

ATTORNEYS FOR PLAINTIFFS

CERTIFICATE OF SERVICE

I certify that a true and correct copy of the foregoing has been served on all counsel of record who have appeared in this matter through the court's Electronic Case Files System.

/s/ Brian McGiverin
Brian McGiverin