# UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF TEXAS
### SAN ANTONIO DIVISION

| | | |
|---|---|---|
| **ROBERT MOSLEY, JR., VINCENT MOSLEY, AND FELICIA MOSLEY,** | § | |
| | § | |
| | § | |
| **PLAINTIFFS,** | § | |
| | § | |
| **V.** | § | **Civil Action No. 5:17-CV-583-XR** |
| | § | |
| **BEXAR COUNTY, HENRY ETTA JOHNSON, AND SEAN MACAULEY #2899,** | § | |
| | § | |
| | § | |
| | § | |
| **DEFENDANTS.** | § | |

## DEFENDANTS BEXAR COUNTY AND SEAN MACAULEY'S MOTION FOR SUMMARY JUDGMENT

TO THE HONORABLE DISTRICT COURT JUDGE RODRIGUEZ:

Comes now, Defendants Bexar County and Sean MacAuley, and file this Motion for Summary Judgment pursuant to Federal Rule of Civil Procedure Rule 56 and move the Court as follows:[1]

## I.  SUMMARY JUDGMENT EVIDENCE

- **Exhibit A:**  Bexar County Hospital District (d.b.a. University Health System) medical records bates stamp 12-24;[2]
- **Exhibit B:**  Unit CI Logbook, BCSO000132-BCSO000134;
- **Exhibit C:**  Stubbs' Supplemental Report BCSO000814-BCSO000819, Incident Reports BCSO000833-BCSO000836;
- **Exhibit D:**  MacAuley Statement, BCSO002558-BCSO002563;
- **Exhibit E:**  Amended Autopsy, BCSO002564-BCSO002572;
- **Exhibit F:**  Deposition of Kevin Ponton;
- **Exhibit G**:  Deposition of Sean MacAuley;

---

[1] Pursuant to the Amended Scheduling Order the parties have been granted leave for motions, replies, and responses to reach 30 pages in length. Docket no. 119 at 2.

[2] Defendants filed an unopposed motion to seal Exhibits A and E. Docket no. 130. As reflected above, Exhibit A to the motion to seal contains Bexar County Hospital District (d.b.a. University Health System) medical records for Robert Mosley, Sr., the decedent. and Exhibit E is Robert Mosley, Sr.'s amended autopsy report. Said motion is incorporated herein by reference.

- **Exhibit H:**   Deposition of Amber Weber, R.N.;
- **Exhibit I:**   Deposition of Candy Jenkins (n.k.a. Candy Guerra);
- **Exhibit J:**   Deposition of John Bennett, R.N.;
- **Exhibit K:**   Deposition of Henry Etta Johnson, L.V.N.;
- **Exhibit L:**   Deposition of Rosinder Brar (n.k.a. Rosinder Johnson);
- **Exhibit M:**   Deposition of Kathryn Brown;
- **Exhibit N:**   Deposition of Spencer Stubbs;
- **Exhibit O:**   Deposition of Peter Holmes, M.D.;
- **Exhibit P:**   Deposition of Sheryl Ann Innerarity, F.N.P.;
- **Exhibit Q:**   Deposition of Gina Colon;
- **Exhibit R:**   Deposition of Herbert Ward;
- **Exhibit S:**   Deposition of Reginald Worlds;
- **Exhibit T:**   Deposition of Betty Vestal, R.N.;
- **Exhibit U:**   Deposition of Katherine Whiteley, M.D.;
- **Exhibit V:**   Deposition of Jennifer Baeza;
- **Exhibit W:**   Deposition of Dr. James A. Feig, M.D.; and
- **Exhibit X:**   Deposition of Gerardo Lozano.

## II.  PROCEDURAL HISTORY

1.    On June 29, 2017, plaintiffs filed their original complaint, identifying defendants as Bexar County, unknown medical providers, and unknown individual correctional officers, and listing three causes of action: (1) violation of the Rehabilitation Act ("RA") and Americans with Disabilities Act ("ADA"); (2) failure to protect; and (3) failure to provide medical care. Docket no. 1.  Plaintiffs' claims concern the death of Robert Mosley, Sr., who was incarcerated in the Bexar County Adult Detention Center ("BCADC") between July 22, 2015 and July 25, 2015.  *Id.*

2.    On July 20, 2017, plaintiffs filed their amended complaint, identifying defendants as Bexar County, Licensed Vocational Nurse (LVN) Henry Etta Johnson ("Nurse Johnson"), and Officer Sean MacAuley, and including two causes of action: (1) violation of the Rehabilitation Act ("RA") and Americans with Disabilities Act ("ADA"); and (2) failure to provide medical care. Docket no. 6.  Multiple motions to dismiss ensued. Docket nos. 9, 14, 15, 16, 18. Bexar County and Officer MacAuley also filed a motion to join required parties and a motion to show

authority when additional family members—Bobbi King (decedent's sister) and Louisa Mosley (decedent's mother)—filed a separate lawsuit. Docket no. 23.

3.      Plaintiffs sought and were granted leave to file a second amended complaint. Docket nos. 28, Oral Order dated Nov. 15, 2017. Plaintiffs' second amended complaint named Nurse Johnson, Officer MacAuley, and Bexar County as defendants and again included three claims: (1) failure to provide medical care, violation of the Fourteenth Amendment—against Nurse Johnson; (2) failure to provide medical care, violation of the Fourteenth Amendment—against Officer MacAuley; and (3) discrimination on the basis of disability in violation of the ADA and RA. Docket no. 59. Nurse Johnson, Bexar County, and Officer MacAuley filed motions to dismiss, which were denied. Docket nos. 62, 63, 64, 73.

4.      On November 19, 2018, plaintiffs' third amended complaint was filed with leave of the court. Docket no. 100. The only substantive difference between plaintiffs' second and third amended complaint was the addition of defendant John Bennett, R.N. ("Nurse Bennett"), a University Health System ("UHS") employee, and an additional claim against Nurse Bennett for an alleged failure to provide medical care in violation of the Fourteenth Amendment. *Id*.

### III.  RELEVANT FACTS

5.      Plaintiffs, the decedent's three adult children, bring this instant case as the sole surviving heirs of Robert Mosley, Sr. ("the decedent" or "Mr. Mosley"). Docket No. 59 at 1.   On July 22, 2015, Mr. Mosley was booked into the BCADC. Exhibit A: UHS Records bates stamp 0012-0013. During the booking process, UHS employees conducted a medical screening of the 54-year-old decedent, who admitted he had been treated for alcoholism and that "he drinks 2-3 12oz beers after work, last drink yesterday of three 12oz beers." *Id*.   On July 25, 2015 at approximately 1:00 a.m., Mr. Mosley was seen by Physician Assistant Peter Forsberg ("PA

Forsberg"), after having been referred to medical when his cellmate said he was "stomping out bugs that are not really there" and was "looking for a particular officer who said he would be released from jail if he would come here from AZ [Arizona]." Exhibit A: bates stamp 0017.  PA Forsberg "suspected that [Mr. Mosley] may drink a bit more than he lets on." *Id.*  As a result of the assessment, PA Forsberg set forth a medical plan for Mr. Mosley: (1) "will be moved to a detox pod"; (2) "Lorazepam 2 mg po BIS x 5 days"; and (3) "MVI, thiamin and Folic acid x 14 days." Exhibit A: bates stamp 0018.

6.      After PA Forsberg's assessment Mr. Mosley was admitted to the detox unit (the "CI unit"). Officer Kevin Ponton ("Officer Ponton") was the unit officer for the second shift, beginning at 3:00 p.m. Exhibit F: Ponton Depo. 28:8-14. During his shift, Mr. Mosley complained to Officer Ponton of "back and leg pain." *Id.* 29:9-10.  Officer Ponton provided Mr. Mosley with a sick call slip request that would initiate a visit to the medical unit. *Id.* 32:9-20. A sick call request is the process in which an inmate can put a written request for medical care to set an appointment with medical personnel. Exhibit G: MacAuley Depo. 77:13-18.

