UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION

| | | |
|---|---|---|
| ROBERT MOSLEY, JR., VINCENT MOSLEY, AND FELICIA MOSLEY, | § § § | |
| Plaintiffs, | § | |
| v. | § | Cause No. 5:17-cv-583 |
| | § | |
| BEXAR COUNTY, HENRIETTA JOHNSON, JOHN BENNETT AND SEAN MACAULEY #2899, | § § § | |
| | § | |
| Defendants. | § § | |

**PLAINTIFFS' RESPONSE AND OPPOSITION
TO DEFENDANT JOHNSON'S MOTION FOR SUMMARY JUDGMENT**

**Table of Contents**

**I. SUMMARY OF PLAINTIFFS' RESPONSE** ........................................................................ 3

**II. SUMMARY JUDGMENT EVIDENCE** ............................................................................. 4

   A.   Upon His Booking into the Jail, Defendants Were Aware of Mr. Mosley's Medical Conditions, Including Hypertension, Liver Disease, and Alcohol Use .......................................................... 4

   B.   Jail Medical Staff Determined that Mr. Mosley Was Experiencing Alcohol Withdrawal, But They Did Not Monitor Him in the Medical Unit or Send Him to a Hospital Despite His Hallucinations, In Violation of UHS Policy ........................................................................................................ 5

   C.   Mr. Mosley Missed a Dose of Alcohol Withdrawal Medication and then Suffered an Injury While in the Detox Cell ................................................................................................................. 7

   D.   Mr. Mosley Was Taken by Wheelchair to the Jail Medical Unit for Assessment of and Treatment for His Injury ................................................................................................................... 7

   E.   Defendants Johnson and Bennett Knew that Mr. Mosley Had Signs of a Possible Hip Fracture But Failed to Perform the Necessary Tests, Request an X-Ray, or Call the On-Call Provider ...................... 9

   F.   Defendants Johnson and Bennett Discharged Mr. Mosley to His Cell, Rather than Continuing to Monitor Him, Even Though He Could Not Walk Unassisted .............................................................. 10

   G.   Defendant Macauley Knew Mr. Mosley Was Asking for Medical Help, But He Failed to Call a Code 1 for Medical Treatment ..................................................................................................... 11

**III. ARGUMENTS AND AUTHORITIES** ............................................................................ 13

   A.   Standard of Review on Summary Judgment ................................................................... 13

   B.   Plaintiffs' Claims of Constitutional Violations Brought Pursuant to 42 U.S.C. 1983 .................... 13

   C.   Standard for Deliberate Indifference to Serious Medical Needs ........................................... 14

D.    Defendant Henry Etta Johnson Showed Deliberate Indifference to Mr. Mosley's Serious Medical Needs ...................................................................................................................................... 15

1.    Mr. Mosley had a Serious Medical Need: A Possible Hip Fracture ............................................ 15

2.    Johnson Knew That Mr. Mosley Had Signs of A Hip Fracture ................................................... 17

3.    Johnson Knew Additional Relevant Facts about Mr. Mosley's Medical Condition, Including His Medication and High Blood Pressure .......................................................................................... 19

4.    Defendant Johnson Exposed Mr. Mosley to a Substantial Risk of Serious Harm by Failing to Perform The Basic Physical Tests to Diagnose a Hip Fracture. ........................................................ 21

a.    As a trained LVN, Defendant Johnson Knew or Should have Known The Basic Necessary Tests to Diagnose a Hip Fracture. .......................................................................... 22

b.    Defendant Johnson Failed to Conduct the Basic Necessary Tests .................................... 23

5.    Defendant Johnson Exposed Mr. Mosley to a Substantial Risk of Serious Harm by Failing to Request an X-Ray or Call a Provider. .............................................................................................. 25

a.    As a Trained LVN, Defendant Johnson Knew that an X-Ray Was Required to Accurately Diagnose a Hip Fracture for Mr. Mosley. .............................................................................. 25

b.    Despite this Knowledge, Johnson Failed to Request an X-ray or Call the On-Call Provider. .................................................................................................................................. 26

6.    Defendant Johnson Exposed Mr. Mosley to a Substantial Risk of Serious Harm by Discharging Him Back to His Cell When He Could Not Walk Unassisted. .......................................................... 27

a. Johnson Knew that Mr. Mosley Needed Additional Monitoring and Follow-up, not Discharge, Because He Still Could Not Walk By Himself ...................................................... 28

b.Despite this Knowledge, Johnson Discharged Him to his Detox Cell .............................. 29

7.    Defendant Johnson's Failures Individually and Taken Together Amounted to Deliberate Indifference to Mr. Mosley's Serious Medical Needs. ................................................................... 30

8.    If Officer MacAuley Called Defendant Johnson around 2:30AM and Defendant Johnson Ignored Mr. Mosley's Complaints, This Amounted to Deliberate Indifference. ............................. 31

E.    The Court Should Reject Defendant Johnson's Other Arguments .................................................. 32

**CONCLUSION** ...................................................................................................................................... 33

## Table of Authorities

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986). ....................................................................... 14

*Celotex. Corp. v. Catrett*, 477 U.S. 317, 322 (1986) .......................................................................... 14

*Domino* v. Texas Dep't of Criminal Justice, 239 F.3d 752 (5th Cir. 2001) ............................................ 16

*Easter v. Powell*, 467 F.3d 459, 465 (5th Cir. 2006) .......................................................................... 32

*EEOC v. LHC Group, Inc.*, 773 F.3d 688 (5th Cir. 2014) .................................................................. 15

*Farmer v. Brennan*, 511 U.S. 825, 832 (1994) .............................................................................. 15, 16

*Gibbs v. Grimmette*, 254 F.3d 545 (5th Cir. 2001) ............................................................................ 16

*Gobert v. Caldwell*, 463 F.3d 339 (5th Cir. 2006) ............................................................................ 16

*Goodman v. Harris Cnty.*, 571 F.3d 388 (5th Cir.2009) ..................................................................... 15

*Hare v. City of Corinth*, 74 F.3d 633 (5th Cir. 1996) .................................................................... 15, 32

*Harris v. Hegmann*, 198 F.3d 153, 159 (5th Cir. 1999)..............................................................16

*Int'l Shortstop, Inc. v. Rally's Inc.*, 939 F.2d 1257 (5th Cir. 1991) ...........................................15

*Lawson v. Dallas County*, 286 F.3d 257 (5th Cir. 2002) ............................................................16

*Rogers v. Bromac Title Serv's, L.L.C.*, 755 F.3d 347 (5th Cir. 2014) ........................................14

*Tolan v. Cotton*, 572 U.S. 650 (2014)............................................................................. 14, 15, 30

*Whitley v. Hanna*, 726 F.3d 631, 638 (5th Cir.2013)..................................................................15

*Wilson v. Seiter*, 501 U.S. 294 (1991).......................................................................................15

TO THE HONORABLE XAVIER RODRIGUEZ, U.S. DISTRICT JUDGE:

Plaintiffs Felicia Mosley, Vincent Mosley, and Robert Mosley Jr. hereby submit this response and opposition to Defendant Johnson's Motion for Summary Judgment (Doc. 131), and would respectfully show the Court as follows:

## I.    SUMMARY OF PLAINTIFFS' RESPONSE

On July 26, 2015, Robert Mosley Sr. died suddenly on the fourth day of his pretrial confinement at Bexar County Jail. He had surrendered himself to resolve an old warrant from 2003. On his third day in jail, he began experiencing symptoms of alcohol withdrawal including hallucinations. Then, after being placed in a detox cell, he fell or was pushed and sustained a serious injury, which he reported as a possible hip fracture. Two jail nurses assessed him and sent him back to his cell, even though he could not walk unassisted. During the night, he cried out for help, dragged himself army-crawling across the cell floor, and asked for someone to call 911. The unit officer ignored his pleas for help, and he found Mr. Mosley unconscious the next morning. Efforts to revive him were unsuccessful, and he died that same day. The medical examiner's autopsy report later concluded that he had sustained an acetabular (hip socket) fracture and experienced associated internal hemorrhaging. The blood loss was so extensive that it caused multiple organ failure and death.

Plaintiffs are his three sole surviving adult children. They bring claims that Mr. Mosley's constitutional Due Process rights were violated by deliberate indifference to his serious medical needs. Specifically, Plaintiffs are suing two jail nurses, Defendants Henry Etta Johnson and John

Bennett, for declining to properly assess and treat Mr. Mosley the night before he died. Johnson and Bennett knew that Mr. Mosley had signs of a hip fracture, that he had reported a potential hip fracture, and that he could not walk unassisted. They knew that hip fractures can be very serious and can lead to death if left untreated or if treatment is delayed. Nevertheless, they returned him to his jail cell after refusing to run the most basic physical tests to diagnose a fracture, or requesting an x-ray, which every nurse knows is essential for diagnosing fractures.

Plaintiffs are also suing Sean Macauley, the jail detention officer in Mr. Mosley's pod, for failing to respond to his repeated calls for help in the overnight hours before he fell unconscious. Officer Macauley was responsible for Mr. Mosley's safety, and he knew that he had suffered a fall, was unable to walk, and was experiencing alcohol withdrawal. Any reasonable officer under those circumstances would have obtained medical attention for Mr. Mosley, but Defendant MacAuley did not, and a result, he died. Finally, Plaintiffs are also suing Bexar County, the jail operator, for its employees' violations of the Americans with Disabilities Act (ADA).