7.      When Mr. Mosley failed to complete the medical visit request form and complained a second time about his back and leg pain, Officer Ponton called the medical staff for a recommended course of action. Exhibit F: Ponton Depo. 33:16-17.[3] Following his call to the medical unit, at approximately 6:20 p.m., Officer Kevin Ponton "initiated [a] Code 1 due to the fact that Inmate Mosley, Robert SID 431135 claimed he could not get up." Exhibit C: bates stamp BCSO000834. In his facility incident report, Officer Ponton stated Mr. Mosley "was responsive and telling me that he could not move his leg and could not get up." *Id.*; *see also*

---

[3] Cpl. Jenkins, who was Officer Ponton's superior on second shift, testified that she was concerned about Mr. Mosley—she instructed Officer Ponton to notify her and call a Code if Mr. Mosley did not get up to eat dinner. Exhibit I: Jenkins Depo. 45:9-11, 47:7-9.

Exhibit F: Ponton Depo. 29:15-17 ("He verbally communicated to me"). Mr. Mosley was able to communicate with Officer Ponton and Officer Ponton does not remember Mr. Mosley appearing disoriented during their interaction. Exhibit F: Ponton Depo. 40:16-18.

8.      Registered Nurse Amber Weber ("Nurse Weber") and Medical Assistant Michael Smith responded to the Code 1 and took Mr. Mosley down to the medical unit using a wheelchair. Exhibit C: bates stamp BCSO000834. Nurse Weber noted "Code 1 called by officer claiming inmate was pushed/fell on previous shift and has not moved since" with a chief complaint of "pain to right hip and knee." Exhibit A: bates stamp 0019. Nurse Weber indicated that Mr. Mosley was "talking and is alert and oriented to person" but "states he is at home and cannot say where he is." *Id.* Nurse Weber further found that Mr. Mosley's "[v]itals not [within] normal limits," she administered his detox medication, gave Mr. Mosley an "ice compress" and when her shift concluded she gave a report to the oncoming nurse, Nurse Johnson. *Id.*

9.      Nurse Johnson took over Mr. Mosley's care. Exhibit H: Weber Depo. 100:8-15. Nurse Johnson's notes reflect that "INMATE C/O RIGHT LEG PAIN STATED FELL ON CENTER [*sic*] BLOCK YESTERDAY" AND "WAS INFORMED BY SGT THAT INMATE WAS PUSHED YESTERDAY BY ANOTHER INMATE AND TODAY INMATE WAS LYING ON CELL FLOOR AND COMPLAINED OF RIGHT LEG PAIN AND HE COULD NOT PUT WEIGHT ON IT". Exhibit A: bates stamp 0021. Under the direction of her superior, John Bennett, R.N., Nurse Johnson released Mr. Mosley to return to the detox unit after finding Mr. Mosley "STOOD ON HIS OWN NO BRUISING NO REDNESS TO HIS RIGHT LEG, GOOD PEDAL PULSE FELT RIGHT FOOT." Exhibit A: bates stamp 0022.

10.     Mr. Mosley returned to the unit—he was able to walk on his own—just before the freeze was instituted[4] at approximately 10:00 p.m. Exhibit F: Ponton Depo. 50:6-7, 76:2-3, 77:22-24, 78:3-6. Cpl. Candy Jenkins (n.k.a. Candy Guerra) and another officer escorted Mr. Mosley back to his cell. Exhibit I: Jenkins Depo. 81:3-7. Although Mr. Mosley was able to walk, Cpl. Jenkins was concerned Mr. Mosley may be dizzy from detoxing, so she and Officer Kyle Griego walked by his side, with an arm under each of Mr. Mosley's arms. Exhibit I: Jenkins Depo. 84:9-19. Mr. Mosley's gait was slow, but he walked independently from the officers' assistance. *Id.*  Nurse Bennett saw Mr. Mosley "ambulate[] with no problem." Exhibit J: Bennett Depo. 115:19-21, 204:1. Nurse Johnson testified she would not send inmates back to their units unless they could independently ambulate. Exhibit K: Johnson Depo. 145:13-20, 146:6-7.

11.     Officer Ponton was still on shift when Mr. Mosley returned to the CI unit, but per protocol for inmate privacy, he was not provided with a medical summary of Mr. Mosley's medical status.  Exhibit F: Ponton Depo. 52:9-12, 52:23-25.  Officer MacAuley relieved Officer Ponton as the CI unit officer at approximately 11:00 p.m.—second shift began at 3:00 p.m., third shift began at 11:00 p.m.  Exhibit C: bates stamp BCSO000836.  During the shift change, Officer Ponton "advised [him] that inmate Mosley had been having medical troubles and a code 1 was initiated during his shift (2nd detail) and medical cleared inmate Mosley to return to his cell." *Id.*

12.     Throughout the night, Officer MacAuley "paid closer attention to inmate Mosley" and "at approximately 0300 hours [he] heard inmates talking in CI-08" where he "was told by inmates in the cell that inmate Mosley was too close to their bunks."[5] Exhibit C: bates stamp BCSO000836.

---

[4] The term freeze is used for the period in which all movement in the jail is suspended and BCADC gathers an accurate count of all inmates prior to a shift change. Exhibit F: Ponton Depo. 49:11-50:4.

[5] In the detox unit, unit officers performed observation checks every thirty minutes. Exhibit G: MacAuley Depo. 25: 13-14, 73:16-19.

Officer MacAuley "called inmate Mosley's first name Robert and he looked up at [Officer MacAuley] making eye contact and appeared to be responsive" and Officer MacAuley "told him to sleep on his mat that was laid on the floor" to which Mr. Mosley "grunted as a sign of acknowledgement." *Id*. Mr. Mosley's demeanor did not suggest a lack of understanding as he made eye-contact with Officer MacAuley and followed the officer's directions. Exhibit G: MacAuley Depo. 159: 16-18.

13.     After observing Mr. Mosley's "abnormal behaviors" Officer MacAuley was concerned, so he "called Emergency Medical treatment and LVN Henrietta [sic] Johnson answered the phone"—she advised Officer MacAuley "that inmate Mosley had issues with his leg and had not taken his detoxification medication but that CI was the right place for him to be at while he underwent detoxification." Exhibit C: bates stamp BCSO000836.  Following the conversation, Officer MacAuley "did not feel that the floor SGT needed to be briefed considering that LVN Johnson stated that no medical attention was required and inmate Mosley was cleared by medical as a result of the previous Code 1." Exhibit C: bates stamp BCSO000836.

14.     At approximately 7:00 a.m., during one of his observation checks, Officer MacAuley "observed Inmate Mosley lying still with no movement" so he immediately called master control to initiate a Code 1 Blue. [6] *Id*.  Sgt. Katherine Brown and Sgt. Michael McAllister were the first to arrive in response to the Code 1 Blue and they began CPR. *Id*.; Exhibit M: Brown Depo. 24:16-18, 25:12-14.  Mr. Mosley was transported to Metropolitan Methodist Hospital and was pronounced dead at 2:16 p.m. Exhibit C: bates stamp BCSO000833.

---

[6]   A Code 1 Blue is a medical emergency in which an inmate is unresponsive to verbal commands and is found without respirations and a pulse, such that resuscitation is needed. Exhibit J: Bennett Depo. 162: 19-21, 163:6-7; Exhibit M: Brown Depo. 46: 21-22.