As set forth herein, Plaintiffs have adduced evidence to establish each element of their constitutional and ADA claims. When the Court construes all facts and inferences in the light most favorable to the nonmoving party, as it must, it should conclude that there are genuine issues of material fact that preclude summary judgment on all of Plaintiffs' claims.

## II.     SUMMARY JUDGMENT EVIDENCE

Plaintiffs rely on the following evidence and evidence cited in support of their arguments:

### A.  Upon His Booking into the Jail, Defendants Were Aware of Mr. Mosley's Medical Conditions, Including Hypertension, Liver Disease, and Alcohol Use

Robert Mosley Sr. was a 54-year old African American man who traveled from his home in Arizona to San Antonio to resolve an old warrant from 2003. On July 22, 2015, he voluntarily surrendered himself to Bexar County Sheriff's Office officials, who booked him into the Bexar

County Adult Detention Center (BCADC, or Bexar County jail). Ex. 1 BCSO 00953-955. The Bexar County Sheriff's Office, a department of Bexar County, operates the jail.

That same evening, Mr. Mosley's jail medical screening during booking noted that he had hypertension, borderline diabetes, "unknown liver disease," and that he took medication twice daily, but did not recall its name. Ex. 2 UHS 0012-0015. He also "state[d] he drinks 2-3 12oz beers after work, [and his] last drink yesterday [was] of three 12oz beers." Ex. 2 UHS 0013. He was referred to the jail's Chronic Care Clinic in 1-2 days. Ex. 2 UHS 0014. He was assigned to a two-man cell. He was not assigned to a detox cell or prescribed alcohol withdrawal medication. Ex. 2 UHS 0015.

**B. Jail Medical Staff Determined that Mr. Mosley Was Experiencing Alcohol Withdrawal, But They Did Not Monitor Him in the Medical Unit or Send Him to a Hospital Despite His Hallucinations, In Violation of UHS Policy**

Just before midnight on the morning of July 25, 2015, Mr. Mosley's cellmate reported to jail staff that Mr. Mosley was experiencing hallucinations and "stomping out bugs that are not really there." Ex. 2 UHS 0015. A jail officer observed that he was "hallucinating and confused," "unware of what he's doing, seeing things that isn't there and short memory," and requested a psychological evaluation. Ex. 3 BCSO 000003. Mr. Mosley was sent to the jail medical unit (known also as MT01) for physical and mental assessment. Ex. 2 UHS 0015. The Bexar County Hospital District, d/b/a University Health Services (UHS), is the medical provider at Bexar County Jail. Jail medical unit staff, including nurses, are UHS employees.

At around 1:00 a.m., Peter Forsberg, a physician assistant working in the jail medical unit, assessed Mr. Mosley. Ex. 8 UHS 0016-18. Mr. Mosley told him that "he's looking for a particular officer who said he would be released from jail if he would come here from AZ." Ex. 8 UHS 0017. Forsberg performed an assessment of Mr. Mosley's various systems and found nothing

remarkable. *Id*. For his musculoskeletal system assessment, Forsberg wrote that he "denies back pain, joint pain, joint swelling, muscle cramps, muscle weakness, stiffness, arthritis," and his assessment showed "[m]usculoskeletal [system] without any significant abnormalities." *Id*.

Forsberg noted other abnormalities, however. Under "Neurological," he noted that Mr. Mosley was "restless." Ex. 8 UHS 0018. He had "no tremors," but "[s]eems slow to reply to questions." *Id*. In addition, he was "[n]ot answering with a clear reply" and exhibited "[t]angential thoughts." *Id*. He noted: "No[t] certain, but it is suspected that this I/M [inmate] may drink a bit more than he lets on." *Id*. Based on these findings, Forsberg concluded that Mr. Mosley showed "Possible Mental Status changes. Possible heavy alcohol drinker." *Id*. Forsberg ordered him moved to a "detox pod" (a pod with cells for inmates underdoing substance withdrawal), and he prescribed Mr. Mosley medication to be taken orally for alcohol withdrawal, including lorazepam (a benzodiazypene), a multivitamin, thiamine, and folic acid. He referred Mr. Mosley to another provider in 1-2 days for "Detox," noting: "Seen in treatment room, notified per unit officer bizarre behavior. States occasional etoh [alcohol] use. Relocated to detox unit and started on Lorazepam 2mg twice a day, Please evaluate." Ex. 8 UHS 0016-18. At the end of his medical visit, a nurse named Manuel Reynosa administered Mr. Mosley the first dose of Lorazepam by mouth.

According to the UHS protocol for alcohol withdrawal, in cases where an inmate is experiencing withdrawal symptoms including hallucinations, UHS staff are required to send the inmate to a local hospital emergency room or monitor the inmate in the jail infirmary. Ex. 4 UHS 227. In Mr. Mosley's case, Forsberg did neither. Later, after Mr. Mosley passed away, the UHS Director of Detention Health Services, Katharine Whiteley, confirmed by email that Forsberg should have sent Mr. Mosley to an emergency room or the infirmary, if he was having hallucinations. Ex. 5 UHS 2137-38. Forsberg was not reprimanded for his handling of Mr. Mosley's case.

### C.  Mr. Mosley Missed a Dose of Alcohol Withdrawal Medication and then Suffered an Injury While in the Detox Cell

After his visit to the medical unit, Mr. Mosley was transferred to an 8-man cell in the CI pod, which is a "detox pod." Ex. 8 UHS 0018. The CI pod is made up of two sides, each of which have a row of cells and a dayroom. Ex. 6 BCSO 000240. One officer, called the unit officer, is stationed in a booth at the entrance to the CI pod, and his job is to oversee the care, control and safety of the pod's inmates. Each cell in the CI pod has a number, and number of inmates inside the cells varies. Each cell has an intercom to communicate with the unit officer.

After coming to the CI pod, Mr. Mosley slept during the morning, missing his next scheduled dose of Lorazepam at approximately 9:00 a.m. Ex. 7 UHS 0009. At that time, a nurse brought a medicine cart to the CI unit. The jail required inmates to exit their cells into the dayroom to be given their medicine by the nurse, but Mr. Mosley was sleeping.

At approximately 3:00 pm that afternoon, Mr. Mosley apparently suffered an injury, resulting from either a fall or being pushed by someone. Compare Ex. 9 UHS 0019 (States, "Fell and could have fractured my hip") with Ex. 10 UHS 0021 ("was informed by Sgt that inmate was pushed"). No video footage exists of this fall.[1] After he sustained this injury, Mr. Mosley was lying on the floor and could not move his leg or get up for hours. Ex. 11 BCSO 000834. He sought medical help. At approximately 6:00 pm, Kevin Ponton, the unit officer on shift in the CI unit, called a Code 1 for Mr. Mosley. *Id.*; Ex. 9 UHS 0019. A Code 1 is the only method for a unit officer to obtain immediate, non-emergent medical attention for an inmate. Ex. 12 BCSO 000241.

### D.  Mr. Mosley Was Taken by Wheelchair to the Jail Medical Unit for Assessment of and Treatment for His Injury

---

[1] BCSO represented that it does not have any video footage of any of the incidents relating to this lawsuit.

At approximately 6:26 p.m., a nurse from the jail medical unit, Amber Weber, RN, arrived at the CI unit in response to the Code 1, with medical assistant Michael Smith. Ex. 11 BCSO000834; Ex. 9 UHS 0019-0021. When she arrived, Mr. Mosley was still on the floor of his cell, and he told her that he was unable to get up. Ex. 9 UHS 0019-21. Weber talked to Mr. Mosley. Although he knew his name, he did not know where he was, and he thought he was at home. *Id.* He thought that she was someone else, and he called her by that person's name. Ex. 33 Weber Dep. 86:16-87:4. Half of the things he said did not make sense to her. Ex. 33 Weber Dep. 89:2-12. He told her that he had fallen, and that he was unable to get up. Ex. 9 UHS 0019-21. He told her that his hip and knee hurt, and that he thought he could have fractured his hip. *Id.* ("Pain to right hip and knee;" circling area from hip to knee on diagram of human body). She documented his swelling and his report of his injury and pain: "Swelling +1 and pain 10 out of 10 to right knee. States, 'Fell and could have fractured my hip.'" Ex. 9 UHS 0019.

Weber tried to bargain with Mr. Mosley to get up, but he could not. Ex. 33 Weber Dep. 87:2-16. She and Smith lifted Mr. Mosley off the floor and into a wheelchair, and they took him to the jail medical unit. Ex. 11 BCSO000834. The CI unit is on the fourth floor; the medical unit is on the first floor. They took the elevator, and Mr. Mosley rode in the wheelchair.

In the medical unit, Mr. Mosley's vital signs were taken, and Weber noted that they were not within normal limits. Ex. 9 UHS 0020. Weber noted swelling and warmth on his right knee, for which he was given an ice compress. *Id.* She gave him a dose of Lorazepam, his alcohol withdrawal medication, since he had missed his morning dose. *Id.* He was placed on a gurney to rest. Weber's shift had ended at 7:00 pm, so she documented the Code 1 and left Mr. Mosley in the care of LVN Henry Etta Johnson and RN John Bennett, the nurses on the next shift. She talked to Johnson about Mr. Mosley and his condition before leaving. Ex. 33 Weber Dep. 100:8-102:17.