15.     After Mr. Mosley had been taken out of the unit, Detective Rosinder Brar (n.k.a Rosinder Johnson) and Detective Herbert Ward interviewed Mr. Mosley's fellow inmates. Exhibit L: Brar Depo. 13:9-16, 16:5-9. From her investigation, Detective Brar did not believe Mr. Mosley's death was a result of an assault. *Id*. 39: 20-23.

16.     On July 27, 2015, Bexar County Medical Examiner James A. Feig, M.D. performed an autopsy of the decedent. Dr. Feig determined that:

> Robert Sidney Mosley, a 54 year old male, died as a result of complications of an acetabular fracture (fracture of the cup of hip) incurred after the deceased, a jail inmate, was reportedly pushed by another inmate. The autopsy revealed severe retroperitoneal hemorrhage (bleeding into the tissues behind the peritoneal lining of the abdomen and pelvis) associated with the hip fracture. Coagulopathy (impaired blood clotting) associated with alcoholic cirrhosis (scarring of the liver) is contributory.

Exhibit E: bates stamp BCSO002570. Because Dr. Feig believed Mr. Mosley had been pushed, due to a note written by Nurse Johnson, the manner of death was deemed a homicide. *Id.*  This determination initiated a criminal investigation, moving the case from Detectives Brar and Ward to Detective Spencer Stubbs, a detective in the homicide division. Exhibit N: Stubbs Depo. 18:4-14. Detective Stubbs "was not able to substantiate the comment made by Nurse Johnson" and therefore could not determine that Mr. Mosley had been pushed, as suggested in Nurse Johnson's notes.  Exhibit C: bates stamp BCSO000819.  Following Detective Stubbs' investigation, he shared his finding with Dr. Feig. Exhibit N: Stubbs Depo. 67:16-20, 68:14-16. Because Detective Stubbs found no evidence to corroborate that the decedent was pushed and was unable to find any evidence of criminal intent, Dr. Feig changed the manner of death from "homicide" to "undetermined," but the cause of death remained unchanged. Exhibit C: bates stamp BCSO002564; Exhibit N: Stubbs Depo. 67:16-20, 68:14-16.

## IV. STANDARD

17.     The standard to be applied in deciding a motion for summary judgment is set forth in Rule 56 of the Federal Rules of Civil Procedure, which provides in pertinent part, the court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law. FED. R. CIV. P. 56(a). Mere allegations of a factual dispute between the parties will not defeat an otherwise proper motion for summary judgment.  Rule 56 requires that there be no genuine issue of material fact. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247, 106 S.Ct. 2505, 2510 (1986).  A fact is material if it might affect the outcome of the lawsuit under the governing law. *Id.* at 248, 106 S.Ct. at 2510; *Thomas v. LTV Corp.*, 39 F.3d 611, 616 (5th Cir. 1994).  A dispute about a material fact is genuine if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.  *Id.*; *Wise v. E.I. DuPont De Nemours & Co.*, 58 F.3d 193, 195 (5th Cir. 1995).  Therefore, summary judgment is proper if, under governing laws, there is only one reasonable conclusion as to the verdict; if reasonable finders of fact could resolve a factual issue in favor of either party, summary judgment should not be granted. *Anderson*, 477 U.S. at 249, 106 S.Ct. at 2510.

18.     The movant on a summary judgment motion bears the initial burden of providing the court with a legal basis for its motion and identifying those portions of the record which it alleges demonstrate the absence of a genuine issue of material fact. *Stout v. Vincent*, 717 Fed.Appx. 468, 471 (5th Cir. 2018) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed. 2d 265 (1986).  The burden then shifts to the party opposing the motion to present affirmative evidence to defeat a properly supported motion for summary judgment. *Anderson*, 477 U.S. at 257, 106 S.Ct. at 2514-15. All facts and inferences drawn from those facts must be

viewed in the light favorable to the party resisting the motion for summary judgment. *Scott v. Harris*, 550 U.S. 372, 378, 127 S.Ct. 1769, 1774 (2007); *Hibernia Nat'l Bank v. Carner*, 997 F.2d 94, 97 (5th Cir. 1993). "The court need consider only the cited materials, but it may consider other materials in the record." FED. R. CIV. P. 56(c)(3).

## V. ARGUMENT

### A.     Officer MacAuley: Denial of Medical Care

19.     Inmates have a clearly established right not to be denied, by deliberate indifference, attention to serious medical needs. *Hunt v. Pierson*, 730 Fed. Appx. 210, 212 (5th Cir. 2018) (citing *Gobert v. Caldwell*, 463 F.3d 339, 345 (5th Cir. 2006)). "Prison officials violate the constitutional prohibition against cruel and unusual punishment when they demonstrate deliberate indifference to a prisoner's serious medical needs, resulting in unnecessary and wanton infliction of pain." *Id.* (citing *Wilson v. Seiter*, 501 U.S. 294, 297, 111 S. Ct. 2321, L. Ed. 2d 271 (1991)).[7]   A pretrial detainee is protected by the due process clause of the Fourteenth Amendment.[8] *Cupit v. Jones*, 835 F.2d 82, 84-85 (5th Cir. 1987).

---

[7]  "A serious medical need is one for which treatment has been recommended or for which the need is so apparent that even laymen would recognize that care is required." *Gobert*, 463 F.3d at 345, n.12 (citing *Hill v. Dekalb Regional Youth Detention Center*, 40 F.3d 1176, 1187 (11th Cir. 1994) abrogated on other grounds by *Hope v. Pelzer*, 536 U.S. 730, 122 S. Ct. 2508, 153 L. Ed. 2d 666 (2002)).

[8]  "The constitutional rights of a pretrial detainee flow from both the procedural and substantive due process guarantees of the Fourteenth Amendment, which provides that no state shall 'deprive any person of life, liberty, or property, without due process of law.'" *Randle v. Lockwood*, No. 6:1-CV-084-RP, 2017 U.S. Dist. LEXIS 31010, 2017 WL 892493, *8 n.5 (W.D. Tex. Mar. 6, 2017) (quoting *Olabisiomotosho v. City of Houston*, 185 F.3d 521, 525-26 (5th Cir. 1999) (quoting U.S. Const. amend. XIV, § 5)). Despite this distinction, "the State owes the same duty under the Due Process Clause and the Eighth Amendment to provide both pretrial detainees and convicted inmates with basic human needs, including medical care and protection from harm, during their confinement." *Id.* (quoting *Hare v. City of Corinth*, 74 F.3d 633, 650 (5th Cir. 1996)).

20.     Deliberate indifference is "an extremely high standard to meet." *Hunt*, 730 Fed. Appx. at 212 (quoting *Domino v. Texas Dep't of Criminal Justice*, 239 F.3d 752, 756 (5th Cir. 2001)). "Deliberate indifference is a subjective standard; it requires that prison officials have actual knowledge of a serious risk of harm and then consciously disregard that risk."[9] *Randle*, 2017 U.S. Dist. LEXIS 31010, at *9.  A plaintiff "must establish that the defendants 'refused to treat him, ignored his complaints, or intentionally treated him incorrectly, or engaged in any similar conduct that would clearly evince a wanton disregard for any serious medical needs.'"[10] *Id.* (quoting *Domino*, 239 F.3d at 756).  Incorrect diagnosis and a failure to alleviate a significant risk that an official should have perceived, but did not, does not meet the high standard. *Id.* In addition, "acts of negligence do not constitute deliberate indifference." *Hunt,* 760 Fed. Appx. at 212 (quoting *Gobert*, 463 F.3d at 346).  "To reach the level of deliberate indifference, official conduct must be 'wanton,' which is defined to mean 'reckless.'" *Alderson v. Concordia Parish Corr. Facility*, 848 F.3d 415, 419 (5th Cir. 2017) (quoting *Johnson v. Treen*, 759 F.2d 1236, 1238 (5th Cir. 1985)). "Actions and decisions by officials that are merely inept, erroneous, ineffective, or negligent do not amount to deliberate indifference." *Id.* (quoting *Alton v. Tex. A&M Univ.*, 168 F.3d 196, 201 (5th Cir. 1999)).[11]

21.     Here, the record lacks any probative evidence by which the factfinder could conclude that MacAuley acted with deliberate indifference towards Mr. Mosley.  As an initial matter, the

---

[9]  *See also Hunt*, 730 Fed. Appx. at 212 (quoting *Farmer v. Brennan*, 511 U.S. 825, 837, 114 S. Ct. 1970, 128 L. Ed. 2d 811 (1994)) ( "A prison official acts with deliberate indifference only if 'the official knows of and disregards an excessive risk to inmate health or safety.'")