### E. Defendants Johnson and Bennett Knew that Mr. Mosley Had Signs of a Possible Hip Fracture But Failed to Perform the Necessary Tests, Request an X-Ray, or Call the On-Call Provider

Defendant Henry Etta Johnson, a Licensed Vocational Nurse employed by UHS and working in the jail medical unit, took over Mr. Mosley's care. Ex. 10 UHS 0021-0022. She was responsible for making an assessment of Mr. Mosley based on his complaints. *Id*. An ordinary nursing assessment includes talking with the patient, viewing the site of the injury, touching the site of the injury, and other physical exams. Ex. 27 Bennett Dep. 29:15-32:2. As an experienced LVN nurse, Johnson knew how to assess a patient complaining of hip and knee pain and reporting a possible hip fracture, and would consult his medical record. *Id*. 55:5-17; 47:4-25.

Defendant Johnson knew that Mr. Mosley was complaining of right leg pain and that he had fallen while in the jail. Ex. 10 UHS 0021-22. She wrote a lengthy medical record describing her assessment. *Id*. In that record, she stated that he was "detoxing" (experiencing alcohol withdrawal), and that he drank "several cans of beer daily." *Id*. She was informed by a Sergeant that Mr. Mosley had been pushed by another inmate, and he was lying on the cell floor, complaining of right leg pain, and that "he could not put weight" on his right leg. *Id*. She also noted that his right leg had swelling, but no redness or bruising. *Id*. She noted that he had "pedal pulse," his right leg was cool and dry to the touch, and that Mr. Mosley was able to move the leg. *Id*. She stated that she referred the case to her supervisor (John Bennett) and that they monitored him in the medical unit (MT01). *Id*. His blood pressure increased to 176/110, but Johnson and Bennett did not give him medication for it or call the on-call provider. *Id*.

It is common medical knowledge that the most basic physical tests to determine if a patient has a hip fracture are: 1) to rotate the legs to see if one is more abducted, and 2) to compare the two hips to look for displacement. Ex. 27 Bennett Dep. 55:18-57:25. Johnson did not perform these

tests or document them in the medical record. Ex. 10 UHS 0021-22. It is common medical knowledge that an x-ray is the most reliable initial diagnostic test to determine if there is a bone fracture, including a hip fracture that is not visible to the naked eye. Ex. 27 Bennett Dep. 51:6-17; Ex. 26 Johnson Dep. 40:12-23; 85:15-20. However, neither Bennett nor Johnson called the on-call provider to request an x-ray for Mr. Mosley. Johnson's medical record does not even mention an x-ray. Ex. 10 UHS 0021-22. The jail medical unit had a physician or other "prescriber" available on-call that night, and they could be reached by telephone. Neither Bennett nor Johnson contacted the on-call provider to elevate the case or seek a consultation about the signs of hip fracture, hypertension, and alcohol withdrawal.

**F. Defendants Johnson and Bennett Discharged Mr. Mosley to His Cell, Rather than Continuing to Monitor Him, Even Though He Could Not Walk Unassisted**

Mr. Mosley lay on a stretcher for approximately two hours. Ex. 10 UHS 0021-22. After two hours, Johnson reported that although he previously had complained of right leg pain, he was now moving his right foot and leg without pain. *Id*. Johnson reported a manual blood pressure re-check, with a reading of 143/78, but did not report the time it was taken. *Id*. She stated that he had no bruising or redness to his right leg, and he had a good pedal pulse in his right foot. *Id*. She informed her supervisor again. *Id*. At approximately 10:45 pm, Johnson and Bennett discharged Mr. Mosley back to his cell.

At discharge, Johnson wrote that "inmate stood on his own." She testified that he walked out and walked to his cell by himself. Ex. 26 Johnson Dep. 146:6-147:8. Bennett also testified that Mr. Mosley walked unassisted to his cell. Ex. 27 Bennett Dep. 111:10-114:12, 113:9-114:4. In fact, two detention officers assisted Mr. Mosley to walk out of the medical unit, down the hallway, and to the elevator. Ex. 51 Guerra Dep. 83:7-86:22. Officer Guerra testified that she and another

officer put their arums under each of his arms to support him and assisted him to walk back to his cell, and that he walked very slowly as if in severe pain. *Id.*

### G. Defendant Macauley Knew Mr. Mosley Was Asking for Medical Help, But He Failed to Call a Code 1 for Medical Treatment

Mr. Mosley spent the night lying on the floor of the cell, with only his mat under him, because he could not get into a bunk. After he returned, there was a shift change, and Officer Sean MacAuley took over from Officer Kevin Ponton as the unit officer of the CI detox pod. Ex. 52 MacAuley Dep. 74:7-15. Ponton told MacAuley that Mr. Mosley had fallen, and that he had gone to the medical unit on a Code 1 and then returned. Ex. 52 MacAuley Dep. 90:21–91:5; Ex. 37 Ponton Dep. 60:19–61:12. MacAuley also read Ponton's report of the Code 1, which explained that Mr. Mosley was unable to move his leg or stand up. Ex. 52 MacAuley Dep. 134:15–135:20; Ex. 11 BCSO000834. MacAuley knew that Mr. Mosley had complained of hip pain for hours after his fall and that he had not moved from his mattress since his return from medical. Further, Ponton told MacAuley to keep a close eye on Mr. Mosley.

Macauley was on shift from 11 p.m. until 7 a.m. the next morning. In the CI unit that night, breakfast was served at around 1:44 a.m. in the common dayroom. Ex. 52 MacAuley Dep. 184:2-14; Ex. 13 BCSO000133. MacAuley noticed that Mr. Mosley did not get up from his mat on the floor to come eat breakfast. Ex. 52 MacAuley Dep. 112:23–113:9. MacAuley called to other inmates who were not eating to see if they were going to eat, but did not ask Mr. Mosley. *Id.* 113:10-114:7.

Around 2 a.m., MacAuley heard complaints from Mr. Mosley's cellmates. Ex. 52 MacAuley Dep. 109:10-22. They told MacAuley that Mr. Mosley, who was not walking but was dragging himself on across the cell floor as if "mopping the floor with himself," had been talking to them and disturbing their sleep, and that Mr. Mosley had asked for 911 to be called. *Id.* 83:16-

21, 107:8-13, 109:13-22; Ex. 14 BCSO000817. MacAuley commanded Mr. Mosley to return to sleep his mattress, but Mr. Mosley did not respond to MacAuley until he called him by his first name. *Id.* 103:17-24. Only then did Mr. Mosley look up and make eye contact with MacAuley, emitting a grunt in acknowledgement. *Id.* 103:24-25. In this moment, MacAuley recognized that Mr. Mosley appeared delirious, and that his behavior was "weird." *Id.* 108:13-19. He then watched as Mr. Mosley crawled back to his mattress, never attempting to stand or walk. *Id.* 105:6-19. He did not, however, call a Code 1.

Macauley testified that he called LVN Johnson to ask if Mr. Mosley was alright. Ex. 52 MacAuley Dep. 116:22-117:1. She told him that Mr. Mosley was in alcohol withdrawal, and he was fine where he was. *Id.* 125:5-17. MacAuley did not log in this phone call into the CI unit jail log until later in the morning, after he found Mr. Mosley unconscious. *Id.* 117:5-16; Ex. 15 BCSO002553. Johnson testified that Macauley never called her. Ex. 26 Johnson Dep. 56:17-19. She testified that if he had, she would have told him to call a Code 1 because it was the only way to get Mr. Mosley immediate medical attention. Ex. 26 Johnson Dep. 52:24-1. In any case, MacAuley did not call a Code 1.

Notes written by BCSO officers state that Mr. Mosley complained of hip pain at 5:00 a.m. that morning. Ex.16 BCSO000018; Ex. 17 BCSO000859-860. Notes written by BCSO officers state that Mr. Mosley asked MacAuley to call 911 at 6:15 a.m. Ex. 16 BCSO000018; Ex. 17 BCSO000859-860. MacAuley did not call a Code 1 at either time.

At 7:00 before his shift ended, Macauley entered Mr. Mosley's cell and found him unconscious. Ex. 52 MacAuley Dep. 173:7-15; Ex. 18 BCSO000836. He called a Code 1 Blue and waited for other officers to arrive. *Id.* Officers attempted to resuscitate Mr. Mosley with CPR. *Id.*; Ex. 34 Brown Dep. 23:20–24:4. San Antonio EMS arrived and took him to Methodist Hospital, where additional resuscitation efforts were attempted without success. At 1:16 p.m., a doctor

declared Mr. Mosley dead. Ex. 19 BCSO000843. The Bexar County medical examiner concluded after autopsy that Mr. Mosley had died because he had suffered an acetabular (hip socket fracture) in his right hip, with associated internal bleeding as a result of the bone shards splicing his blood vessels. The hemorrhage had caused massive organ failure and death. Ex. 35 Feig Dep. 31:17-21; 56:14-20; Ex. 20 BCSO002564-2572.

## III.     ARGUMENTS AND AUTHORITIES

### A.  Standard of Review on Summary Judgment

Summary judgment is proper only if the evidence before the court shows that no genuine issues of material fact are in dispute and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(b); *Celotex. Corp. v. Catrett*, 477 U.S. 317, 322 (1986). The party moving for summary judgment bears the burden of showing that the evidence in the record demonstrates an absence of genuine issues of material fact. *Celotex Corp.*, 477 U.S. at 323. A dispute about a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

A court reviewing a motion for summary judgment must "construe all facts and inferences in the light most favorable to the nonmoving party." *Rogers v. Bromac Title Serv's*, L.L.C., 755 F.3d 347, 350 (5th Cir. 2014); *Tolan v. Cotton*, 572 U.S. 650, 651 (2014) ("in ruling on a motion for summary judgment, "[t]he evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in his favor."). The court should "refrain from making credibility determinations or weighing the evidence," which are tasks for the fact-finder at trial. *EEOC v. LHC Group, Inc.*, 773 F.3d 688, 694 (5th Cir. 2014); *see also Tolan*, 134 S.Ct. at 1866. Any "reservations the court has concerning the evidence will preclude summary judgment." *Int'l Shortstop, Inc. v. Rally's Inc.*, 939 F.2d 1257, 1264 (5th Cir. 1991).