[10]  An inmate's "[f]ailure to comply with medical instructions is a factor for courts to consider in evaluating deliberate indifference." *Golbert*, 463 F.3d at 347 n.25 (quoting *Hall v. Thomas*, 190 F.3d 693 (5th Cir. 1999)).

[11]  "Under exceptional circumstances, a prison official's knowledge of a substantial risk of harm may be inferred by the obviousness of a substantial risk." *Bias v. Woods*, 288 Fed. Appx. 158, 162 (5th Cir.  2008) (quoting *Farmer*, 511 U.S. at 842, 114 S.Ct. at 128).

evidence demonstrates with reasonable medical certainty that Mr. Mosley died as a result of seizure that caused his acetabular hip fracture and internal bleeding.  Dr. Peter Holmes, an orthopedic surgeon[12] testified Mr. Mosley "had his seizure in the middle of the night, it sheared his vessels. He had a hematoma and he died. Nothing would have saved him." Exhibit O: Holmes Depo. 26:3-5. Dr. Holmes further testified at the "moment of the injury he was dead." *Id*. 133:22.

22.    Plaintiffs' claim that Mr. Mosley's acetabular hip fracture was caused by a fall during the early afternoon of July 25, 2015 is without evidentiary support. Rather, it is supported only by the speculation of plaintiffs' expert—speculation that is contrary to all other evidence regarding Mr. Mosley's injury.[13]  To accept plaintiffs' allegations as true, plaintiffs' expert has deemed the nursing notes and witness testimony regarding Mr. Mosley's ability to ambulate when he left the medical unit to be "inconsistent with reality."[14] Exhibit P: Innerarity Depo. 96:9-15, 97:10-98:6, 98:9, 99:11-14, 100:3-5, 100:6-15, 102:4-6, 106:6-24, 107:19-22, 116:22-117:1, 144:11-14, 145:10-12, 171:17-172:5.

---

[12] The medical examiner, Dr. Feig, the UHS Director of Nursing, Betty Vestal, the former Medical Director of Detention Healthcare Service, Dr. Katherine Whiteley, and plaintiffs' expert, Sheryl Innerarity, F.N.P., deferred to an orthopedic surgeon for a conclusion regarding diagnosis of and the weight-bearing possibilities of an acetabular fracture, as well as causation of such an injury. Exhibit P: Innerarity Depo. 74:6-9; Exhibit T: Vestal Depo. 126:2-5; Exhibit U: Whiteley Depo. 151:2-4; Exhibit W: Feig Depo. 36:5-10.

[13]  All defendants filed a motion to strike testimony of Sheryl Ann Innerarity, F.N.P., plaintiffs' expert. Docket no. 128.  As explained in the motion to strike, plaintiffs' expert ignored all evidence that went against her assumption that Mosley had a hip fracture at the time that Johnson and Bennett examined him, she refused to consider any evidence contrary to her assumptions, which reveals her unreliability as an expert. Further, plaintiffs' experts' testimony lacks a reliable foundation. See *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 597, 113 S. Ct. 2786, 2799, 125 L. Ed. 2d 469 (1993).

[14] Dr. Feig testified that he is unable to state with medical certainty how long Mr. Mosley bled from severed arties caused by the fracture, but due to Mr. Mosley's liver disease he would have had a difficult time clotting.  Exhibit W: Feig Depo. 88:1-10, 89:8-13.

23.     In order to demonstrate that Mr. Mosley had an obvious serious medical condition—the acetabular fracture—that was ignored by the UHS medical staff and BCADC officers, there must be some evidence that such a fracture existed when Mr. Mosley returned to the CI unit from the medical unit. Contrary to plaintiffs' allegations, medical personnel and BCADC officers' testimony demonstrates that Mr. Mosley did not have an acetabular fracture when he left the medical unit. Plaintiff's expert testified that Mr. Mosley could not have walked unassisted if he had an acetabular fracture.[15] Exhibit P: Innerarity Depo. 144:12-14. Dr. Holmes, an orthopedic surgeon, testified the fracture was "unwalkable, unmoveable fracture" (Exhibit O: Holmes Depo. 25:13-14)—Mr. Mosley absolutely did not have the life-threatening fracture when he walked back to the CI unit because "[h]e would have had a gross shortening, external rotation of the leg, [while] screaming in agony, [he was] unmovable." *Id.* 157:5-7.

### 1.     Officer MacAuley's actual knowledge

24.     Even if this Court believes that Mr. Mosley's manner of death could have been from a previous fall that caused Mr. Mosley to fracture his hip, resulting in a slow bleed, plaintiffs' claims against Officer MacAuley must be dismissed. There is no evidence demonstrating Officer MacAuley acted with deliberate indifference towards Mr. Mosley's medical needs—MacAuley lacked the knowledge of Mr. Mosley's potential internal bleed—or that Mr. Mosley's alleged fracture and internal bleeding was so obvious Officer MacAuley should have known Mr. Mosley could have had a serious life-threatening injury.

---

[15] Dr. Whiteley, the former Medical Director of Detention Healthcare Services, testified that clinical suspicion of a hip fracture comes from "[a]n injury, pain at the site, ***inability to walk***, inability to move the leg, bend the knee, rotate the leg." Exhibit U: Whiteley Depo. 38:13-22 (emphasis added).

25.     There is no evidence to demonstrate that Officer MacAuley had subjective knowledge of a serious risk of harm to Mr. Mosley and that he then consciously disregarded the risk. *Randle*, 2017 U.S. Dist. LEXIS 31010, at *9. Even if Officer MacAuley was negligent, his actions did not arise to the level of reckless or wanton behavior.

26.     On the date at issue, Officer MacAuley had approximately four months of experience as a unit officer and had never been assigned to the detox unit until the night of July 25, 2015. Exhibit G: MacAuley Depo. 29:19-23; 88:2-5. As a unit officer, Officer MacAuley received CPR training, but no additional medical training specialized for detoxing inmates. *Id*. 22:15, 23:4-7, 24:7-11.  The evidence demonstrates that Officer MacAuley was aware Mr. Mosley had been to the medical unit during the prior shift and he purposely paid close attention to Mr. Mosley after speaking with Office Ponton during the shift change. *Id*. 85:2-4. Officer MacAuley knew only that Mr. Mosley had been the subject of a Code 1 on the prior shift[16] and that Mr. Mosley was experiencing detox—CI is a detox unit—but he "had never been around somebody detoxing before." *Id*. 91:24-92:24, 108: 18-21.