### B.  Plaintiffs' Claims of Constitutional Violations Brought Pursuant to 42 U.S.C. 1983

To establish a claim under 42 U.S.C. § 1983, "a plaintiff must (1) allege a violation of a right secured by the Constitution or laws of the United States and (2) demonstrate that the alleged deprivation was committed by a person acting under color of state law." *Whitley v. Hanna*, 726 F.3d 631, 638 (5th Cir.2013). Additionally, "[c]laims under § 1983 may be brought against persons in their individual or official capacity, or against a governmental entity." *Goodman v. Harris Cnty.*, 571 F.3d 388, 395 (5th Cir.2009).

### C. Standard for Deliberate Indifference to Serious Medical Needs

The Constitution imposes on prison and jail officials a duty to ensure that inmates receive adequate medical care. *Farmer v. Brennan*, 511 U.S. 825, 832 (1994); *Wilson v. Seiter*, 501 U.S. 294, 297 (1991). When the government restrains an individual's liberty and renders him unable to care for himself, it has an affirmative duty to provide for his basic needs, including medical care and reasonable safety. *Hare v. City of Corinth*, 74 F.3d 633, 639 (5th Cir. 1996). For pretrial detainees, the sources of the right to adequate medical care are the substantive and procedural due process guarantees of the Fourteenth Amendment. *Id*. at 639-640.

To prove a claim of deliberate indifference to serious medical needs, a plaintiff must prove that he was exposed to a substantial risk of serious harm, and that jail officials acted or failed to act with deliberate indifference to that risk. *Wilson*, 501 U.S. at 297; *Farmer*, 511 U.S. at 832; *Lawson v. Dallas County*, 286 F.3d 257, 262 (5th Cir. 2002). To prove deliberate indifference, the plaintiff must show that jail officials were aware of the risk, and consciously disregarded it. *Id*. Specifically, plaintiff must show that defendants were both (1) aware of facts from which an inference of an excessive risk to the prisoner's health or safety could be drawn, and (2) that they actually drew an inference that such potential for harm existed. *Farmer*, 511 U.S. at 837; *Harris v. Hegmann*, 198 F.3d 153, 159 (5th Cir. 1999).

A jail official acts with deliberate indifference "only if [(A)] he knows that inmates face a substantial risk of serious bodily harm and [(B)] he disregards that risk by failing to take reasonable measures to abate it." *Gobert*, 463 F.3d at 346 (quoting *Farmer*, 511 U.S. at 847). A jail official's knowledge of a substantial risk of harm may be inferred by the obviousness of the substantial risk, *Harris*, 198 F.3d at 159; *Farmer*, 511 U.S. at 841, but not from an official's mere failure to act reasonably. *Lawson*, 286 F.3d at 262. Each defendant's deliberate indifference must be examined separately. *Id*.

A "serious medical need" is "one for which treatment has been recommended or for which the need is so apparent that even laymen would recognize that care is required." *Gobert v. Caldwell*, 463 F.3d 339, 345 n.12 (5th Cir. 2006). Evidence may show that it is "common medical knowledge" that the alleged improper medical care puts the patient as a substantial risk of serious harm. *Lawson*, 286 F.3d at 262. Disagreement with the course of medical treatment provided typically will not suffice to show a Constitutional violation. *Gibbs v. Grimmette*, 254 F.3d 545 (5th Cir. 2001). However, plaintiff may make out a claim by showing that defendants "refused to treat him, ignored his complaints, intentionally treated him incorrectly, or engaged in any similar conduct that would clearly evince a wonton disregard for any serious medical needs." *Domino v. Texas Dep't of Criminal Justice*, 239 F.3d 752, 756 (5th Cir. 2001).

## D. Defendant Henry Etta Johnson Showed Deliberate Indifference to Mr. Mosley's Serious Medical Needs

### 1. Mr. Mosley had a Serious Medical Need: A Possible Hip Fracture

When Mr. Mosley came into the jail medical unit for assessment on the evening of July 25, 2015, he had a serious medical need because he presented with signs of a hip fracture.

It is common medical knowledge that hip fractures are serious and can be deadly, and require timely detection and management.[2] Nurses and doctors alike are trained to know that "hip fractures are associated with increased mortality." Ex. 23 Kim Edward LeBlanc et al., *Hip Fracture: Diagnosis, Treatment, and Secondary Prevention*, 89 AMERICAN FAMILY PHYSICIAN n. 12 (June 15, 2014) (hereinafter, LeBlanc, *Hip Fracture*).[3] Nurses and doctors understand that "delayed recognition of hip fracture can result in increased morbidity and mortality." Ex. 25 Lance C. Brunner et al., *Radiological Decision-Making*, 67 AMERICAN FAMILY PHYSICIAN n.3 (February 1, 2003). Because of this, nurses and doctors know that "it is vital to detect and appropriately treat patients with hip fracture." *Id*. In addition, it is common medical knowledge that "90% of fractures [are] associated with a fall." Ex. 23 LeBlanc, *Hip Fracture*. Some patients will initially "present with vague pain in the groin, knee, buttock, or thigh." Ex. 22 Bateman, *Medical Management*. Many factors contribute to an increased risk of hip fracture, including "increased age" and "chronic alcohol or tobacco use." *Id*.

Given her training and experience, Defendant Johnson knew or should have known that hip fractures are serious and deadly, and a patient who complains of severe hip or knee pain after a fall is showing signs of potential hip fracture. Johnson was a trained LVN (licensed vocational nurse) with over 40 years of nursing experience. Ex. 26 Johnson Dep. 8:2-13. She had extensive

---

[2] "Timely diagnosis and highly attentive perioperative care of the complex patient with a hip fracture aim to reduce the risk for such complications and to facilitate rapid transition to rehabilitation in the hopes of improving functional recovery." Ex. 21 Fernanda Porto Carriero et al., *In the Clinic: Hip Fracture*, Annals of Internal Medicine (Dec. 2011) (hereinafter, Carriero, *In the Clinic: Hip Fracture*). Because "a hip fracture can cause substantial bleeding into the injured thigh . . . patients should be monitored for the development of acute anemia, hemorrhagic shock, and compartment syndrome." Ex. 22 Laura Bateman et al., *Medical Management in the Acute Hip Fracture Patient: A Comprehensive Review for the Internist*, 12 THE OCHSNER JOURNAL n. 2 (Summer 2012) (hereinafter, Bateman, *Medical Management*).

[3] "Hip fractures are associated with increased mortality; 12% to 17% of patients with a hip fracture die within the first year and the long-term increased risk of death is twofold. Of the patients who survive, only one-half walk independently again . . ." Ex. 23 LeBlanc, *Hip Fracture*. A widely-used hospital nursing manual and textbook notes that hip fractures commonly require surgery to heal, and the surgery can be so emergent that the patient has "no preoperative preparation." Ex. 24 Sandra F. Smith et al., *Clinical Nursing Skills: Basic to Advanced Skills* (8th ed. 2012).

experience in general medicine, first in hospitals and then in the jail for fifteen years. Ex. 26 Johnson Dep. 8:19-25, 9:03-05, 9:25-10:1. As an LVN, she met continuing legal education requirements every two years. Ex. 26 Johnson Dep. 14:6-19. Her UHS job description required the provision of nursing care in accordance with UHS jail medical policies and standards of nursing practice. Ex. 28 UHS 2100-2101. So did Texas nursing regulations. *See* Ex. 30 Tex. Adm. Code §217.11(1)(D), §217.11(1)(M).

Defendant Johnson stated that she would never make a decision regarding a hip fracture without guidance from her supervisor, because she knows that a fracture is a serious injury. Ex. 26 Johnson Dep. 85:1-20. She admitted that without an x-ray, it would be hard to diagnose a fracture with certainty. Ex. 26 Johnson Dep. 38:17-18; 40:18-41:07. Her supervisor RN John Bennett knew that hip fractures are so serious that they often warrant surgery, and must be diagnosed promptly. Ex. 27 Bennett Dep. 52:6-54:7. RN Bennett recognized that a hip fracture can become an emergency because of bleeding into the joint, and since it is an area of the body that can hold a sizable amount of blood, hemorrhagic shock is a possible outcome. Ex. 27 Bennett Dep. 54:8-55:4. PA Peter Forsberg testified that jail medical staff are trained to know that bleeding out is a "frequent problem" with hip fractures. Ex. 31 Forsberg Dep. 66:5-11. Betty Vestal, the nursing director for the jail and UHS's 30(b)(6) witness, agreed that hip fractures can be very serious depending on where they are, and that surgery can sometimes be required. Ex. 32 Vestal Dep. 85:6-11.

### 2.  Johnson Knew That Mr. Mosley Had Signs of A Hip Fracture

Based on her review of Mr. Mosley's electronic medical record, her conversation with RN Weber, her conversation with Mr. Mosley, and her observation of him, Johnson knew when she assessed Mr. Mosley in the clinic that he showed signs of a hip fracture. Her knowledge was further augmented by her supervisor, RN John Bennett.