27.     At the start of his shift, around 11:00 p.m., when MacAuley first began observing Mr. Mosley he saw no indication of distress—Mr. Mosley was "changing sleeping positions." Exhibit G: MacAuley Depo. 98:12. At approximately 2:30 a.m., MacAuley heard a commotion in Cell 8 and went to the cell where other inmates complained Mr. Mosley was "going up to other inmates," "crawling over to them" and his fellow inmates "telling him to go away from them." *Id*. 101:22-25, 102:24. Officer MacAuley "called to Inmate Mosley to come over to sleep

---

[16] UHS medical staff does not provide unit officers with an inmate's medical condition or diagnosis. Exhibit X: Lozano Depo. 32:8-24.

on his mat" and "[h]e responded to Robert" with "eye contact" and "grunted as a sign of acknowledgement." *Id*. 103:17-25.[17]

28.     Officer MacAuley was new to the detox unit and thought Mr. Mosley's crawling around was a component of detoxing (Exhibit G: MacAuley Depo. 110:6-8) so he called the medical unit "to inquire about his condition" and spoke with Nurse Henry Etta Johnson (Nurse Johnson).[18] Exhibit C: bates stamp BCSO002559; Exhibit G: MacAuley Depo. 120:19-20,

---

[17]  Officer MacAuley saw Mr. Mosley crawling around the cell acting strangely, but this observation does not indicate that Office MacAuley thought Mr. Mosley was unable to walk. Officer MacAuley testified that if he had any suspicion or reason to believe that Mr. Mosley had trouble walking and could not get up, he would have called a Code 1. Exhibit G: MacAuley Depo. 180:14-17.

[18]  Nurse Johnson testified that she has no independent memory of whether Officer MacAuley called her during the early hours of July 26, 2015.  Exhibit K: Johnson Depo. 114:2-4, 114:19-21.  But, Nurse Johnson disputes whether she ever received the call. Johnson Depo 114:22-23. The evidence demonstrates Officer MacAuley noted the call as a late entry into the unit log book at between 6:49 a.m. and 7:00 a.m. Exhibit C: bates stamp BCSO000134. Officer MacAuley discussed the call in his report submitted after shortly Mr. Mosley was taken to the hospital, but before Mr. Mosley's death, Officer MacAuley believed all jail phone calls were recorded, and Officer MacAuley's statements were consistent throughout the Internal Affairs investigation initiated to ensure Officer MacAuley followed proper protocol. Exhibit B: Unit CI Logbook bates stamped BCSO000132-BCSO000134; Exhibit C: bates stamped BCSO000836; Exhibit D: Officer MacAuley Statement BCSO002558-BCSO002563; Exhibit V: Baeza Depo 46:21-47:11. Officer MacAuley explained that he logged the call as a late entry in the unit logbook because "I realized when I had to call the Code One Blue, that [*sic*] should have documented the phone call to Medical. This is why I included a late entry in the logbook. Since I was aware that all jail phone calls are recorded, it occurred to me if there was any issue or question, that the conversation would be available for review. I felt that I needed to include the information as a late entry so that it was clear I was not trying to insert anything or omit anything into the log book…because the information could be relevant in light of the Code that was called" Exhibit C: bates stamp BCSO002560.
        In reality, not all calls within the BCADC are recorded. As Officer Baeza, who conducted the Internal Affairs investigation, explained, "Everybody in the jail thinks that every single phone is recorded, including all the officers, and it's not. They - - All the officers believe that the – that –like, the desk phones and all that, they believe every single conversation they have is recorded. These phone calls are not recorded." Baeza Depo. 62:15-24
        Importantly, prior to the call, Officer MacAuley did not know that Nurse Johnson was on duty that night and could not have known Nurse Johnson treated Mr. Mosley before his shift or that Mr. Mosley had received his medication dose while in the medial unit. Exhibit G: MacAuley Depo. 119:12; Exhibit D: bates stamp BCSO002559. To correctly identify who would have

121:11-12. Officer MacAuley testified he told Nurse Johnson "I have Inmate Mosley's card pulled to the side. What's the story? And then she started talking and I couldn't fit a word in edgewise. I couldn't interrupt her. She was talking pretty fast." Exhibit G: MacAuley Depo. 121:18-22. Officer MacAuley testified that Nurse Johnson said "oh, yes we know Robert. He's been down here numerous times and he was complaining about his leg" and "he wasn't taking his medication and that's why he was acting that way." *Id*. 121:23-122:2. Officer MacAuley confirmed that Mr. Mosley was taking his medication and remembered "feeling comfortable about the situation thinking that [Nurse Johnson] knew - - knew him pretty well." *Id.* 122: 3-15. Although Officer MacAuley did not go into great detail regarding his observations, he felt Nurse Johnson "had an accurate summary of - - description of what [Mr. Mosley] was experiencing" and "she described the abnormal behaviors." *Id.* 123:12-14, 127:23. Officer MacAuley testified that Nurse Johnson told Officer MacAuley "we looked at his leg and it was fine" and "he's going through detox, that's - - that's what he's going through right now." *Id.* 125:8-9.[19]

29.   Officer MacAuley's decision to reach out to the medical staff concerning Mr. Mosley demonstrates he was not indifferent to Mr. Mosley's medical needs and did not consciously disregard a known risk. Unit officers often call the medical unit for advice regarding inmates' medical needs. Exhibit G: MacAuley Depo. 28:13-19; Exhibit H: Weber Depo. 96:6-9; Exhibit I: Jenkins Depo. 99:11-13; Exhibit R: Ward Depo. 68:6-15; Exhibit S: Worlds Depo. 28:22-29:5, 29:17; Exhibit Q: Colon Depo. 15:25-16:12. UHS and BCADC employees worked closely

---

answered the phone in the treatment room would have been difficult since there are approximately seventeen medical personnel staff members on each shift. Exhibit T: Vestal Depo. 12:11.
[19]   Although Nurse Johnson testified she did not remember Officer MacAuley's call, his testimony is consistent throughout his initial reports, his log-book entry, and deposition testimony that he called Nurse Johnson between 2:30 and 3:00 a.m.

together, often liaising regarding inmate needs.[20] Exhibit T: Vestal Depo. 20:11-21:6. UHS and

BCADC employees were deferential to each other regarding the services they performed for

inmates. When the medical team responds to medical codes, officers did not interfere with the

treatment provided, officers were present for security purposes only. Exhibit Q: Colon Depo.

16:7; Exhibit H: Weber Depo. 139:2-7; Exhibit T: Vestal Depo. 21:6-14. Officer MacAuley's

belief that Nurse Johnson was familiar with Mr. Mosley and that Mr. Mosley's abnormal

behavior was explainable because he was detoxing was not unreasonable and certainly did not

demonstrate deliberate indifference.

30.      After the call, Officer MacAuley observed Mr. Mosley sleeping again and shifting around

on his mat—"[t]he rest of the night they were asleep." Exhibit G: MacAuley Depo. 129:24-130:

1-4, 176:12. Even when Officer MacAuley found him non-responsive around 7:00 a.m. his

fellow inmates believed that Mr. Mosley was still sleeping. *Id*. 176:13-16. Neither Mr. Mosley

nor his fellow inmates reported to Officer MacAuley that Mr. Mosley had a medical need or

emergency. Within each cell there is an intercom system, which permits inmates to reach out to

the unit officer as needed. Exhibit G: MacAuley Depo. 16:3-8, 68:13-21, 137:4-8; Exhibit R:

Ward Depo. 68:20-25; Exhibit U: Whiteley Depo. 160:21-24; Exhibit S: Worlds Depo. 33:15-25.