Before Defendant Johnson assessed him, Mr. Mosley had reported to Nurse Amber Weber that he had fallen earlier in the day, was unable to stand several hours after his fall, and had "pain 10 out of 10" in his right knee, and had swelling "+1" to his right knee. Ex. 9 UHS 0019-0021. He also reported to RN Weber that "he could have fractured his hip." Ex. 9 UHS 0019. Defendant Johnson could see each of these facts, which were documented by RN Weber in the electronic medical record.[4] Ex. 26 Johnson Dep. 64:6-65:13. The medical record also told her that a Code 1 had been called for Mr. Mosley, and his chief complaint was "pain to right hip and knee" after a fall. Ex. 9 UHS 0019-0021; Ex. 26 Johnson Dep. 66:07-68:14. In addition, Nurse Weber spoke to Johnson and told her these facts about Mr. Mosley before Weber left at the end of her shift. Ex. 26 Johnson Dep. 68:15-69:2; Ex. 33 Weber Dep. 100:8-101:11.

Defendant Johnson also confirmed these facts with Mr. Mosley during her assessment of him, as she documented in her treatment record. Ex. 10 UHS 0021-0022; Ex. 26 Johnson Dep. 80:19-81:14 (her practice was to ask inmate why he was in medical unit, and cross-check the medical record). Mr. Mosley told her that he fell, and had leg pain as a result. Ex. 10 UHS 0021-0022; Ex. 26 Johnson Dep. 74:12-75:21. A sergeant informed her that Mr. Mosley had been pushed. Ex. 10 UHS 0021-0022; Ex. 26 Johnson Dep. 76:24-78:4. She noted that Mr. Mosley's chief complaint was right leg pain. Ex. 26 Johnson Dep. 71:20-73:20. She noted swelling on Mr. Mosley's right leg. Ex. 26 Johnson Dep. 81:20-82:23. Further, Johnson was aware that Mr. Mosley was unable to put weight on his leg. Ex. 26 Johnson Dep. 80:12-80:21.

Finally, Johnson spoke with her supervisor, RN John Bennett, who admitted he knew at the time that Mr. Mosley had shown signs of a hip fracture. Ex. 10 UHS 0022; Ex. 26 Johnson Dep. 83:13-24. Bennett agreed that the swelling in his knee, pain of 10 out of 10, as well as his

---

[4] UHS's 30(b)(6) witness and Nursing Director Betty Vestal testified that a nurse coming on shift would have to look at the patient's medical record to provide nursing care in accordance with the standards of nursing practice. Ex. 32 Vestal Dep. 62:14-42; 62:25-63:7.

inability to move for several hours, were signs of a potential hip fracture. Ex. 27 Bennett Dep. 131:14-24. He agreed that Mr. Mosley's fall, followed by right leg pain, and not being able to put weight on his leg were signs as well. Ex. 27 Bennett Dep. 106:4-8. Bennett also stated that both RN's and LVN's are trained to know how serious hip fractures can be. Ex. 27 Bennett Dep. 53:15-55:17. Therefore, Defendant Johnson's knowledge was augmented by speaking to her supervisor, RN Bennett, who also knew that Mr. Mosley had signs of a hip fracture.

### 3. Johnson Knew Additional Relevant Facts about Mr. Mosley's Medical Condition, Including His Medication and High Blood Pressure

At the time of her assessment, Defendant Johnson also knew that Mr. Mosley was experiencing alcohol withdrawal, and had symptoms including hallucinations, disorientation and liver disease. His jail intake screening, which was in his medical record, noted that he consumed alcohol daily, and that he had liver disease. Ex. 2 UHS 0013. His medical record from a medical visit with PA Forsberg earlier that day showed that he was experiencing alcohol withdrawal, had experienced hallucinations, and was taking lorazepam as medication for withdrawal. Ex. 8 UHS 0016-0018. Johnson knew he was disoriented when RN Weber talked to him. Ex. 26 Johnson Dep. 67:8-19; Ex. 9 UHS 0020. During the assessment, Mr. Mosley told Johnson that he consumed "several cans of beer daily." Ex. 10 UHS 0021; Ex. 26 Johnson Dep. 75:22-76:23. She was also aware that Mr. Mosley had just taken 2 milligrams of Lorazepam (a benzodiazypene) for alcohol withdrawal symptoms, and that this medicine had a sedative effect. Ex. 26 Johnson Dep. 90:6-15; 101:3-102:8.

This was relevant for two reasons. First, alcohol withdrawal and disorientation can "mask" the symptoms of a hip fracture. Ex. 36 Whiteley Dep. 150:16-25. This made a complete assessment for Mr. Mosley's hip fracture all the more important. Second, it is common medical knowledge among nurses that benzodiazepines (BZDs) are among a class of "fall-risk increasing drugs" with

adverse effects such as "sleepiness, fatigue, coordination impairment, slowed thoughts, cognitive impairment, and confusion." Ex. 38 Anna Lukačišinová Ballóková & Daniela Fialová, *Benzodiazepines, Age-Related Pharmacological Changes, and Risk of Falls in Older Adults*, 3 NEUROPATHOLOGY OF DRUG ADDICTIONS AND SUBSTANCE MISUSE (2016). This means that Johnson knew or should have known that taking Lorazepam made him more sleepy, less likely to report his pain, and more susceptible to another fall. RN Bennett admitted as much. Ex. 27 Bennett Dep. 114:13-20. Whiteley also admitted that lorazepam "can decrease the sensation of pain." Ex. 36 Whiteley Dep. 63:4-8. Vestal admitted it had a sedative effect. Ex. 32 Vestal 79:10-80:3.[5]

Finally, Johnson knew that Mr. Mosley's blood pressure was elevated. When RN Weber took and recorded Mr. Mosley's blood pressure at 7:15 p.m., it was 149/102. Ex. 9 UHS 0019. According to UHS jail medical policy and its medical director, this was elevated. Ex. 39 UHS 2157 (2156-58); Ex. 36 Whiteley Dep. 110:3-9.[6] PA Forsberg acknowledged that 149/102 was elevated. Ex. 31 Forsberg Dep. 89:15-25. Johnson knew about this reading because it was in the electronic medical record. Ex. 9 UHS 0019; Ex. 26 Johnson Dep. 68:15-69:6.

Defendant Johnson later took Mr. Mosley's blood pressure at 8:15 p.m. and recorded it as 176/110, which was even higher. Ex. 10 UHS 0021; Ex. 26 Johnson Dep. 73:21-74:7. Both Johnson and Bennett admitted that this blood pressure was high. *Id.*; Ex. 27 Bennett Dep. 86:23.

---

[5] Medical Director Whiteley indicated by email that PA Forsberg should have sent Mr. Mosley out for alcohol withdrawal treatment to an emergency room or the infirmary since he was having hallucinations and was disoriented. Ex. 5 UHS 2137-2138; Ex. 36 Whiteley Dep. 52:2-7; 87:6-17; 86:6-25. His alcohol withdrawal was so serious that he should not have gone to a detox cell. She testified that she stood by her email. Ex. 36 Whiteley Dep. 95:11-13. Nursing Director Vestal admitted that under the UHS alcohol withdrawal protocol, if a person showed symptoms of delirium tremens—including disorientation and hallucinations—an IV drip of lorazepam (Ativan) should be started to reduce the risk of seizures, and the provider would consider sending them to the emergency room. Ex. 32 Vestal Dep. 114:14-116:5; 119:1-9; UHS 227. Forsberg did none of these things.

[6] UHS policy requires the provider to be "notified immediately when blood pressure measurements fall outside the established parameters and the patient is symptomatic." Ex. 39 UHS 2157. The medical records do not show that Mr. Mosley was ever screened for symptoms such as dizziness, lightheadedness, blurred vision, or difficulty with speech. Hence, Medical Director Whiteley concluded that the nurses had failed to treat him for hypertension as required. Ex. 36 Whiteley Dep. 122:2-122:9.

Despite two elevated readings, neither Johnson nor Bennett gave him any blood pressure medication. Medical Director Whiteley admitted they failed to treat his hypertension after these two elevated readings. Ex. 36 Whiteley Dep. 110:3-9, 122:2-9, 124:20-125:3. Bennett agreed that the 149/102 reading by RN Weber followed by the 176/110 reading by Johnson an hour later should have led Johnson to initiate protocol and treatment for elevated blood pressure. Ex. 27 Bennett Dep. 86:19-87:25. Defendant Johnson claimed she did a manual blood pressure recheck later that night and found that it was 143/78. Ex. 26 Johnson Dep. 87:1-25. In any case, Defendants did not address Mr. Mosley's blood pressure.[7] The significance of the elevated blood pressure was that it indicated severe distress, and showed the need for an in-depth assessment for a hip fracture.

### 4. Defendant Johnson Exposed Mr. Mosley to a Substantial Risk of Serious Harm by Failing to Perform The Basic Physical Tests to Diagnose a Hip Fracture.

When a hip fracture is suspected, it is "readily diagnosed by a history of a fall that led to a painful hip, inability to walk, or an externally rotated limb, and plain radiographs of the hip that confirm the diagnosis." Ex. 40 Martyn Parker & Antony Johansen, *Clinical Review: Hip Fracture*, 333 BMJ (July 1, 2006).[8] Patients with hip fractures frequently have hip pain and may exhibit shortened or externally rotated limbs. Ex. 25 Lance C. Brunner et al., *Radiological Decision-Making*, 67 AMERICAN FAMILY PHYSICIAN n.3 (February 1, 2003). In some instances, hip fracture patients may only complain of vague pain, and they may have the ability to walk, but a physician

---

[7] UHS's 30(b)(6) witness Betty Vestal testified that based on his report of hypertension they should have checked his blood pressure daily for five days; they did not. Ex. 32 Vestal Dep. 38:14-39:9. She agreed that the elevated blood pressure readings should have led to a call to the on-call provider, which also did not happen. Ex. 32 Vestal Dep. 66:6-11; 67:8-25; 70:5-21.