Inmates commonly communicate with the unit officer in the picket, using the intercom on a

frequent basis regarding issues like "grievances, medications, fights." Exhibit G: MacAuley

---

[20]  UHS and Bexar County are separate political entities and medical personnel at BCADC are
employed by UHS. See Texas Health & Safety Code, § 281.057, Texas Administrative Code,
Title 1, Part 15, Chap. 355, Subchapter J, Div. 4, Rule §355.8065(b)(45), *Bexar County Hospital
District v. Crosby*, 160 S.W.2d 116 (Tex. 1959). Although BCACD has certain policies that
require certain medical care procedures to be followed regarding inmates healthcare, such
policies are created with UHS input and violations of the same would only permit UHS
employees to be banned from BCADC property—UHS would institute discipline against their
own employees.  Exhibit T: Vestal Depo. 137:13-138:7; Exhibit S: Worlds Depo. 55:8-56:4.

Depo. 68:13-21. Despite their ability to do so, no one reached out to Officer MacAuley to express concerns regarding Mr. Mosley.  *Id*. 137:4-6, 176:13-16.

31.    On his own accord, after witnessing Mr. Mosley's strange behavior, Officer MacAuley spoke to Mr. Mosley's fellow inmates who shared that "he's been acting like this for days" and "he's just faking it." Exhibit G: MacAuley Depo. 109:16-22. One inmate said "something about 911" but when Officer MacAuley questioned what the statement meant, the inmate was unclear about when 911 had been mentioned and what the comment indicated. *Id*. 109:16-22, 151:18-24, 152:3-21. Although plaintiffs allege Mr. Mosley told his cellmates to call 911 around 6:15 a.m., there is no evidence demonstrating Officer MacAuley had knowledge of such request.[21] *Id*. 150:25. Even plaintiffs' expert testified she did not see any indication in the record that Officer MacAuley had any awareness that Mr. Mosley may have had a medical need. Exhibit P: Innerarity Depo. 176:1-7, 176:23-177:2.

32.    Officer MacAuley's knowledge was limited to what he observed—strange behavior he believed to be consistent with detox.[22] Officer MacAuley did not observe Mr. Mosley talking to himself, asking to be let out of the cell, or stating that his brother was in the day room area outside the cell. Exhibit G: MacAuley Depo. 82:24-83:1. Officer MacAuley never heard any sounds like an inmate hitting the floor and never heard any cries of pain. *Id*. 139: 18-25. Even when exhibiting odd behavior—which Officer MacAuley attributed to detoxing—Mr. Mosley did not appear to be in pain. *Id*. 109:3-8. Most importantly, Mr. Mosley did not complain to Officer MacAuley about hip or leg pain, Officer MacAuley did not observe Mr. Mosley experiencing pain, and no one brought a medical need to Officer MacAuley's attention. *Id.*

---

[21]  Inmates "don't usually have access to a clock" so "they're guessing what time it is." Exhibit R: Ward Depo. 58:4-12

[22]  Dr. Whiteley testified that disorientation is not equivalent to hallucination. Exhibit U: Whiteley Depo. 112:4-8, 112:15-16, 132:22-25.

84:22-24. Officer MacAuley's observations did not demonstrate the possibility that a life-threatening seizure might occur and cause an acetabular fracture that would severe multiple iliac arteries.

33.    Officer MacAuley's actions were reasonable in light of his knowledge at the time because he lacked any subjective knowledge that there could have been a serious risk of harm. The deliberate indifferent standard is "an extremely high standard to meet." *Hunt*, 730 Fed. Appx. at 212 (additional citation omitted). Deliberate indifference may manifest where officers knew the medical staff was joking about an inmates' continued erection due to a drug reaction and treating the medical condition like a "juvenile joke" or where an officer ignored an inmate's plea for help, refused to get medical treatment for the inmate, and told the inmate to "man-up" after the inmate was brutally attacked. *Randle*, 2017 U.S. Dist. LEIXS 31010, 2017 WL 892493; *Alderson,* 848 F.3d 415. With a detoxing inmate, deliberate indifference was found where the inmate was experiencing delirium tremens but officers failed to provide proper food and refused to seek medical care for the inmate because of the high cost associated with the care.  *Borum v. Swisher County*, No. 2:14-CV-127-J, 2015 U.S. LEXIS 8628, 2015 WL 327508 (N.D.Tex. Jan. 26, 2015). Deliberate indifference has also been found where an officer ignored the inmate emergency call button or a fellow inmate's plea for help and where officers forced an inmate to do manual labor without checking the inmate's medical restrictions, and intentionally delayed medical care for a back injury. *O'Neil v. Tex. Dep't of Crim. Justice*, 804 F.Supp. 2d 532, 532 (N.D. Tex. Apr. 7, 2011); *Reeves v. Collins*, 27 F. 3d 174 (5th Cir. 1994).

34.    In comparison, where an inmate's symptoms were "clearly indicative of intoxication and he neither requested medical care nor indicated in his answers to questions regarding his medical state that he needed such care, it was entirely reasonable for jail personnel to believe Plaintiff

was under the influence of alcohol and/or drugs" such that they did not suspect he had suffered from a stroke—plaintiff "adduced no evidence tending to show that the consequences he claims. . . . namely the denial of medical care to a stroke victim, were known or obvious." *Hines v. Henson*, No. 9:06Cv269, 2007 U.S.Dist. LEXIS 68528, 2007 WL 2726072 (E.D.Tex. Sept. 14, 2007) (*aff'd* 293 Fed. Appx. 261 (5th Cir. 2008).

35.     Here, none of these deliberate indifference examples match the circumstances at issue. Officer MacAuley had no reason to suspect Nurse Johnson was not taking Mr. Mosley's condition seriously or to believe that Mr. Mosley's abnormal behavior was anything other than a side effect of detox. There is no evidence Officer MacAuley doubted the knowledge gained from Nurse Johnson—Mr. Mosley had been given the appropriate medication and he might act in a bizarre manner throughout the night because he was detoxing. In addition, Officer MacAuley did not ignore any complaints from Mr. Mosley or his fellow inmates. Officer MacAuley noted abnormal behavior in the detox unit, never suspecting or becoming aware that a serious medical issue had occurred or could occur.

### 2.     Obvious medical need

36.     Similarly, there is no evidence that Mr. Mosley had a serious medical need such that even a layman would recognize that care was required. *Gobert*, 463 F.3d at 345. It is common knowledge that inmates experiencing detox are often vomiting, have diarrhea, sleep extensively, are dizzy, complain of joint pain, have headaches, and demonstrate unusual behavior. Exhibit I: Jenkins Depo. 47:12-14; Exhibit F: Ponton Depo. 21:8-15; Exhibit T: Vestal Depo. 63:16-25. Cpl. Jenkins testified detox inmates appear sick, are lethargic/low energy, and are normally in pain. Exhibit I: Jenkins Depo. 60:14-24, 61:20-24. Nurse Weber described detox patients as "out

of it" and it was common for a detox patient to have an altered mental state.  Exhibit H: Weber Depo. 88:23-24, 162:11-14.[23]

37.     Mr. Mosley's appearance and behavior was consistent with common knowledge about detoxing inmates. Nurse Weber described Mr. Mosley as a "frail old man," "disheveled," and "not well-kept." Exhibit H: Weber Depo. 86:15-20, 105:18-22, 120:12-21. While it is true that Officer MacAuley did not see Mr. Mosley standing and walking in the cell—only observing Mr. Mosley crawling around the floor bothering other inmates—it is important to note that Officer MacAuley was in the unit at night, during the third shift from 11:00 p.m. until 7:00 a.m. Exhibit G: MacAuley Depo. 85:16-19. When Officer MacAuley did not see Mr. Mosley come from his cell for breakfast, he was not surprised since inmates often skipped the meal to continue sleeping—"[a]t the time I figured he didn't want to eat. There were other inmates that chose not to eat that night." *Id.* at 50:18-23, 113:5-7.   Mr. Mosley's appearance, not eating breakfast, abnormal behavior, and sleeping position on the floor were insufficient facts to create Officer MacAuley's awareness that Mr. Mosley may have had a serious medical issue or need.   A reasonable unit officer would not have suspected that Mr. Mosley could have had a seizure or even more unlikely, already had an acetabular fracture. Officer MacAuley felt the medical staff was aware of Mr. Mosley's medical needs and those needs had been met—he was "reassured" that "everything was fine and [Mr. Mosley] was where he needed to be [cleared to return to the Detox unit]." Exhibit C: bates stamp BCSO002559.