[8] *See also*, Ex. 21 Carriero, *In the Clinic: Hip Fracture*. ("Physical examination can confirm the diagnosis of hip fracture. The injured leg is often shortened, externally rotated, and abducted when the patient is in the supine position."). Where "the bone is completely broken, the leg may appear to be shorter than the non-injured leg." Ex. 41 The American Association of Orthopaedic Surgeons, *Hip Fractures*, OrthoInfo, *available at* https://orthoinfo.aaos.org/en/diseases--conditions/hip-fractures. Additionally, "the patient will often hold the injured leg in a still position with the foot and knee turned outward." *Id*.

should be consulted in these cases. *Id*. Clinical manifestations of hip fracture include groin pain, the inability to bear weight on the affected leg after a fall, pain that radiates to the knee, and a leg that appears "shortened and externally rotated" when the patient is lying down. Ex. 42 Denise R. Ramponi et al., *Imaging: Hip Fractures*, 40 ADVANCED EMERGENCY NURSING JOURNAL VOL. 40, NO. 1 (Jan.-Mar. 2018) (hereinafter, Ramponi, *Imaging: Hip Fractures*).[9]

### a. As a trained LVN, Defendant Johnson Knew or Should have Known The Basic Necessary Tests to Diagnose a Hip Fracture.

RN Bennett stated that the standard physical tests for diagnosing a hip fracture include looking to see if one foot is rotated outwards, comparing the two legs, ascertaining the level of pain, and checking for bruising and swelling in the affected areas. Ex. 27 Bennett Dep. 55:7-57:25. Bennett asserted that both registered nurses and LVNs are familiar with these tests. *Id*. Likewise, PA Forsberg stated that the standard ways to examine a possible hip fracture are to check range of motion, swelling and bruising, and whether or not the limb is shortened. Ex. 31 Forsberg Dep. 97:5-13. Betty Vestal stated that a standard way to determine if there is a hip fracture is to observe whether the hips are aligned, noting that one hip may be off center. Ex. 32 Vestal Dep. 74:13-76:2. Defendant Johnson knew or should have known that these were the basic required tests to detect or rule out a hip fracture.

UHS jail medical policies required timely, appropriate care based on professional clinical judgment. Ex. 43 UHS 0268-0269. The policies state that persons with suspected fractures may be medically stabilized within the jail only if "their neurovascular checks, distal to the injury, remain

---

[9] *See also*, Ex. 23 LeBlanc et al., *Hip Fracture, supra*. ("[W]hen the patient lies in the supine position, the leg is held in external rotation and abduction, and appears shortened. Pain is elicited with rotation, such as with the log roll maneuver, which involves gentle internal and external rotation of the lower leg and thigh in the supine position. In addition, a fracture may be suspected if groin pain is elicited when applying an axial load to the affected extremity. Because of the pain and instability, patients are unable to perform an active straight leg raise.").

within normal limits." Ex. 44 UHS 436 (433-446).[10] Further, they require nurses to document "results of diagnostic and therapeutic tests and procedures" in the medical record. Ex. 46 UHS 550 (549-554) (II.B.17, II.B.10).

### b.   Defendant Johnson Failed to Conduct the Basic Necessary Tests

Defendant Johnson failed to perform these basic physical tests. She did not see if his right leg or foot was rotated outward. She did not see if his injured right leg was shortened or abducted. She did not compare the two hips or legs by looking at their alignment or testing the range of motion in each leg. Ex. 32 Vestal Dep. 78:8-11. She did not check for swelling or redness at his hip. Defendant Johnson testified that it was her practice to document in the electronic medical record any physical test she performed. Ex. 26 Johnson Dep. 110:20-113:4. The fact that she failed to document these basic tests shows that she did not perform them. Ex. 10 UHS 0021-0022.[11] Indeed, she documented other tests she performed: Johnson documented that she checked Mr. Mosley's leg for swelling, redness, and bruising, and she checked his pedal pulse (the pulse on his foot). Ex. 10 UHS 0021-0022; Ex. 26 Johnson Dep. 81:20-83:12. But she failed to perform the most important tests, despite knowing their importance.[12] RN Bennett agreed that he would expect to see these basic physical test results—whether the leg was rotated outward, a comparison of the two hips and legs, and level of pain—documented in the electronic medical record. Ex. 27 Bennett Dep. 60:19-61:24. They were not.

---

[10] "Neurovascular checks" include range of motion, motor function, assessment of pain, and more. See e.g. Ex. 45 Nursing Center, Neurovascular Assessment, available at https://www.nursingcenter.com/getattachment/Clinical-Resources/nursing-pocket-cards/Neurovascular-Assessment/Neurovascular-Assessment.pdf.aspx.

[11] When asked what the general tests for hip fracture are, Johnson mentioned pedal pulses, swelling and bruising, but she never mentioned comparing the two hips and legs, or checking for external rotation, or running any range of motion tests. Ex. 26 Johnson Dep. 36:25-37:8.

[12] Johnson also failed to look for swelling, bruising or redness at Mr. Mosley's hip and instead focused only on his leg. As Medical Director Whiteley noted, Johnson would have had to have Mr. Mosley disrobe to check his hip and buttocks for swelling, bruising, and redness; the medical record shows no record of that. Ex. 36 Whiteley Dep. 129:1-19.

Given the facts detailed above showing signs of Mr. Mosley's hip fracture and Johnson's knowledge of the seriousness of hip fractures, her failures to see if Mr. Mosley's right leg was shorter than his left, if his right leg was rotated outwards, or if the two hips and legs looked the same, were deliberate and inexcusable. Her failures exposed Mr. Mosley to substantial risk of serious harm, namely a fracture that could lead to internal bleeding and death.[13]

In her motion for summary judgment, Defendant Johnson asserts that there was no indication of a hip fracture at any point, including when Mr. Mosley was seen by RN Weber, RN Bennett, and LVN Johnson. Doc. 131 at 11-12. This is flatly incorrect. Johnson knew Mr. Mosley had fallen or was pushed, he had hip and leg pain, he believed he had a hip fracture, his blood pressure was elevated, he had swelling in his right knee, he was unable to bear weight on the leg for hours, and he had reported pain 10 out of 10. Ex. 9 UHS 0019-0021; Ex. 10 UHS 0021-0022. The evidence refutes Defendant's argument. Further, RN Bennett acknowledged that Mr. Mosley showed signs of a hip fracture. Ex. 27 Bennett Dep. 131:14-24.

Defendant also argues that the testimony of Plaintiff's expert witness Dr. Sheri Innerarity, regarding the inadequacy of Johnson's assessment, should be disregarded because there was no evidence of a hip fracture at the time of Mr. Mosley's examination by Johnson. Doc. 131 at 13; see Innerarity Report at 8, 14. This misses the point. The evidence cited above shows numerous *signs* of a hip fracture. A reasonable juror could conclude or infer that based on her nursing training and experience and the facts provided to her by Weber, Mr. Mosley and the medical record,

---

[13] Johnson testified that the RN, and not the LVN, made nursing diagnoses and final decisions on patients. Ex. 26 Johnson Dep. 12:2-13:19. RN Bennett testified, however, that both RN's and LVN's like Johnson can make nursing diagnoses. Ex. 27 Bennett Dep. 148:4-14. He said that LVN does not need RN approval of the LVN's plan for the patient. Ex. 27 Bennett Dep. 159:18-23. A reasonably jury could infer that as the nurse conducing the physical assessment, Johnson was obligated to perform the requisite basic tests, even if RN Bennett would then make the "nursing diagnosis." Moreover, UHS jail medical policies state that "…LVNs continuously identifies patient care needs, modifies the plan of care as needed, and coordinates care from admission through discharge with the RN." Ex. 47 UHS 2154 (2152-2155). UHS's 30(b)(6) witness Betty Vestal testified that LVN's determine if vital signs are normal and are in charge of minor issues, while RN's are in charge of nursing care. Ex. 32 Vestal Dep. 30:16-24; 31:4-21.

Johnson knew that Mr. Mosley showed signs of a potential hip fracture, knew the basic tests to be performed, and yet failed to perform them.

**5.    Defendant Johnson Exposed Mr. Mosley to a Substantial Risk of Serious Harm by Failing to Request an X-Ray or Call a Provider.**

It is common medical knowledge that "plain radiography should be the initial diagnostic test in patients with suspected hip fracture." Ex. 23 LeBlanc, *Hip Fracture*. In fact, "radiographs are the cornerstone of diagnosis" for a hip fracture. Ex. 21 Carriero, *In the Clinic: Hip Fracture*. "Timely diagnosis based on clinical history and physical includes plain radiographs and, possibly, magnetic resonance images if radiographs are not confirmatory." Ex. 42 Ramponi, *Imaging: Hip Fractures*.[14]

**a.    As a Trained LVN, Defendant Johnson Knew that an X-Ray Was Required to Accurately Diagnose a Hip Fracture for Mr. Mosley.**

Johnson admitted that she could not know with certainty whether a patient had a hip fracture until an x-ray was done. Ex. 26 Johnson Dep. 36:21-37:8. She admitted that a hip fracture is not externally visible and requires an x-ray for confirmation. Ex. 26 Johnson Dep. 40:12-23. Johnson also knew that the only way a mild hip fracture could be distinguished from a severe one would be through x-ray imaging. Ex. 26 Johnson Dep. 85:15-20. RN Bennett admitted that an x-ray is the most common step for determining a fracture. Ex. 27 Bennett Dep. 51:6-17. Nursing Director Betty Vestal stated that the surest way to detect a hip fracture is through an x-ray. Ex. 32 Vestal Dep. 73:15-74:12; 85:7-17. Medical Director Whiteley similarly agreed that an x-ray was critical to confirming Mr. Mosley's hip fracture. Ex. 36 Whiteley Dep. 121:6-14.