---

[23]   Sleeping on the cell floor would not be a factor indicating an injury or illness within the detention center. Inmates commonly move their bed mats to the floor either to avoid sleeping on the top bunk or because the temperature on the floor is cooler. Exhibit F: Ponton Depo. 30:8-25; Exhibit M: Brown Depo. 35:6-13.

### 3.      Qualified Immunity

38.      Even if a constitutional violation occurred when Officer MacAuley did not seek medical attention for Mr. Mosley for an unknown risk of seizure, qualified immunity demands dismissal of Plaintiff's claims. Qualified immunity shields certain public officials during the performance of discretionary functions from civil liability and protects "all but the plainly incompetent or those who knowingly violate the law." *Pasco v. Knoblauch*, 566 F.3d 572, 581 (5th Cir. 2009) (quoting *Malley v. Briggs*, 475 U.S. 335, 341, 106 S.Ct. 1092, 1096 (1986)).   "A qualified immunity defense alters the typical summary judgment burden of proof in that once the defense is pleaded by an official, the burden shifts to the plaintiff to rebut the defense by establishing a genuine fact issue as to whether the official's allegedly wrongful conduct violated clearly established federal law." *Hunt*, 730 Fed. Appx. at 215 (citing *Brown v. Callahan*, 623 F.3d 249, 253 (5th Cir. 2010)).

39.      "Determination of qualified immunity claims require a court to examine: whether the facts a plaintiff alleges or has shown make out a constitutional violation; and whether the constitutional right allegedly violated was 'clearly established' at the time the events in question occurred." *McBride v. Comal Cty.*, No. SA-17-CA-120-XR, 2017 U.S.Dist. LEXIS 100652, at *8 (W.D.Tex. June 29, 2017) (citing *Pearson v. Callahan*, 555 U.S. 223, 231, 129 S.Ct. 808, 172 L.Ed. 565 (2009)). "Where a plaintiff fails to show the violation of a constitutional right or the right was 'clearly established' at the time, the public official is protected by qualified immunity." *Id.*

40.      "To be clearly established, a right must be sufficiently clear that every reasonable official would have understood what he is doing violates that right." *Randle,* 2017 U.S. Dist. LEXIS 31010, *9 (quoting *Taylor v. Barkes*, 135 S.Ct. 2042, 2044, 192 L. Ed. 2d 78 (2015) (additional

citation omitted). "While there is no requirement that caselaw directly on point exist, 'existing precedent must have placed the statutory or constitutional question beyond debate.'" *Id.* (additional citation omitted). "Examples of behavior that does (and does not) constitute deliberate indifference are relevant in assessing the scope of clearly established law and, therefore, are relevant in determining whether the defendants' actions were objectively reasonable"—"it is the plaintiff's burden to demonstrate that all reasonable officials similarly situated would have known that the alleged acts of the defendants violated the United States Constitution." *Thompson v. Upshur County*, 245 F.3d 447, (5th Cir. 2001) (citing *Hare v. City of Corinth,* 135 F.3d 320, 327-28 (5th Cir. 1998); *Pierce v. Smith*, 117 F.3d 866, 872 (5th Cir. 1997)).

41.     Here, qualified immunity turns on whether plaintiffs can demonstrate a constitutional violation and whether the constitutional right allegedly violated was clearly established as of July 26, 2015.  First, plaintiffs cannot demonstrate that Mr. Mosley's cause of death was not the result of an unpreventable seizure, caused by Mr. Mosley's alcoholism and previous medical conditions.  Even if a seizure did not cause Mr. Mosley's acetabular fracture, which caused internal bleeding, and Mr. Mosley sustained the fracture from a fall during the early afternoon hours on July 25, 2015, Officer MacAuley had no knowledge that Mr. Mosley had a serious medical issue. As a result, a reasonable officer in Officer MacAuley's position would not have known medical care was needed such that he violated Mr. Mosley's constitutional rights by failing to provide it.

42.     As discussed, Mr. Mosley's appearance and behavior was consistent with detoxing inmates. Officer MacAuley followed normal protocol when he was faced with an unknown situation and called the medical staff for advice. Officer MacAuley could not report to medical

that Mr. Mosley was complaining of pain or call a Code 1, because he was never aware of Mr. Mosley being in pain and the need for a Code 1 was not apparent. Any knowledge that Mr. Mosley's fellow inmates had cannot be imputed to Officer MacAuley without some evidence showing that Officer MacAuley was made aware of their knowledge. Plaintiffs are unable to provide any evidence that Officer MacAuley had the knowledge sufficient to demonstrate deliberate indifference.

43.     After Mr. Mosley's death, Officer MacAuley was the subject of an Internal Affairs investigation. The investigator, Officer Baeza, found Officer MacAuley's statements to be credible and found no evidence of wrongdoing by Officer MacAuley. Exhibit V: Baeza Depo. 46:21-47:11, 52:11-23. Plaintiffs lack evidence that Officer MacAuley violated any BCADC policy and their expert has admitted that she had no familiarity with officer training in adult detention centers, had never been to the BCADC, had no detention facility unit experience, did not review BCADC policies, and was unfamiliar with officers' responsibilities. Exhibit P: Innerarity Depo. 163:9-165:11, 167:15-21, 171:7-10. Plaintiffs' expert stated, "You know, like I said, I haven't read their stuff. I know not what their requirements are. So while I'm critical of common sense kinds of things, I don't have anything to refer back to." Exhibit P: Innerarity Depo 171:7-10.

44.     With regard to whether Mr. Mosley's right to medical care in these circumstances was clearly established at the time of his death, case law does not support a similar circumstance in which deliberate indifferent was found. A reasonable officer would not have understood that by not calling another Code 1, Officer MacAuley was violating Mr. Mosley's constitutional rights. Existing precedent did not establish that an officer faced with abnormal behavior from a detoxing inmate must know that the inmate could have a seizure or fracture when other indicators of

*delirium tremens* are not present. Precedent set a few months prior to this incident demonstrates that deliberate indifference could be found where a detoxing inmate was experiencing *delirium tremens* and officers were aware of the inmates' condition but failed to provide proper food or subsistence to the inmate and refused to seek medical care for the inmate because of the high cost associated with the care. *Borum*, 2015 U.S. LEXIS 8628, 2015 WL 327508. The circumstances of this case are vastly different and Officer MacAuley saw no indication that Mr. Mosley could be facing a life-threatening seizure. As a result, this Court cannot conclude that all reasonable unit officers situated similarly to Officer MacAuley would realize that the United States Constitution required him to seek medical care for an undiagnosed and unknown medical condition.