---

[14] "[S]ome patients with hip fracture have normal ambulation and complain only of vague pain." Ex. 25 Lance C. Brunner et al., *Radiological Decision-Making*, 67 AMERICAN FAMILY PHYSICIAN n.3 (February 1, 2003). This makes an x-ray all the more important to confirm a hip fracture.

### b. Despite this Knowledge, Johnson Failed to Request an X-ray or Call the On-Call Provider.

Defendant Johnson asserted that she, as an LVN, could not order x-rays; however, she admitted if she and the RN agreed that x-rays were needed, they could contact the provider (a physician or physician assistant) and request the x-ray, and have the provider approve the request. Ex. 26 Johnson Dep. 40:24-42:2. She also testified that the provider never rejected a request for an x-ray in her experience. *Id*. Johnson had never had a superior tell her that a patient could not go to the hospital for x-rays. Ex. 26 Johnson Dep. 144:20-145:2. Johnson knew that x-rays were available at the jail during daylight hours, and during the night, patients could be sent out to University Hospital to get x-rays. Ex. 26 Johnson Dep. 47:4-48:13. RN Bennett also testified that there was no limitation on x-rays and provider calls, and that nurses could always reach a provider by telephone 24-7. Ex. 27 Bennett Dep. 160:21-161:18. Bennett also admitted that if there was a suspected fracture, he and Johnson should have referred him for an x-ray. Ex. 27 Bennett Dep. 102:25-103:22. The provider was available by telephone on nights and weekends; the RN could always call the provider to get an x-ray. Ex. 32 Vestal 17:3-11; 73:15-74:12.

Defendant Johnson claimed that it was her practice to send patients to the provider as soon as possible when the provider was on site. Ex. 26 Johnson Dep. 50:2-20. Bennett made clear that any prudent nurse would consult the provider when encountering cases where a patient had a potential fracture, and if a provider were not on site, it would be prudent to call the on-call provider at home. Ex. 27 Bennett Dep. 49:21-50:25; 164:18-166:5. Bennett also agreed that after a fall, it would be prudent to check the patient's neurological status and for a possible head injury, and to elevate the case to a provider if the inmate had an altered mental state. Ex. 27 Bennett Dep. 140:17-

143:14.[15] UHS jail medical policies contemplated notice to a provider for Code 1's. Ex. 49 UHS 468 (466-471) (III.C; IV.B.1).

Despite this, Defendant Johnson did not contact, or ask RN Bennett to contact, the on-call provider who was available at the time of Mr. Mosley's assessment to request an x-ray. Ex. 27 Bennett Dep. 164:18-166:5.[16] The failure to obtain an x-ray was fatal. Had Mr. Mosley obtained an x-ray that night, it would have detected his hip fracture, and he would have obtained emergency medical care and surgery to stop the internal bleeding. Instead, he needlessly suffered hemorrhagic shock and died an untimely death. Medical Director Whiteley agreed that "[a]t the very least, [Johnson and Bennett] should have called a provider." Ex. 36 Whiteley Dep. 120:8-21.[17] Since Mr. Mosley had "significant symptoms," they should have called the "24-hour providers on call," who would have ordered an x-ray. *Id*. 120:22-121:5.

Based on this evidence, a reasonable jury could find that Johnson, with her training and experience, knew that an x-ray was required to diagnose Mr. Mosley's hip fracture, that she could contact an on-call provider by telephone, and that the provider could order an x-ray, and yet she deliberately failed to call the provider to request an x-ray.

### 6. Defendant Johnson Exposed Mr. Mosley to a Substantial Risk of Serious Harm by Discharging Him Back to His Cell When He Could Not Walk Unassisted.

Two hours after she completed her assessment of Mr. Mosley, and after he lay down on the stretcher, Defendants Johnson and Bennett decided to discharge Mr. Mosley back to his cell,

---

[15] Neither Bennett nor LVN Johnson checked for or asked Mr. Mosley about a head injury. Ex. 10 UHS 0021-0022.

[16] UHS jail medical policies required nurses to document the provider who was called and the report given to the on-call provider. Ex. 50 UHS 1513A (1510A-1514A) (III.B.). No such record exists because Defendants did not call the provider.

[17] Johnson's failure to call the provider and simply "elevate" the case to him or her independently showed deliberate indifference to a substantial risk of serious harm. Ex. 36 Whiteley Dep. 120:8-21. Bennett admitted that it was always prudent to call the on-call provider for fractures, Ex. 27 Bennett Dep. 49:21-50:25, and also if the patient had an altered mental state after a fall. Ex. 27 Bennett Dep. 140:17-143:14.

even though he could not walk unassisted. Ex. 10 UHS 0022; Ex. 26 Johnson Dep. 88:1-22; Ex. 27 Bennett Dep. 68:14-69:12; 96:5-25. In doing so, they subjected him to a substantial risk of serious harm, including death, and in fact, Mr. Mosley was found unresponsive less than ten hours later and died the next day.

### a. Johnson Knew that Mr. Mosley Needed Additional Monitoring and Follow-up, not Discharge, Because He Still Could Not Walk By Himself

It is common medical knowledge that a person with numerous signs of a hip fracture, disorientation from alcohol withdrawal, and high blood pressure—and who *could not walk unassisted*—should be monitored or provided further medical treatment, rather than discharged without any follow-up. As set forth above, Johnson knew about the seriousness of hip fractures, that Mr. Mosley had signs of a hip fracture, including a fall followed by severe knee pain, the inability to put weight on his leg, swelling to his right knee, and he reported that he could have a hip fracture. Ex. 9 UHS 0019-0021. She knew he was taking a sedative and was experiencing alcohol withdrawal, and his blood pressure was high. *Id*. Since Mr. Mosley had not had an x-ray, and she had not conducted the basic physical tests, she *could not rule out* the fracture.

Two hours after she completed her assessment, and after Mr. Mosley had rested on the stretcher in the medical unit, Johnson saw that he could not walk unassisted (by himself). BCSO detention officer Candy Jenkins Guerra testified under oath that she and Officer Kyle Griego hoisted Mr. Mosley from the medical unit stretcher, where he was lying down. Ex. 51 Guerra Dep. 83:7-18. She testified that each officer grabbed him by one of his arms and supported him as he walked, and he walked extremely slowly because he was in pain. Ex. 51 Guerra Dep. 83:19-85:16. Guerra emphasized that Mr. Mosley was in so much pain that he could barely walk, and he definitely was not working normally. Ex. 51 Guerra Dep. 85-17-86:22. They assisted him the entire

way back to his cell, via the elevator, and laid him down on his mat on the floor of his cell. *Id*.[18] Guerra believed he could not walk by himself without help. *Id*.

It is implausible that officers Guerra and Griego physically assisted Mr. Mosley to walk even though he did not need assistance. Medical Director Whiteley testified that officers ordinarily do not touch inmates for fear of contracting lice or scabies. Ex. 36 Whiteley Dep. 159:2-21.

### b.  Despite this Knowledge, Johnson Discharged Him to his Detox Cell

Despite knowing that Mr. Mosley still could not walk unassisted, Johnson discharged him to his detox cell. Discharging Mr. Mosley to his cell when he could not walk unassisted subjected him to substantial risk of serious harm. Medical Director Whiteley testified repeatedly that if Mr. Mosley was unable to walk by himself, it was inappropriate and dangerous to return him to his cell. Ex. 36 Whiteley Dep. 127:14-18; 127:19-128:14. Similarly, Nursing Director Betty Vestal testified that he should not have been discharged if he could not walk by himself because it was a fall risk and a safety risk. Ex. 32 Vestal Dep. 80:8-81:15; 89:21-90:3. RN Bennett acknowledged that they could have monitored Mr. Mosley overnight in the medical unit. Ex. 27 Bennett Dep. 148:15-24. Vestal said they could have monitored him in the treatment room or called a provider and possibly sent him to the emergency room. Ex. 32 Vestal Dep. 80:16-83:2; 84:7-85:8. UHS jail

---

[18] Defendant Johnson testified that at the end of his two hours of rest on the stretcher, she saw Mr. Mosley get up and walk out of the medical unit on his own. Ex. 26 Johnson Dep. 146:6-147:8. She had earlier testified that she recalled nothing about Mr. Mosley or the incident. Ex. 26 Johnson Dep. 72:19-73:8; 114:19-21. Johnson acknowledged that she has no memory of Mr. Mosley getting off the stretcher or leaving MTO1. Ex. 26 Johnson Dep. 149:15-150:23. She also made clear that she would not have been able to see Mr. Mosley once he went into the hallway, and she would not have seen him go up to the elevator or travel back to his pod on another floor. *Id*. She could only see him until he walked out of the doors of MTO1. *Id*.  Defendant RN Bennett also insisted that he saw Mr. Mosley walk out of the medical unit on his own, unassisted. Ex. 27 Bennett Dep. 111:10-114:12, 113:9-114:4. Bennett earlier testified that he only "vaguely" remembered the whole incident with Mr. Mosley and that "as far as he knew" Mr. Mosley had walked back to his pod. Bennett Dep. 62:18-64:4. At the least, Guerra's deposition testimony creates a factual dispute on this issue. A reasonable jury could infer that Guerra's testimony is credible because she was the person to assist Mr. Mosley from the medical unit to his cell. Although the court should not make credibility determinations at the summary judgment stage, all inferences should be drawn in Plaintiffs' favor. *Tolan*, 572 U.S. at 651.

medical policies stated that if an inmate was unstable after a Code 1, as Mr. Mosley still was, "immediate transport to the Emergency Room is required." Ex. 49 UHS 469 (466-471)(IV.C.).