**2.       Bexar County: American with Disabilities Act & Rehabilitation Act**

45.     The Americans with Disabilities Act ("ADA") and Rehabilitation Act ("RA") both prohibit discrimination against disabled persons—jurisprudence interpreting either section is applicable to both the RA and the ADA. *Kemp v. Holder*, 610 F.3d 231, 234 (5th Cir. 2010) (ADA and RA govern different entities: "ADA applies only to public entities, including private employers…whereas the RA prohibits discrimination in federally-funded programs and activities"). Establishing a *prima facie* case of disability-based discrimination requires plaintiffs to prove: (1) the decedent had a qualifying disability; (2) the decedent was denied the benefits of services, programs, or activities for which Bexar County is responsible, or was otherwise discriminated against by Bexar County; and (3) the decedent was discriminated against by reason of his disability. *Melton v. Dallas Area Rapid Transit*, 391 F.3d 669, 671-672 (5th Cir. 2004) (discussing *prima facie* elements for a discrimination claim under the ADA).

46.     A disability is "a physical or mental impairment that substantially limits one or more of the major life activities" of an individual. 29 C.F.R. 1630.2 (g)(1)(i). A substantial impairment is "one that limits an individual's ability to perform a major life activity as compared to most people in the general population." 29 C.F.R. 1630.2 (j)(1)(ii). Major life activities are those activities that are of central importance to daily life including things like "caring for oneself, performing manual tasks, seeing, hearing, eating, sleeping, *etc.*" *Hale v. King*, 642 F.3d 492, 500 (5th Cir. 2011); *see also* 29 C.F.R. 1630.2 (i)(i). In determining if a person is substantially limited in a major life activity the EEOC has advised the Court to consider "(i) the nature and severity of the impairment, (ii) the duration or expected duration of the impairment; and (iii) the permanent or long term impact, or the expected permanent or long term impact of or resulting from the impairment." *Hale*, 642 F. 3d at 500. "[S]ubstance addiction is not a per se disability under the ADA…courts must employ an individual assessment to determine whether the claimant's addiction substantially limited one of his major life activities compared to most people in the general population." *Garza v. City of Donna*, No. 7:16-CV-00558, 2017 U.S. Dist. LEXIS 103118 at *15, 2017 WL 2861456 (S.D. Tex. July 5, 2017).

47.     Defendants are "not required to 'guess' [plaintiff's] need for reasonable accommodation." *O'Neil*, 804 F.Supp. at 538. However, a plaintiff "need not have expressly requested a certain accommodation where Defendants had actual knowledge of his disability and limitations but took no action." *Id.* 46. Here, Mr. Mosley died as a result of a seizure the morning of July 26, 2015, which caused an acetabular hip fracture that "sheared his [blood] vessels" and "nothing would have saved him." Exhibit O: Holmes Depo. 26:3-5. Thus, Mr. Mosley's medical need arose shortly before he was found unresponsive and when Officer MacAuley became aware of Mr. Mosley's serious medical condition he called a Code 1 Blue, initiating immediate medical

attention. Exhibit C: bates stamp BCSO00836. The moment Officer MacAuley knew Mr. Mosley needed assistance he reacted to the exigent circumstances.

48.     Even if Mr. Mosley's cause of death was a hip fracture with a slow bleed caused by a fall during the early afternoon of July 25, 2015, BCADC staff provided Mr. Mosley medical care when they were aware such care was needed. Officer Ponton sought medical care for Mr. Mosley when he was aware Mr. Mosley had leg and hip pain. Exhibit F: Ponton Depo. 29:15-17, Exhibit C: bates stamp BCSO000834. When Mr. Mosley returned to the detox unit neither Officer MacAuley nor any other BCADC staff was aware that Mr. Mosley was unable to walk, stand, or clearly communicate his needs. Officer Ponton and Cpl. Jenkins both testified that Mr. Mosley was ambulatory when he returned to the detox unit. Exhibit I: Jenkins Depo. 84:18-19 ("He was walking very slowly. He was walking like he was in pain, but he was walking."); Exhibit F: Ponton Depo. 76:3, 77:24, 78:6. Cpl. Jenkins further testified "He looked like he was a man in pain, detoxing," "he looked like other inmates when they are detoxing," his "voice was low," and "he spoke softly." Exhibit I: Jenkins Depo. 60:11-17, 63:13-15.

49.     With regard to Officer MacAuley, the evidence further demonstrates that he observed initially Mr. Mosley sleeping, he had limited interaction with Mr. Mosley who followed and acknowledged his orders, and then saw Mr. Mosley sleeping the rest of the night. Exhibit C: bates stamp BCSO000836; Exhibit G: MacAuley Depo. 98:9-12, 101:20-25, 102:23-24, 103:16-25, 130:1-4, 176:10-12. From his observations, Officer MacAuley had no knowledge of a medical need and, therefore, had no reason to seek additional medical care for Mr. Mosley.

50.     Because Officer MacAuley did not consciously ignore his training or any expression or obvious displays of pain, or violate BCADC policies, Bexar County did not violate the ADA or RA. BCADC accommodated Mr. Mosley's alcoholism by placing him in a detox unit in

accordance with P.A. Forsberg's instruction. Mr. Mosley received medical care during the time he was in the BCADC for his alcoholism. In fact, Mr. Mosley was seen by the medical staff during the shift before Officer MacAuley came on duty. Throughout Officer MacAuley's shift, there were no indicators that Mr. Mosley would suffer from a seizure. Even if his injury occurred earlier, as plaintiffs allege, a need for additional accommodation for Mr. Mosley's disability and limitations was not obvious to Officer MacAuley. Abnormal behavior in the detox unit, without additional signs of *delirium tremens* (tremors, active hallucinations, *etc*.), does not indicate an obvious need for medical attention. Accordingly, there is no evidence that BCADC staff failed to respond to a known medical issue in violation of the ADA and RA.

## VI. CONCLUSION

In sum, plaintiffs' claims must be dismissed as a matter of law because no evidence shows a violation of Mr. Mosley's constitutional rights, no evidence shows Officer MacAuley manifested deliberate indifference to any serious medical need, and no evidence supports a finding that the ADA or RA was violated. Accordingly, for the reasons discussed, defendants' motion should be granted.

WHEREFORE, PREMISES CONSIDERED, defendants pray that the Court dismiss plaintiffs' claims and all other relief to which movants are entitled at law and in equity.

Respectfully submitted,


JOE D. GONZALES
Bexar County Criminal District Attorney

By: /s/ Kristin K. Bloodworth
KRISTIN K. BLOODWORTH
SBN: 24095848
Assistant District Attorneys
101 W. Nueva – Civil Division
San Antonio, Texas 78205

(210) 335-2139 – Telephone
(210) 335-2773 – Fax
kristin.bloodworth@bexar.org
Attorney for Bexar County and
Sean MacAuley

## CERTIFICATE OF SERVICE

I hereby certify that on the 17th day of July 2019, I electronically filed the foregoing document with the Clerk of Court using the CM/ECF system.  All parties were served via e-service unless otherwise noted below:

Brian McGiverin
1411 West Ave, Ste. 104
Austin, Texas  78701
brian@lawcenterofaustin.com
Phone: 512-3596-0226
Attorney for Plaintiffs
VIA E-FILING SERVICE

Ranjana Natarajan
University of Texas: School of Law
727 East Dean Keeton Street
Austin, Texas 78705
Phone: 512-232-7222
rnatarajan@law.utexas.edu
Attorney for Plaintiffs
VIA E-FILING SERVICE

Laura A. Cavaretta, Adriaan Jansse
Cavaretta, Katona & Leighner PLLC
One Riverwalk Place
700 N. St. Mary's Street, Suite 1500
San Antonio, Texas 78205
cavarettal@ckl-lawyers.com
Phone: 210-588-2901
Attorneys for Defendant Henrietta Johnson
VIA E-FILING SERVICE

/s/ Kristin K. Bloodworth
KRISTIN K. BLOODWORTH