Based on this evidence, a reasonable jury could find that Johnson, with her training and experience, knew that additional monitoring and treatment was required, and yet deliberately failed to provide it, discharging Mr. Mosley to his cell (and to his death) instead.

**7. Defendant Johnson's Failures Individually and Taken Together Amounted to Deliberate Indifference to Mr. Mosley's Serious Medical Needs.**

Johnson knew that Mr. Mosley showed signs of a hip fracture, and yet she responded with deliberate indifference to that risk of serious harm by refusing to perform the standard physical tests, to contact a provider, to request an x-ray, or to keep him in the medical unit for monitoring rather than discharging him when he could not walk. Given the extent of her training and knowledge, Johnson's failures individually and taken together amounted to an intentional refusal of treatment and ignoring Mr. Mosley's complaints of hip pain and potential hip fracture.

In *Hare v. City of Corinth*, 74 F.3d 633, 650 (5th Cir. 1996), the Fifth Circuit denied summary judgment to defendant jail officers because evidence in the record showed that two officers had actual knowledge of a substantial risk of serious harm, namely the risk of suicide by the inmate, but they still disregarded the necessary precautions. *Id*. at 397. In *Easter v. Powell*, 467 F.3d 459, 465 (5th Cir. 2006), the Fifth Circuit denied summary judgment to a jail nurse because evidence in the record showed that the nurse knew the inmate had a heart condition and severe chest pain for which he requested treatment, and she twice deliberately refused him treatment and discharged him to his cell, without justification. *Id.* at 461-63. The court concluded she "failed to follow a prescribed course of treatment that called for the administration" of his medication amounted to deliberate indifference. *Id.* at 464.

Here, Johnson knew that there was a substantial risk of serious harm from an untreated hip fracture and that Mr. Mosley had signs of a hip fracture, yet she refused to perform the requisite physical assessments for hip fractures, call for an x-ray, contact the provider, or keep him for further monitoring when he could not walk unassisted. Her actions and omissions amounted to deliberate indifference. [19]

## 8. If Officer MacAuley Called Defendant Johnson around 2:30 a.m. and Defendant Johnson Ignored Mr. Mosley's Complaints, This Amounted to Deliberate Indifference.

Officer MacAuley reported calling Johnson at approximately 2:30 a.m. and logging this call later at 6:49 a.m. Ex. 52 MacAuley Dep. 117:2-13. He called out of concern for Mr. Mosley's health. Ex. 52 108:13-109:5. MacAuley testified that on the phone call, Johnson described what MacAuley was observing about Mr. Mosley without MacAuley having to say anything. Ex. 52 MacAuley Dep. 123:22-125:17. Johnson told him that Mr. Mosley was complaining of hip and leg pain because he had not taken his detox meds, and that he had then resumed his medication. Ex. 52 MacAuley Dep. 121:18-122:4. Johnson assured him that Mr. Mosley was fine where he was. Ex. 52 MacAuley Dep. 122:13-15. Johnson denied that this call occurred.[20]

[19] Defendants Johnson and Bennett each disclaimed their own role and pointed the finger at each other for (1) failing to properly assess Mr. Mosley, (2) failing to call the provider or request and x-ray, and (3) failing to monitor him overnight or send him to the emergency room instead of discharging him to his cell. Johnson stated that she referred the case to Bennett; that it was her typical practice to report the facts and let the supervising nurse decide what needed to be done; and that the supervising nurse decided when to discharge someone from the jail medical unit. Ex. 26 Johnson Dep. 88:1-5; 25:9-26:13; 84:16-85:14. Bennett claimed that he did not look at or touch Mr. Mosley's hip area, Ex. 27 Bennett Dep. 101:16-19; that he did not talk to Johnson about Mr. Mosley's vital signs, blood pressure, or fracture, *id.* 102:2-21; and that he only approved Johnson's plan to discharge Mr. Mosley, Ex. 27 Bennett Dep. 109:5-110:18. He later agreed that he as the supervising nurse discharged Mr. Mosley. Ex. 27 Bennett Dep. 110:19-111:9. Despite (or perhaps because of) their conflicting testimony, Plaintiffs' claims against both Bennett and Johnson are supported by the record, and summary judgment should be denied.

[20] Johnson disputed receiving this call. Ex. 26 Johnson Dep. 113:23-114:16. She stated that if she had received the call, she would have told MacAuley to call a Code 1. Ex. 26 Johnson Dep. 114:10-115:24. A reasonable jury could conclude that MacAuley called Johnson, given the specificity of MacAuley's testimony and his having logged the call that morning. At the least, there is a dispute about this issue, and the Court should allow Plaintiffs to proceed to trial on this claim.

Bennett stated that any prudent nurse receiving that call would have told the officer to initiate a Code 1 if the officer had concerns. Ex. 27 Bennett Dep. 130:22-131:16. Vestal agreed. Ex. 32 Vestal Dep. 98:23-99:13. Bennett said that a prudent nurse would not receive such a call from Officer MacAuley and then do nothing in response, but would instead have the patient return to the clinic right away. Ex. 27 Bennett Dep. 132:6-16. In fact, Bennett admitted that doing nothing after receiving such a call constitutes exposing the patient to an unreasonable risk of harm. *Id.* PA Forsberg stated that it is standard to have officers calling medical to ask whether to call a Code 1. Ex. 31 Forsberg Dep. 108:22-109:10. He noted that the jail does not expect officers to do physical assessments, and it is routine to have officers call medical personnel about an inmate. *Id.* He also stated that Johnson had the authority to tell an officer to call a Code 1. *Id.*

Johnson knew all the facts relating to Mr. Mosley's fall, injury, pain and inability to walk. In addition, MacAuley told her that around 2:30 a.m., Mr. Mosley still seemed like he was in pain. She knew that she had the authority to tell Officer MacAuley to call a Code 1, but did not. In so doing, Johnson ignored the unreasonable risk of harm associated with leaving Mr. Mosley in his cell after Officer MacAuley's call. By assuring MacAuley that Mr. Mosley was just going through detox and that he was fine where he was, Defendant Johnson acted with deliberate indifference to Mr. Mosley's serious medical needs.

### E.  The Court Should Reject Defendant Johnson's Other Arguments

Johnson argues that testimony by Dr. Peter Holmes, Defendant's expert orthopedic surgeon, shows that Mr. Mosley did not have a fracture at the time that Johnson assessed him. Doc. 131 at 10, citing Ex. 53 Holmes Dep. 25:10-16; 74:13-21; 105:7-106:9. This is incorrect. First, Dr. Holmes incorrectly assumed that Mr. Mosley walked out of the medical unit unassisted. Ex. 53 Holmes Dep. 24:20-25:14. In fact, Officers Guerra and Griego supported his weight by holding each of his arms, and Guerra insisted that he could barely walk and was in serious, severe pain.

Ex. 51 Guerra Dep. 83:7-86:22. Second, Dr. Holmes had no medical evidence to support his contention that Mr. Mosley fractured his hip after being discharged to his cell, as opposed to several hours before, when he fell and had severe pain "10 out of 10," a spike in blood pressure consistent with pain, swelling to his knee, an inability to bear weight on his right leg, and reported a possible fracture. *See* Part.D, supra. Based on this record evidence, a reasonable jury could conclude that Mr. Mosley had already fractured his hip when Johnson assessed him in the medical unit. Third, a reasonable jury could conclude that even if Dr. Holmes is right that a seizure occurred overnight, possibly exacerbating a fracture and leading to internal bleeding, Defendants Johnson's failures in assessing and diagnosing the fracture, in failing to send him for an x-ray, and failing to monitor Mr. Mosley when he was not stable, were so egregious that summary judgment must be denied.

Based on the summary judgment record, Plaintiffs have alleged genuine disputes of material fact on their claim that Johnson was deliberately indifferent to Mr. Mosley's serious medical needs.

## CONCLUSION

For the foregoing reasons, Plaintiffs respectfully request that the Court deny Defendant Henry Etta Johnson's motion for summary judgment in all respects, and allow Plaintiffs' claims against Johnson to proceed to trial.

DATED: September 20, 2019

Respectfully submitted,

/s/ Ranjana Natarajan
Ranjana Natarajan
Texas Bar No. 24071013
THE UNIVERSITY OF TEXAS SCHOOL OF
LAW – CIVIL RIGHTS CLINIC
727 East Dean Keeton Street
Austin TX 78705
Tel: 512-232-7222
Email: rnatarajan@law.utexas.edu

On the brief:
Elise Czuchna, Law Student, 2L
Jessica Hallam, Law Student, 2L

Brian McGiverin
Texas Bar No. 24067760
brian@lawcenterofaustin.com
DIETZ, LAWRENCE & MCGIVERIN
2221 Hancock Drive
Austin, TX 78756
Telephone: (512) 387-0718
Fax: (512) 597-0805

ATTORNEYS FOR PLAINTIFFS

CERTIFICATE OF SERVICE

I certify that a true and correct copy of the foregoing has been served on all counsel of record who have appeared in this matter through the Electronic Case Files System of the Western District of Texas.

/s/ Brian McGiverin
Brian McGiverin