UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION

| | | |
|---|---|---|
| ROBERT MOSLEY, JR., VINCENT MOSLEY, AND FELICIA MOSLEY, | § § § | |
| Plaintiffs, | § | |
| v. | § § | Cause No. 5:17-cv-583 |
| BEXAR COUNTY, HENRIETTA JOHNSON, JOHN BENNETT AND SEAN MACAULEY #2899, | § § § § | |
| Defendants. | § § § | |

**PLAINTIFFS' RESPONSE AND OPPOSITION TO
DEFENDANTS BEXAR COUNTY AND MACAULEY'S
MOTION FOR SUMMARY JUDGMENT**

**Table of Contents**

**I.    SUMMARY OF PLAINTIFFS' RESPONSE** .................................................................. 3

**II.    SUMMARY JUDGMENT EVIDENCE** .......................................................................... 4

  A.    Upon His Booking into the Jail, Defendants Were Aware of Mr. Mosley's Medical Conditions, Including Hypertension, Liver Disease, and Alcohol Use .................................................................. 5

  B.    Jail Medical Staff Determined that Mr. Mosley Was Experiencing Alcohol Withdrawal, But They Did Not Monitor Him in the Medical Unit or Send Him to a Hospital Despite His Hallucinations, In Violation of UHS Policy ........................................................................................................... 5

  C.    Mr. Mosley Missed a Dose of Alcohol Withdrawal Medication and then Suffered an Injury While in the Detox Cell ........................................................................................................................... 7

  D.    Mr. Mosley Was Taken by Wheelchair to the Jail Medical Unit for Assessment of and Treatment for His Injury .................................................................................................................................. 8

  E.    Defendants Johnson and Bennett Knew that Mr. Mosley Had Signs of a Possible Hip Fracture But Failed to Perform the Necessary Tests, Request an X-Ray, or Call the On-Call Provider ...................... 9

  F.    Defendants Johnson and Bennett Discharged Mr. Mosley to His Cell, Rather than Continuing to Monitor Him, Even Though He Could Not Walk Unassisted .............................................................. 10

  G.    Defendant MacAuley Knew Mr. Mosley Was Asking for Medical Help, But He Failed to Call a Code 1 for Medical Treatment ........................................................................................................ 11

**III.    ARGUMENTS AND AUTHORITIES** .......................................................................... 13

  A.    Standard of Review on Summary Judgment ........................................................................... 13

  B.    Plaintiffs' Claims of Constitutional Violations Brought Pursuant to 42 U.S.C. 1983 ................... 14

  C.    Standard for Deliberate Indifference to Serious Medical Needs ................................................ 14

1.    Defendant MacAuley Showed Deliberate Indifference to Mr. Mosley's Serious Medical Needs 15

2.    Mr. Mosley Had a Serious Medical Need: Severe Pain after a Fall and Injury ......................... 16

3.    It was Obvious that Mr. Mosley Had Pain that Required Treatment ........................................ 18

4.    Defendant MacAuley Failed to Obtain Medical Care for Mr. Mosley ...................................... 20

5.    The Court Should Reject Defendant MacAuley's Other Arguments .......................................... 23

6.    Defendant Macauley Is Not Entitled to Qualified Immunity ...................................................... 25

D.   Bexar County violated the Americans with Disabilities Act (ADA) and Rehabilitation Act (RA) by denying Mr. Mosley benefits of its of services, programs, or activities – and by otherwise discriminating against him – by reason of his disability. ........................................................................ 26

1.    Defendants' motion only raises narrow challenges to Bexar County's ADA liability. .............. 26

2.    Discriminatory purpose ............................................................................................................. 27

3.    Bexar County's motion inappropriately relies on disputed expert testimony ........................... 31

4.    Critical discrepancies in Defendants' testimony ........................... **Error! Bookmark not defined.**

**CONCLUSION** ............................................................................................................................... 32

## Cases

Alderson v. Concordia Parish Correctional Facility, 848 F.3d 418 (5th Cir. 2017) ............................... 18, 24

Anderson v. Liberty Lobby, Inc., 477 U.S. 242 (1986) ................................................................................ 13

Celotex. Corp. v. Catrett, 477 U.S. 317 (1986) ........................................................................................... 13

Domino v. Texas Dep't of Criminal Justice, 239 F.3d 752 (5th Cir. 2001) ....................................... 15, 24, 25

Easter v. Powell, 467 F.3d 459 (5th Cir. 2006) ..................................................................................... 24, 26

EEOC v. LHC Group, Inc., 773 F.3d 688 (5th Cir. 2014) .............................................................................. 13

Farmer v. Brennan, 511 U.S. 825 (1994) ...................................................................................... 14, 15, 19

Freeman v. Gore, 483 F.3d 404 (5th Cir.2007) ........................................................................................... 25

Gibbs v. Grimmette, 254 F.3d 545 (5th Cir. 2001) ..................................................................................... 15

Gobert v. Caldwell, 463 F.3d 339 (5th Cir. 2006) ...................................................................................... 15

Gonzales v. Dallas County, 249 F.3d 406 (5th Cir. 2001) ........................................................................... 25

Goodman v. Harris Cnty., 571 F.3d 388 (5th Cir.2009) .............................................................................. 14

Hare v. City of Corinth, 74 F.3d 633, 639 (5th Cir. 1996) .................................................................... 14, 25

Harris v. Hegmann, 198 F.3d 153 (5th Cir. 1999) ....................................................................................... 15

Hope v. Pelzer, 536 U.S. 730 (2002) ........................................................................................................... 25

Huffman v. Univ. Med. Ctr. Mgmt. Corp., No. CV 17-4480, 2017 WL 4960268 (E.D. La. Nov. 1, 2017) ..... 27

Int'l Shortstop, Inc. v. Rally's Inc., 939 F.2d 1257 (5th Cir. 1991) .............................................................. 14

Ivy v. Williams, 781 F.3d 250 (5th Cir. 2015) .............................................................................................. 27

King v. Munoz, No. No. A-16-CA-131-SS, 2017 WL 4547170 *3 (W.D. Tex. Oct. 12, 2017) ........................ 28

Lawson v. Dallas County, 286 F.3d 257 (5th Cir. 2002) ........................................................................ 14, 15

Loosier v. Unknown Med. Doctor, 435 Fed.Appx. 302 (5th Cir. 2010) ........................................................ 24

Lucas v. Goodwin 2018 WL 1210968 (W.D. La. Mar. 7, 2018) .................................................................... 24

Lytle v. Bexar County, 560 F.3d 404 (5th Cir. 2009) ................................................................................... 25

Matson v. Sanderson Farms, Inc., 388 F. Supp. 3d 853 (S.D. Tex. 2019) ...................................................26
Melton v. Dallas Area Rapid Transit, 391 F.3d 669 (5th Cir. 2004)............................................................26
Mendoza v. Lynaugh, 989 F.2d 191 (5th Cir. 1993) ................................................................................24
Minix v. Haynes, No. G-03-115 2009 WL 819755 (S.D. Tex. Mar. 26, 2009)...............................................19
Pa. Dep't of Corr. v. Yeskey, 524 U.S. 206 (1998) ..................................................................................27
Pioneer Expl., L.L.C. v. Steadfast Ins. Co., 767 F.3d 503 (5th Cir. 2014)....................................................26
Randle v. Lockwood, No. 6:1-CV-084-RP, 2017 U.S. Dist. LEXIS 31010 (W.D. Tex. Mar. 6, 2017) .............23
Rogers v. Bromac Title Serv's, L.L.C., 755 F.3d 347 (5th Cir. 2014)...........................................................13
Tolan v. Cotton, 572 U.S. 650 (2014) ..................................................................................................13
Whitley v. Hanna, 726 F.3d 631 (5th Cir.2013)......................................................................................14
Wilson v. Seiter, 501 U.S. 294 (1991)...................................................................................................14

TO THE HONORABLE XAVIER RODRIGUEZ, U.S. DISTRICT JUDGE:

Plaintiffs Felicia Mosley, Vincent Mosley, and Robert Mosley Jr. hereby submit this response and opposition to Defendants Bexar County and MacAuley's Motion for Summary Judgment (Doc. 132), and would respectfully show the Court as follows:

## I.    SUMMARY OF PLAINTIFFS' RESPONSE

On July 26, 2015, Robert Mosley Sr. died suddenly on the fourth day of his pretrial confinement at Bexar County Jail. He had surrendered himself to resolve an old warrant from 2003. On his third day in jail, he began experiencing symptoms of alcohol withdrawal including hallucinations. Then, after being placed in a detox cell, he fell or was pushed and sustained a serious injury, which he reported as a possible hip fracture. Two jail nurses assessed him and sent him back to his cell, even though he could not walk unassisted. During the night, he cried out for help, dragged himself army-crawling across the cell floor, and asked for someone to call 911. The unit officer ignored his pleas for help, and he found Mr. Mosley unconscious the next morning. Efforts to revive him were unsuccessful, and he died that same day. The medical examiner's autopsy report later concluded that he had sustained an acetabular (hip socket) fracture and experienced associated internal hemorrhaging. The blood loss was so extensive that it caused multiple organ failure and death.

Plaintiffs are his three sole surviving adult children. They bring claims that Mr. Mosley's constitutional Due Process rights were violated by deliberate indifference to his serious medical needs. Specifically, Plaintiffs are suing two jail nurses, Defendants Henry Etta Johnson and John Bennett, for declining to properly assess and treat Mr. Mosley the night before he died. Johnson and Bennett knew that Mr. Mosley had signs of a hip fracture, that he had reported a potential hip fracture, and that he could not walk unassisted. They knew that hip fractures can be very serious and can lead to death if left untreated or if treatment is delayed. Nevertheless, they returned him to his jail cell after refusing to run the most basic physical tests to diagnose a fracture, or requesting an x-ray, which every nurse knows is essential for diagnosing fractures.

Plaintiffs are also suing Sean MacAuley, the jail detention officer in Mr. Mosley's pod, for failing to respond to his repeated calls for help in the overnight hours before he fell unconscious. Officer MacAuley was responsible for Mr. Mosley's safety, and he knew that he had suffered a fall, was unable to walk, and was experiencing alcohol withdrawal. Any reasonable officer under those circumstances would have obtained medical attention for Mr. Mosley, but Defendant Sean MacAuley did not, and a result, he died. Finally, Plaintiffs are also suing Bexar County, the jail operator, for its employees' violations of the Americans with Disabilities Act (ADA) and Rehabilitation Act.

As set forth herein, Plaintiffs have adduced evidence to establish each element of their constitutional and ADA/RA claims. When the Court construes all facts and inferences in the light most favorable to the nonmoving party, as it must, it should conclude that there are genuine issues of material fact that preclude summary judgment on all of Plaintiffs' claims.

## II.     SUMMARY JUDGMENT EVIDENCE

Plaintiffs rely on the following evidence in support of their arguments:

**A.  Upon His Booking into the Jail, Defendants Were Aware of Mr. Mosley's Medical Conditions, Including Hypertension, Liver Disease, and Alcohol Use**

Robert Mosley Sr. was a 54-year old African American man who traveled from his home in Arizona to San Antonio to resolve an old warrant from 2003. On July 22, 2015, he voluntarily surrendered himself to Bexar County Sheriff's Office officials, who booked him into the Bexar County Adult Detention Center (BCADC, or Bexar County jail). Ex. 1 BCSO 00953-955. The Bexar County Sheriff's Office, a department of Bexar County, operates the jail.

That same evening, Mr. Mosley's jail medical screening during booking noted that he had hypertension, borderline diabetes, "unknown liver disease," and that he took medication twice daily, but did not recall its name. Ex. 2 UHS 0012-0015. He also "state[d] he drinks 2-3 12oz beers after work, [and his] last drink yesterday [was] of three 12oz beers." *Id.* UHS 0013. He was referred to the jail's Chronic Care Clinic in 1-2 days. UHS 0014. He was assigned to a two-man cell. He was not assigned to a detox cell or prescribed alcohol withdrawal medication. *Id.* UHS 0015.

**B.  Jail Medical Staff Determined that Mr. Mosley Was Experiencing Alcohol Withdrawal, But They Did Not Monitor Him in the Medical Unit or Send Him to a Hospital Despite His Hallucinations, In Violation of UHS Policy**

Just before midnight on the morning of July 25, 2015, Mr. Mosley's cellmate reported to jail staff that Mr. Mosley was experiencing hallucinations and "stomping out bugs that are not really there." Ex. 2 UHS 0015. A jail officer observed that he was "hallucinating and confused," "unaware of what he's doing, seeing things that isn't there and short memory," and requested a psychological evaluation. Ex. 3 BCSO 000003. Mr. Mosley was sent to the jail medical unit (known also as MT01) for physical and mental assessment. Ex. 2 UHS 0015. The Bexar County Hospital District, d/b/a University Health Services (UHS), is the medical provider at Bexar County Jail. Jail medical unit staff, including nurses, are UHS employees.

At around 1:00 AM, Peter Forsberg, a physician assistant working in the jail medical unit, assessed Mr. Mosley. Ex. 2 UHS 0015-16. Mr. Mosley told him that "he's looking for a particular officer who said he would be released from jail if he would come here from AZ." *Id.* UHS 0015. Forsberg performed an assessment of Mr. Mosley and found nothing remarkable. *Id.* For his musculoskeletal system assessment, Forsberg wrote that he "denies back pain, joint pain, joint swelling, muscle cramps, muscle weakness, stiffness, arthritis," and his assessment showed "[m]usculoskeletal [system] without any significant abnormalities." *Id.*

Forsberg noted other abnormalities, however. Under "Neurological," he noted that Mr. Mosley was "restless." Ex. 2 UHS 0015. He had "no tremors," but "[s]eems slow to reply to questions." *Id.* In addition, he was "[n]ot answering with a clear reply" and exhibited "[t]angential thoughts." *Id.* He noted: "No[t] certain, but it is suspected that this I/M [inmate] may drink a bit more than he lets on." *Id.* Based on these findings, Forsberg concluded that Mr. Mosley showed "Possible Mental Status changes. Possible heavy alcohol drinker." *Id.* Forsberg ordered him moved to a "detox pod" (a pod with cells for inmates underdoing substance withdrawal), and he prescribed Mr. Mosley medication to be taken orally for alcohol withdrawal, including lorazepam (a benzodiazypene), a multivitamin, thiamine, and folic acid. He referred Mr. Mosley to another provider in 1-2 days for "Detox," noting: "Seen in treatment room, notified per unit officer bizarre behavior. States occasional etoh [alcohol] use. Relocated to detox unit and started on Lorazepam 2mg twice a day, Please evaluate." *Id.* UHS 0015-18. At the end of his medical visit, a nurse named Manuel Reynosa administered Mr. Mosley the first dose of Lorazepam by mouth.

According to the UHS protocol for alcohol withdrawal, in cases where an inmate is experiencing withdrawal symptoms including hallucinations, UHS staff are required to send the inmate to a local hospital emergency room or monitor the inmate in the jail infirmary. Ex. 4 UHS 0227. In Mr. Mosley's case, Forsberg did neither. Later, after Mr. Mosley passed away, the UHS

Director of Detention Health Services, Katharine Whiteley, confirmed by email that Forsberg should have sent Mr. Mosley to an emergency room or the infirmary, if he was having hallucinations. Ex. 5 UHS 2137-2138. Forsberg was not reprimanded for his handling of Mr. Mosley's case.

### C. Mr. Mosley Missed a Dose of Alcohol Withdrawal Medication and then Suffered an Injury While in the Detox Cell

After his visit to the medical unit, Mr. Mosley was transferred to an 8-man cell in the CI pod, which is a "detox pod." Ex. 2 UHS 0018. The CI pod is made up of two sides, each of which have a row of cells and a dayroom. Ex. 6 BCSO 000240. One officer, called the unit officer, is stationed in a booth at the entrance to the CI pod, and his job is to oversee the care, control and safety of the pod's inmates. Each cell in the CI pod has a number, and the number of inmates inside varies. Each cell has an intercom to communicate with the unit officer.

After coming to the CI pod, Mr. Mosley slept during the morning, missing his next scheduled dose of Lorazepam at approximately 9:00 AM. Ex. 2 UHS 0009. At that time, a nurse brought a medicine cart to the CI unit. The jail required inmates to exit their cells into the dayroom to be given their medicine by the nurse, but Mr. Mosley was sleeping.

At approximately 3:00 pm that afternoon, Mr. Mosley suffered an injury, apparently resulting from either a fall or being pushed by someone. Compare Ex. 2 UHS 0019 (States, "Fell and could have fractured my hip") with *Id.* UHS 0021 ("was informed by Sgt that inmate was pushed"). No video footage exists of this fall.[1] After he sustained this injury, Mr. Mosley was lying on the floor and could not move his leg or get up for hours. Ex. 7 BCSO 000834. He sought medical help. At approximately 6:00 pm, Kevin Ponton, the unit officer on shift in the CI unit, called a

---

[1] BCSO represented that it does not have any video footage of any of the incidents relating to this lawsuit.

Code 1 for Mr. Mosley. *Id.*; Ex. 2 UHS 0019. A Code 1 is the only method for a unit officer to obtain immediate, non-emergent medical attention for an inmate. Ex. 8 BCSO 000241.

### D.  Mr. Mosley Was Taken by Wheelchair to the Jail Medical Unit for Assessment of and Treatment for His Injury

At approximately 6:26 p.m., a nurse from the jail medical unit, Amber Weber, RN, arrived at the CI unit in response to the Code 1, with medical assistant Michael Smith. Ex. 7 BCSO 000834; Ex. 2 UHS 0018-0020. When she arrived, Mr. Mosley was still on the floor of his cell, and he told her that he was unable to get up. *Id.* Weber talked to Mr. Mosley. Although he knew his name, he did not know where he was; he thought he was at home. *Id.* He thought that she was someone else, and he called her by that person's name. Ex. 9 Weber Dep. 86:16-87:4. Half of the things he said did not make sense to her. *Id.* 89:2-12. He told her that he had fallen, and that he was unable to get up. Ex. 2 UHS 0018-20. He told her that his hip and knee hurt, and that he thought he could have fractured his hip. *Id.* ("Pain to right hip and knee;" circling area from hip to knee on diagram of human body). She documented his swelling and his report of his injury and pain: "Swelling +1 and pain 10 out of 10 to right knee. States, 'Fell and could have fractured my hip.'" Ex. 2 UHS 0019.

Weber tried to bargain with Mr. Mosley to get up, but he could not. Ex. 9 Weber Dep. 87:2-16. Therefore, she and Smith lifted Mr. Mosley off the floor and into a wheelchair, and they took him to the jail medical unit. Ex. 7 BCSO 000834. The CI unit is on the fourth floor; the medical unit is on the first floor. They took the elevator, and Mr. Mosley rode in the wheelchair.

In the medical unit, Mr. Mosley's vital signs were taken, and Weber noted that they were not within normal limits. Ex. 2 UHS 0020. Weber noted swelling and warmth on his right knee, for which he was given an ice compress. *Id.* She gave him a dose of Lorazepam, his alcohol withdrawal medication, since he had missed his morning dose. *Id.* He was placed on a gurney to

rest. Weber's shift had ended at 7:00 pm, so she documented the Code 1 and left Mr. Mosley in the care of LVN Henry Etta Johnson and RN John Bennett, the nurses on the next shift. She talked to Johnson about Mr. Mosley and his condition before leaving. Ex. 9 Weber Dep. 100:8-102:17.

**E.   Defendants Johnson and Bennett Knew that Mr. Mosley Had Signs of a Possible Hip Fracture But Failed to Perform the Necessary Tests, Request an X-Ray, or Call the On-Call Provider**

Defendant Henry Etta Johnson, a Licensed Vocational Nurse employed by UHS and working in the jail medical unit, took over Mr. Mosley's care. Ex. 2 UHS 0020-22. She was responsible for making an assessment of Mr. Mosley based on his complaints. *Id*. An ordinary nursing assessment includes talking with the patient, viewing the site of the injury, touching the site of the injury, and other physical exams. Ex. 10 Bennett Dep. 29:15-32:2. As an experienced LVN nurse, Johnson knew how to assess a patient complaining of hip and knee pain and reporting a possible hip fracture, and would consult his medical record. *Id*. 55:5-17; 47:4-25.

Defendant Johnson knew that Mr. Mosley was complaining of right leg pain and that he had fallen while in the jail. Ex. 2 UHS 0021-22. She wrote a lengthy medical record describing her assessment. *Id*. In that record, she stated that he was "detoxing" (experiencing alcohol withdrawal), and that he drank "several cans of beer daily." *Id*. She was informed by a Sergeant that Mr. Mosley had been pushed by another inmate, and he was lying on the cell floor, complaining of right leg pain, and that "he could not put weight" on his right leg. *Id*. She also noted that his right leg had swelling, but no redness or bruising. *Id*. She noted that he had "pedal pulse," his right leg was cool and dry to the touch, and that Mr. Mosley was able to move the leg. *Id*. She stated in the record that she referred the case to her supervisor (John Bennett) and that they monitored him in the medical unit (MT01). *Id*. His blood pressure increased to 176/110, but Johnson and Bennett did not give him medication for it or call the on-call provider. *Id*.

It is common medical knowledge that the most basic physical tests to determine if a patient has a hip fracture are: 1) to rotate the legs to see if one is more abducted, and 2) to compare the two hips to look for displacement. Ex. 10 Bennett Dep. 55:18-57:25. Johnson did not perform these tests or document them in the medical record. Ex. 2 UHS 0021-22. It is common medical knowledge that an x-ray is the most reliable initial diagnostic test to determine if there is a bone fracture, including a hip fracture that is not visible to the naked eye. Ex. 10 Bennett Dep. 51:6-17; Ex. 11 Johnson Dep. 40:12-23; 85:15-20. However, neither Bennett nor Johnson called the on-call provider to request an x-ray for Mr. Mosley. Johnson's medical record does not even mention an x-ray. Ex. 2 UHS 0021-22. The jail medical unit had a physician or other "prescriber" available on-call that night, and they could be reached by telephone. Neither Bennett nor Johnson contacted the on-call provider to elevate the case or seek a consultation about the signs of hip fracture, hypertension, and alcohol withdrawal.

**F.   Defendants Johnson and Bennett Discharged Mr. Mosley to His Cell, Rather than Continuing to Monitor Him, Even Though He Could Not Walk Unassisted**

Mr. Mosley lay on a stretcher for approximately two hours. Ex. 2 UHS 0021-22. After two hours, Johnson reported that although he previously had complained of right leg pain, he was now moving his right foot and leg without pain. *Id*. Johnson reported a manual blood pressure re-check, with a reading of 143/78, but did not report the time it was taken. *Id*. She stated that he had no bruising or redness to his right leg, and he had a good pedal pulse in his right foot. *Id*. She informed her supervisor again. *Id*. At approximately 10:45 pm, Johnson and Bennett discharged Mr. Mosley back to his cell.

At discharge, Johnson wrote that "inmate stood on his own." She testified that he walked out and walked to his cell by himself. Ex. 11 Johnson Dep. 146:6-147:8. Bennett also testified that Mr. Mosley walked unassisted to his cell. Ex. 10 Bennett Dep. 111:10-114:12, 113:9-114:4. In

fact, two detention officers assisted Mr. Mosley to walk out of the medical unit, down the hallway, and to the elevator. Ex. 12 Guerra Dep. 83:7-86:22. Officer Guerra testified that she and another officer put their arms under each of his arms to support him and assisted him to walk back to his cell, and that he walked very slowly as if in severe pain. *Id*.

### G. Defendant MacAuley Knew Mr. Mosley Was Asking for Medical Help, But He Declined to Call a Code 1 for Medical Treatment

Mr. Mosley spent the rest of the night lying on the floor of the cell, with only his mat under him, because he could not get into a bunk. After he returned, there was a shift change, and Officer Sean MacAuley took over from Officer Kevin Ponton as the unit officer of the CI detox pod. Ex. 13 MacAuley Dep. 74:7-15. Ponton told MacAuley that Mr. Mosley had fallen, and that he had gone to the medical unit on a Code 1 and then returned. *Id*. 90:21–91:5; Ex. 14 Ponton Dep. 60:19–61:12. MacAuley also read Ponton's report of the Code 1, which explained that Mr. Mosley was unable to move his leg or stand up. Ex. 13 MacAuley Dep. 134:15–135:20; Ex. 7 BCSO 000834. MacAuley knew that Mr. Mosley had complained of hip pain for hours after his fall and that he had not moved from his mattress since his return from medical. Further, Ponton told MacAuley to keep a close eye on Mr. Mosley.

Macauley was on shift from 11 p.m. until 7 a.m. the next morning. In the CI unit that night, breakfast was served at around 1:44 a.m. in the common dayroom. Ex. 13 MacAuley Dep. 184:2-14; Ex.15 BCSO 002552. MacAuley noticed that Mr. Mosley did not get up from his mat on the floor to come eat breakfast. Ex. 13 MacAuley Dep. 112:23–113:9. MacAuley called to other inmates who were not eating to see if they were going to eat, but did not ask Mr. Mosley. *Id*. 113:10-114:7.

Around 2 a.m., MacAuley heard complaints from Mr. Mosley's cellmates. Ex. 13 MacAuley Dep. 109:10-22. They told MacAuley that Mr. Mosley, who was not walking but was

dragging himself across the cell floor as if "mopping the floor with himself," had been talking to them and disturbing their sleep, and that Mr. Mosley had asked for 911 to be called. *Id.* 83:16-21, 107:8-13, 109:13-22; Ex. 16 BCSO 000817. MacAuley commanded Mr. Mosley to return to sleep on his mattress, but Mr. Mosley did not respond to MacAuley until he called him by his first name. *Id.* 103:17-24. Only then did Mr. Mosley look up and make eye contact with MacAuley, emitting a grunt in acknowledgement. *Id.* 103:24-25. In this moment, MacAuley recognized that Mr. Mosley appeared delirious, and that his behavior was "weird." *Id.* 108:13-19. He then watched as Mr. Mosley crawled back to his mattress, never attempting to stand or walk. *Id.* 105:6-19. He did not, however, call a Code 1.

MacAuley testified that he called LVN Johnson to ask if Mr. Mosley was all right. Ex. 13 MacAuley Dep. 116:22-117:1. She told him that Mr. Mosley was in alcohol withdrawal, and he was fine where he was. *Id.* 125:5-17. MacAuley did not record the phone call in the CI unit jail log until later in the morning, after he found Mr. Mosley unconscious. *Id.* 117:5-16; Ex. 15 BCSO 002553. Johnson testified that MacAuley never called her. Ex. 11 Johnson Dep. 56:17-19. She testified that if he had, she would have told him to call a Code 1 because it was the only way to get Mr. Mosley immediate medical attention. *Id.* 52:24-1. In any case, MacAuley did not call a Code 1.

Notes written by BCSO officers state that Mr. Mosley complained of hip pain at 5:00 a.m. that morning. Ex. 17 BCSO 000018; Ex. 18 BCSO 000859-860. Notes written by BCSO officers state that Mr. Mosley asked MacAuley to call 911 at 6:15 a.m. *Id.* MacAuley did not call a Code 1 at either time.

At 7:00, before his shift ended, MacAuley entered Mr. Mosley's cell and found him unconscious. Ex. 13 MacAuley Dep. 173:7-15; Ex. 19 BCSO 000836. He called a Code 1 Blue and waited for other officers to arrive. *Id.* Officers attempted to resuscitate Mr. Mosley with CPR.

*Id.*; Ex. 21 Brown Dep. 23:20–24:4. San Antonio EMS arrived and took him to Methodist Hospital, where additional resuscitation efforts were attempted without success. At 1:16 p.m., a doctor declared Mr. Mosley dead. Ex. 22 BCSO 000843. The Bexar County medical examiner concluded after autopsy that Mr. Mosley had died because he had suffered an acetabular (hip socket fracture) in his right hip, with associated internal bleeding as a result of the bone shards splicing his blood vessels. The hemorrhage had caused massive organ failure and death. Ex. 23 Feig Dep. 31:17-21; 56:14-20; Ex. 24 BCSO 002564-2572.

## III.    ARGUMENTS AND AUTHORITIES

### A.  Standard of Review on Summary Judgment

Summary judgment is only proper if the evidence before the court shows that no genuine issues of material fact are in dispute and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(b); *Celotex. Corp. v. Catrett*, 477 U.S. 317, 322 (1986). The party moving for summary judgment bears the burden of showing that the evidence in the record demonstrates an absence of genuine issues of material fact. *Celotex Corp.*, 477 U.S. at 323. A dispute about a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

A court reviewing a motion for summary judgment must "construe all facts and inferences in the light most favorable to the nonmoving party." *Rogers v. Bromac Title Serv's*, L.L.C., 755 F.3d 347, 350 (5th Cir. 2014); *Tolan v. Cotton*, 572 U.S. 650, 651 (2014) ("in ruling on a motion for summary judgment, '[t]he evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in his favor.'"). The court should "refrain from making credibility determinations or weighing the evidence," which are tasks for the fact-finder at trial. *EEOC v. LHC Group, Inc.*, 773 F.3d 688, 694 (5th Cir. 2014); *see also, Tolan*, 134 S.Ct. at 1866. Any

"reservations the court has concerning the evidence will preclude summary judgment." *Int'l Shortstop, Inc. v. Rally's Inc.*, 939 F.2d 1257, 1264 (5th Cir. 1991).

**B.  Plaintiffs' Claims of Constitutional Violations Brought Pursuant to 42 U.S.C. 1983**

To establish a claim under 42 U.S.C. § 1983, "a plaintiff must (1) allege a violation of a right secured by the Constitution or laws of the United States and (2) demonstrate that the alleged deprivation was committed by a person acting under color of state law." *Whitley v. Hanna*, 726 F.3d 631, 638 (5th Cir.2013). Additionally, "[c]laims under § 1983 may be brought against persons in their individual or official capacity, or against a governmental entity." *Goodman v. Harris Cnty.*, 571 F.3d 388, 395 (5th Cir.2009).

**C.  Standard for Deliberate Indifference to Serious Medical Needs**

The Constitution imposes on prison and jail officials a duty to ensure that inmates receive adequate medical care. *Farmer v. Brennan*, 511 U.S. 825, 832 (1994); *Wilson v. Seiter*, 501 U.S. 294, 297 (1991). When the government restrains an individual's liberty and renders him unable to care for himself, it has an affirmative duty to provide for his basic needs, including medical care and reasonable safety. *Hare v. City of Corinth*, 74 F.3d 633, 639 (5th Cir. 1996). For pretrial detainees, the sources of the right to adequate medical care are the substantive and procedural due process guarantees of the Fourteenth Amendment. *Id*. at 639-640.

To prove a claim of deliberate indifference to serious medical needs, a plaintiff must prove that he was exposed to a substantial risk of serious harm, and that jail officials acted or failed to act with deliberate indifference to that risk. *Wilson*, 501 U.S. at 297; *Farmer*, 511 U.S. at 832; *Lawson v. Dallas County*, 286 F.3d 257, 262 (5th Cir. 2002). To prove deliberate indifference, the plaintiff must show that jail officials were aware of the risk, and consciously disregarded it. *Id*. Specifically, plaintiff must show that defendants were both (1) aware of facts from which an inference of an excessive risk to the inmate's health or safety could be drawn, and (2) that they

actually drew an inference that such potential for harm existed. *Farmer*, 511 U.S. at 837; *Harris v. Hegmann*, 198 F.3d 153, 159 (5th Cir. 1999).

A jail official acts with deliberate indifference "if [(A)] he knows that inmates face a substantial risk of serious bodily harm and [(B)] he disregards that risk by failing to take reasonable measures to abate it." *Gobert v. Caldwell*, 463 F.3d 339, 346 (5th Cir. 2006) (quoting *Farmer*, 511 U.S. at 847). A jail official's knowledge of a substantial risk of harm may be inferred by the obviousness of the substantial risk, *Hegmann*, 198 at 159; *Farmer*, 511 U.S. at 841, but not from an official's mere failure to act reasonably. *Lawson*, 286 F.3d at 262. Each defendant's deliberate indifference must be examined separately. *Id.*

A "serious medical need" is "one for which treatment has been recommended or for which the need is so apparent that even laymen would recognize that care is required." *Gobert,* 463 F.3d at 345 n.12. Evidence may show that it is "common medical knowledge" that the alleged improper medical care puts the patient at a substantial risk of serious harm. *Lawson*, 286 F.3d at 262. Disagreement with the course of medical treatment provided typically will not suffice to show a constitutional violation. *Gibbs v. Grimmette*, 254 F.3d 545 (5th Cir. 2001). However, a plaintiff may make out a claim by showing that defendants "refused to treat him, ignored his complaints, intentionally treated him incorrectly, or engaged in any similar conduct that would clearly evince a wonton disregard for any serious medical needs." *Domino v. Texas Dep't of Criminal Justice,* 239 F.3d 752, 756 (5th Cir. 2001).

### 1. Defendant MacAuley Showed Deliberate Indifference to Mr. Mosley's Serious Medical Needs

Defendant MacAuley, the unit officer in the CI block on the night of July 25, 2015, acted with deliberate indifference to Mr. Mosley's serious medical needs by declining to obtain medical care for his hip injury and severe pain. MacAuley was aware of the signs of severe pain that Mr.

Mosley was exhibiting throughout his shift, yet failed to call a Code 1 at several opportunities, despite repeated calls for help. As a result, Mr. Mosley died of the preventable consequences of internal bleeding related to his hip fracture.

### 2. Mr. Mosley Had a Serious Medical Need: Severe Pain after a Fall and Injury

Defendant MacAuley knew that Mr. Mosley had a hip injury and severe pain before his shift began. Before assuming his responsibilities as unit officer in the CI unit, MacAuley knew that Mr. Mosley had suffered a fall; that the unit officer on the previous shift—Officer Ponton—had called a Code 1[2] at around 6:20 p.m. because Mr. Mosley could not move his leg or stand up; that Mr. Mosley was taken to the medical unit in a wheelchair; that he had been laying on his mattress since he had returned from the medical unit; and that he had continued to complain of hip pain for hours after his fall. Ex. 13 MacAuley Dep. 134:15-21, 135:13-20; Ex. 14 Ponton Dep. 60:19–61:12; Ex. 7 BCSO 000834; Ex. 20 BSCO 000835. MacAuley learned these facts both by reading Officer Ponton's incident report from the Code 1 as well as from speaking to Officer Ponton before his shift began. *Id.*

In addition, Officer Ponton advised MacAuley to "[k]eep an eye on" Mr. Mosley during his shift. Ex. 14 Ponton Dep. 60:19-24; Ex. 12 Guerra. Dep 97:13-14. As Officer Guerra explained, Ponton shared the Code 1 details to MacAuley because it was important to share information about inmates in possible distress, especially in the CI unit where inmates were detoxing. Ex. 12 Guerra Dep. 97:2-22 ("You have to [give this debriefing]. You cannot . . . omit that about anybody, especially in the detox unit.").

MacAuley admitted that, because he knew about the Code 1 that Ponton had called for Mr. Mosley, he made sure to pay "close[] attention to" to him during his shift. Ex. 13 MacAuley Dep

---

[2] A Code 1 is initiated when an "[a]rea is in need of immediate medical assistance (e.g. seizure, chest pains, shortness of breath, etc.)." Ex. 8 BCSO 000241.

94:7-13 ("I was just keeping an eye with the knowledge that he had a Code 1 beforehand."); Ex. 19 BCSO 000836; Ex. 16 BSCO 000823 ("[I]nmate Mosley was complaining that his hip and leg were hurting and due to that complaint [MacAuley] would check on inmate Mosley 'all the time.'").

After MacAuley started his shift, he observed Mr. Mosley. First, when breakfast was served in the CI unit at around 1:44 a.m., MacAuley noted that Mr. Mosley did not get up from his mattress on the floor to eat, even after MacAuley called out to the inmates to tell them to come out of their cells to eat in the adjoining dayroom. Ex. 13 MacAuley Dep. 112:23–114:7. Then at around 2:00 a.m., MacAuley watched Mr. Mosley, who had spent the previous several hours almost completely immobile, suddenly begin to "drag his body around" on the floor toward his cellmates. He was not walking; he was lying prone on the ground, dragging his body with his arms (army-crawling). His cellmates told MacAuley that Mr. Mosley had asked for 911 to be called. *Id.* 83:19-21, 109:16-21; Ex. 16 BSCO 000823. At 5:00 a.m., Mr. Mosley complained to Defendant MacAuley of hip pain. Ex. 25 Cagle Dep. 63:2-14; Ex. 17 BCSO 000018; Ex. 18 BCSO000859; Ex. 13 MacAuley Dep. 149:23–150:23.[3] Then, at around 6:15 a.m., Mr. Mosley again asked for 911 to be called. Ex. 17 BCSO 000018; Ex. 18 BCSO 000859; Ex. 26 Lozano Dep. 25:14–26:9.[4]

---

[3] Detective Brar included this fact in her report. Lieutenant Cagle testified that he must have been the one to inform Detective Brar of this fact, which she then wrote down. Detective Brar's notes are admissible as a recorded recollection of Lieutenant Cagle. Fed. R. Evid. 803(5). Cagle does not recall from whom this information came, but he did not dispute its accuracy. MacAuley was the only officer speaking to inmates in the CI unit at that time and must be the source of this information. Ex. 13. MacAuley Dep. 149:23–150:23. Detective Brar's notes are thus admissible as evidence of MacAuley's knowledge of Mr. Mosley's medical needs. Fed. R. Evid. 807(a).

[4] Officer Lozano admitted that he may have written the note about Mr. Mosley's 6:15 a.m. cry for help. Ex. 26 Lozano Dep. 24:1-9; Ex. 17 BCSO 000018. The handwriting in the note matches the handwriting in the CI log identified as Officer Lozano's, and other handwriting identified as belonging to the CI Unit officer that morning. Ex. 15 BCSO002553-2554; Ex. 18 BCSO000859. On the morning of Mr. Mosley's death, Officer Lozano was the unit officer in CI. Ex. 15 BCSO002553. At that time, he was also responsible for debriefing CID investigators on the events leading to the Code 1 Blue, and therefore he took notes. Ex. 26 Lozano Dep. 21:4-12. Since MacAuley testified that he was the only person who spoke with the inmates in the CI unit prior to the Code 1 Blue, Officer Lozano must have received this information from Defendant MacAuley. Thus, Officer Lozano's note is admissible as evidence of MacAuley's knowledge of Mr. Mosley's medical needs. Fed. R. Evid. 807(a).

Based on these facts, a reasonable jury could conclude that MacAuley knew that Mr. Mosley had fallen, reported a hip injury, been unable to move, and continued to experience severe and prolonged pain that required treatment.

In his motion, MacAuley argues that Mr. Mosley did not have a serious medical need during MacAuley's shift because there is no evidence that Mr. Mosley suffered a hip fracture *before* he returned from the medical unit to the CI unit. Doc. 132 at 13. This is incorrect. First, there is ample evidence that Mr. Mosley suffered a fracture before he returned to the detox unit, including that after he fell, he reported pain 10 out of 10 in severity, had swelling in his right knee, was unable to bear weight or stand up for hours after the fall, and even after two hours in the medical unit was unable to walk unassisted. Ex. 2 UHS 0018-0023; Ex. 12 Guerra Dep. 83:7-86:22 (Guerra and another guard assisted Mr. Mosley to walk back to his cell because he was still in severe pain).[5]

Second and more importantly, pain alone is a serious medical need. *Alderson v. Concordia Parish Correctional Facilit*y, 848 F.3d 418, 422 (5th Cir. 2017). Thus, whether MacAuley knew Mr. Mosley's specific diagnosis is irrelevant. He knew about Mr. Mosley's severe pain through three separate sources—his conversation with Ponton and reading Ponton's report, his observations of Mr. Mosley in the middle of the night, and Mr. Mosley's cries for help at 5:00am and 6:15am. Ex. 25 Cagle Dep. 63:2-14; Ex. 13 MacAuley Dep. 149:23–150:23; Ex. 14 Ponton Dep. 60:19-24; Ex. 12 Guerra Dep. 97:2-22; Ex. 7 BSCO 000834. A jury could reasonably infer from this evidence that Defendant MacAuley knew that Mr. Mosley was suffering from severe pain that required treatment.

### 3.  It was Obvious that Mr. Mosley Had Pain that Required Treatment

---

[5] More evidence on this issue is set forth in Plaintiffs' opposition to the motions for summary judgment by Defendants Johnson and Bennett.

Moreover, Mr. Mosley's medical needs were so obvious could infer that MacAuley, as a trained corrections officer, must have known that Mr. Mosley was experiencing pain that required treatment. *See Farmer*, 511 U.S. at 837  (knowledge of a substantial risk of harm may be inferred from the fact that the risk was obvious). As part of his corrections training, MacAuley was trained by medical professionals to "[r]ecogniz[e] and respond[] to the need for emergency medical care." Ex. 27 UHS 0355-0356. MacAuley had learned that an inmate's unusual behavior may indicate the need for medical attention. Ex. 13 MacAuley Dep. 22:20–23:3.

At around 2:00 a.m. on July 26, 2015, MacAuley observed Mr. Mosley engaging in unusual behavior, such as army-crawling around on the floor, making noises, and bothering his cellmates, asking for someone to call 911. Ex. 13 MacAuley Dep. 108:22-25. Mr. Mosley, who had spent the previous several hours almost completely immobile, suddenly begin to "drag his body around" on the floor toward his cellmates as if "mopping the floor with himself." *Id.* 83:19-21; Ex. 16 BSCO 000823. In addition, MacAuley noted that Mr. Mosley "seemed delirious" and that he was barely responsive to verbal commands; he admitted that "something just felt off" and "[i]t didn't feel right" watching Mr. Mosley mop the floor with his body. Ex. 13 MacAuley Dep. 103:20–103:18, 108:18–109:5; Ex. 16 BSCO 000823. MacAuley found Mr. Mosley's crawling to be concerning and "strange" behavior. Ex. 13 MacAuley Dep. 128:5-9. Moreover, Mr. Mosley's cellmates informed MacAuley that Mr. Mosley had asked for 911 to be called, and that "he's been acting like this for days." *Id.* 109:16-21.

MacAuley's observation of Mr. Mosley's unusual behavior, combined with his prior knowledge of Mr. Mosley's fall and pain, gave him sufficient notice that Mr. Mosley required medical treatment. *Minix v. Haynes*, No. G-03-115 2009 WL 819755 at *6 (S.D. Tex. Mar. 26, 2009) (severe pain can be indicative of a serious medical need). Given these facts, it would have

been obvious to MacAuley as a reasonably trained corrections officer that Mr. Mosley was experiencing severe pain or delirium that required immediate medical attention.

Mr. Mosley's medical needs only became more obvious as the night wore on. During MacAuley's rounds, Mr. Mosley asked for medical treatment at least twice. First, at 5:00 a.m., Mr. Mosley complained to MacAuley of hip pain. Ex. 18 BCSO 000859; Ex. 25 Cagle Dep. 63:2-14; Ex. 13 MacAuley Dep. 149:23–150:23. Second, at around 6:15 a.m., Mr. Mosley again asked for 911 to be called. Ex. 26 Lozano 25:14–26:9. These cries for help further alerted MacAuley to the fact that Mr. Mosley was in severe pain that required medical attention. The risk to Mr. Mosley was obvious.

### 4. Defendant MacAuley Failed to Obtain Medical Care for Mr. Mosley

Despite Mr. Mosley's severe pain and obvious need for immediate medical attention, MacAuley failed to obtain any medical care for him. As a trained corrections officer, MacAuley knew that one of his most important duties was to protect inmates from illness and injury. Ex. 13 MacAuley Dep. 12:17-23; Ex. 28 Worlds Dep. 38:9-19. He knew he had a duty to address any medical issues and injuries that befell inmates in his care. Ex. 13 MacAuley Dep. 12:17-22; Ex. 14 Ponton Dep. 12:24–13:2. Bexar County's 30(b)(6) witness Reginald Worlds stated MacAuley knew that if, based on his own assessment of the situation and without approval from medical staff or supervisors, he believed that Mr. Mosley required immediate medical attention, *i.e.*, if he showed signs of distress, "per policy, if he feels that strongly about it, he should just call the Code One." Ex. 28 Worlds Dep. 19:16–20:15, 37:12-21; Ex. 25 Cagle Dep. 32:2-4. Put differently, he knew that he should call a Code 1 if he believed Mr. Mosley's condition was severe enough that he should not be forced to wait through the sick call process, which would not provide him medical attention for at least 24 or up to 72 hours. Ex. 28 Worlds Dep. 17:17–18:3. Lieutenant Cagle also testified that as a trained corrections officer, MacAuley knew that he should "automatically" call

a Code One in "an emergency situation where [an inmate] can't get up." Ex. 25 Cagle Dep. 32:10-11; 33:2-5.

Four different times during his shift, when he became aware of Mr. Mosley's pain and strange behavior, MacAuley failed to call a Code 1. MacAuley ignored Mr. Mosley's obvious signs of severe pain, including his audibly labored breathing, inability to stand or walk, and cries for help. Ex. 8 BCSO 000241; Ex. 29 BCSO 002042; Ex. 16 BSCO 000823; Ex. 30 Colon Dep. 19:1-4 (explaining that Bexar County corrections officers call a Code 1 "immediately" when an inmate presents with shortness of breath); Ex. 21 Brown Dep. 9:9-14 (asserting that all Bexar County employees are "required to comply with" the Sheriff's Manual for Detention Operations); Ex. 25 Cagle Dep. 9:7-18.[6] By failing to call a Code 1, MacAuley subjected Mr. Mosley to a severe risk of serious harm by knowingly declining to secure him access to lifesaving medical care.

First, MacAuley should have called a Code 1 at 2:00 a.m. when he saw Mr. Mosley drag himself across the floor of his cell in obvious pain, and had asked for someone to call 911. In light of the events of the previous several hours, a trained officer would have called a Code 1 for immediate medical attention upon seeing an inmate army-crawl across the floor after being unable to stand or walk for hours after a fall. Ex. 28 Worlds Dep. 45:22–46:8. In fact, MacAuley knew he could call a Code 1 for medical needs as minor as the common cold. Ex. 13 MacAuley Dep. 20:1-4. Instead, MacAuley commanded Mr. Mosley to go back to sleep and watched him army-crawl back to his mattress on the cell floor. Ex. 13 MacAuley Dep. 103:17–105:11.

Second, MacAuley should have called a Code 1 after his phone call to Defendant Johnson. At around 2:30 a.m., MacAuley allegedly called the medical unit regarding Mr. Mosley. Ex. 13

---

[6] See also, Ex. 31 Ann Hargas & Lois Miller, *Pain Assessment in People with Dementia*, 108 Am. J. of Nursing 7, 68 (2008), *available at* https://journals.lww.com/ajnonline/Fulltext/2008/07000/Pain_Assessment_in_People_with_Dementia.30.aspx#epub-link (explaining that noisy, labored breathing is indicative of severe pain, and is a common tool used to assess pain in patients unable to verbally communicate their pain levels).

MacAuley Dep. 121:1.[7] He spoke with Defendant Henry Etta Johnson, the LVN who had treated Mr. Mosley during the Code 1 earlier that evening. *Id.* 121:18–125-10. He did not provide her any details but merely asked, "What's his story?" *Id.* MacAuley did not describe any of Mr. Mosley's concerning behaviors, tell her Mr. Mosley had requested that 911 be called, or ask any follow-up questions when Johnson said—sight unseen—that Mr. Mosley was "fine and he was where he needed to be." *Id.* 132:15-18; Ex. 32 BCSO 002559. A jury could conclude any trained corrections officer would not be deterred from calling a Code 1 by a nurse who had no information about the patient's symptoms or level of pain. Ex. 28 Worlds Dep. 37:12-25.

Third, MacAuley should have called a Code 1 at 5:00 a.m. after Mr. Mosley complained again of hip pain. At 5:00 a.m., Mr. Mosley verbalized his need for medical care when he complained aloud of hip pain. Ex. 17 BCSO 000018; Ex. 18 BCSO 000859; Ex. 25 Cagle Dep. 63:2-14. He had not moved from his mattress on the floor since 2:30 a.m. Ex. 13 MacAuley Dep. 176:10-16. Defendant MacAuley did not call a Code One or do anything else in response. Against the backdrop of the events, any trained officer would understand that Mr. Mosley was in distress and in urgent need of medical attention. Ex. 28 Worlds Dep. 47:2-12.

Fourth, MacAuley should have called a Code 1 when he heard Mr. Mosley make his final plea for help. At 6:15 a.m., Mr. Mosley again asked for 911 to be called. Ex. 17 BCSO 000018;

---

[7] There is a genuine issue of material fact regarding whether Defendant MacAuley called LVN Johnson at 2:30 a.m. MacAuley testified that he called the medical unit after Mr. Mosley caused a disturbance in his cell by dragging himself around on the cell floor. Ex. 13 MacAuley Dep. 121:1. He testified that Johnson answered the phone and he recognized her voice, and that he was "[one] hundred percent" certain that he made the call. *Id.* 157:22–158:17, 158:19. MacAuley did not log this call with Johnson into the CI Unit logbook until after he found Mr. Mosley unresponsive in his cell nearly five hours later, even though he successfully logged the rounds he conducted at 2:35 a.m. and 3:00 a.m. Ex. 15 CI BCSO 002552-2553. Johnson disputes receiving this call, and testified that she was certain that MacAuley "never spoke to [her]" that night. Ex. 11. Johnson Dep. 53:5-7, 56:17-19. Johnson testified that if MacAuley had spoken with her, she would have instructed him to call a Code 1 immediately because Mr. Mosley had already been sent to medical in a Code 1 earlier that night. *Id.* 53:24-19. Johnson said she would never have told MacAuley that Mr. Mosley was fine because it was not within the scope of her authority as an LVN. *Id.* On the basis of this evidence, a reasonable jury could conclude either that MacAuley indeed spoke with Johnson, or that he never called the medical unit at all. The Court should draw the inference in Plaintiffs' favor and allow the claim to go to trial.

Ex. 18 BCSO 000859; Ex. 26 Lozano Dep. 25:14–26:9. Again, MacAuley chose not to call a Code One or do anything else.[8]

A reasonable jury could find that each instance of MacAuley declining to call a Code 1 showed deliberate indifference, and more so when taken together, MacAuley's course of conduct during that shift showed deliberate indifference to Mr. Mosley's serious medical needs.

### 5.   The Court Should Reject Defendant MacAuley's Other Arguments

In his motion for summary judgment, MacAuley claims that the medical evidence conclusively indicates that Mr. Mosley died as a result of a seizure and associated complications. Doc.132 at 11-12. This is incorrect. As the Bexar County medical examiner testified, his autopsy showed that Mr. Mosley died from multiorgan failure as a result of severe internal bleeding caused by the hip fracture he sustained less than 24 hours before his death. Ex. 23 Feig Dep. 31:17-21; 56:14-20; Ex. 27 BCSO 002564-2572. The hip fracture was the source of his obvious and severe pain for which MacAuley refused to obtain treatment. In any case, even if Mr. Mosley died as a result of seizure associated with alcohol withdrawal, and that is why he cried out for help, MacAuley's obligations under the law and under BCSO policy were the same. MacAuley was required to exercise judgment and call a Code 1 for an inmate in obvious distress, which he failed to do.

Deliberate indifference can be established by evidence that officials "refused to treat him [and] ignored his complaints." Doc. 132 at 11, citing *Randle v. Lockwood*, No. 6:1-CV-084-RP, 2017 U.S. Dist. LEXIS 31010, at *9 (W.D. Tex. Mar. 6, 2017) (internal citations omitted) (quoting

---

[8] As the unit officer, Macauley was responsible for conducting an "observation round" every thirty minutes in the CI pod. This "round" involved going to every cell door, peering in, and making sure that every inmate was alive and safe. The log shows that Macauley conducted a "round" at the following times: 11:45 p.m., 12:10 a.m., 12:27 a.m., 12:52 a.m., 1:11 a.m., 1:34 a.m., 1:52 a.m., 2:17 a.m., 2:35 a.m., 3:00 a.m., 3:18 a.m., 3:43 a.m., 4:01 a.m., 4:26 a.m., 4:44 a.m., 5:09 a.m., 5:27 a.m., and 6:16 a.m. Ex. 15 BCSO 002551-2553. But he filed a late entry for the round at 6:36. *Id.* BCSO002553 (marked LE).

*Domino*, 239 F.3d at 756). A reasonable jury could conclude that MacAuley acted with deliberate indifference by repeatedly failing to call a Code 1 and ignoring Mr. Mosley's pleas for help. *See Loosier v. Unknown Med. Doctor*, 435 Fed.Appx. 302, 306 (5th Cir. 2010) (finding that a doctor and nurse acted with deliberate indifference to an inmate's serious medical needs by refusing to treat pain caused by a neck injury that he sustained in a fall); *Easter v. Powell*, 467 F.3d. 459, 465 (5th Cir. 2006) (finding that pain suffered during a delay in treatment is actionable under the Eighth Amendment).

Separately, a delay in medical treatment, such as MacAuley's the five-hour delay here, can constitute deliberate indifference to a serious medical need when it results in substantial harm. *Mendoza v. Lynaugh,* 989 F.2d 191, 195 (5th Cir. 1993); *see also Lucas v. Goodwin* 2018 WL 1210968 at *4 (W.D. La. Mar. 7, 2018) ("If prison officials or doctors act with deliberate indifference in delaying treatment, additional injuries caused by the delay violate the Eighth Amendment if they rise to the level of substantial harm.").[9]

Mr. Mosley's internal bleeding was acute, and may have lasted five to six hours before his death. Ex. 23 Feig Dep. 67:23-69:3. Responding promptly and appropriately to Mr. Mosley's pain would have revealed his hip fracture and associated internal bleed and could have saved his life. *See* Ex. 33 E. Faist et al., *Multiple Organ Failure in Polytrauma Patients*, 23 J. of Trauma 9, 775 (1983), *available at*, https://insights.ovid.com/crossref?an=00005373-198309000-00002 (finding that prompt post-injury treatment including pulmonary and cardiovascular support is critical to increase the likelihood of survival in the face of multiorgan failure).

---

[9] *See also Alderson*, 848 F.3d at 423 (5th Cir. 2017) (reversing dismissal and concluding that corrections officer's actions delaying medical treatment for inmate with broken ribs and puncture wounds by over an hour could, if proven, constitute deliberate indifference to inmate's serious medical needs); *Powell*, 467 at 463 (finding that evidence that a prison nurse knew an inmate had a heart condition, was experiencing severe chest pain, and was not receiving treatment for his heart condition was sufficient to establish that the nurse knew of a substantial risk of harm to the inmate's health).

Thus, a reasonable jury could conclude that MacAuley is liable for refusing to obtain Mr. Mosley lifesaving treatment. *See Domino*, 239 F.3d at 755 (corrections official is liable for deliberate indifference to an inmate's serious medical needs if they "knew of and disregarded a substantial risk of serious harm").

### 6.  Defendant Macauley Is Not Entitled to Qualified Immunity

MacAuley is not entitled to qualified immunity. First, as explained above, his conduct violated Mr. Mosley's constitutional right to adequate medical care and amounted to deliberate indifference to his serious medical needs. Second, the right was sufficiently clear that a reasonable correctional employee would have known that his conduct was unconstitutional. *Lytle v. Bexar County*, 560 F.3d 404, 410 (5th Cir. 2009). When a defendant seeks summary judgment based on qualified immunity, the defendant "must be prepared to concede the best view of the facts to the plaintiff." *Freeman v. Gore*, 483 F.3d 404, 410 (5th Cir.2007) (quoting *Gonzales v. Dallas County*, 249 F.3d 406, 411 (5th Cir. 2001)). The Court should accept the non-movant's version of the facts, drawing all inferences and resolving all ambiguities in her favor. *Lytle*, 560 F.3d at 410.[10]

In the Fifth Circuit, it is clearly established that a person has a constitutional right to minimal life-saving medical care during incarceration. In *Hare* the Fifth Circuit denied summary judgment to jail officers because evidence in the record showed that two officers had actual knowledge of a substantial risk of serious harm, namely the risk of suicide by the inmate, but they still disregarded the necessary precautions to save his life. 74 F.3d at 397. In *Powell*, the Fifth Circuit denied summary judgment to a jail nurse because evidence in the record showed that the nurse knew the inmate had a heart condition and severe chest pain for which he requested

---

[10] The purpose of qualified immunity is to ensure that government employees have fair notice their conduct is unlawful before they are held liable for it. *Hope v. Pelzer*, 536 U.S. 730, 739-40 (2002). In line with that purpose, the requirement for "fair notice" is interpreted pragmatically; it does not require case law with exactly similar fact patterns before an official can be held liable for his conduct. *Id*. at 739.

treatment, and she twice deliberately refused him treatment and discharged him to his cell, without justification. 467 F.3d at 461-63. The law in the Fifth Circuit makes abundantly clear that MacAuley's refusal to obtain treatment for Mr. Mosley was deliberate indifference.

**D. Bexar County violated the Americans with Disabilities Act (ADA) and Rehabilitation Act (RA) by denying Mr. Mosley benefits of its of services, programs, or activities – and by otherwise discriminating against him – by reason of his disability.**

To establish a prima facie case of discrimination under the ADA, a plaintiff must demonstrate: "(1) that he is a qualified individual within the meaning of the ADA; (2) that he is being excluded from participation in, or being denied benefits of, services, programs, or activities for which the public entity is responsible, or is otherwise being discriminated against by the public entity; and (3) that such exclusion, denial of benefits, or discrimination is by reason of his disability." *Melton v. Dallas Area Rapid Transit*, 391 F.3d 669, 671–72 (5th Cir. 2004) (citing *Lightbourn v. Cty. of El Paso, Texas*, 118 F.3d 421, 428 (5th Cir. 1997)).

**1. Defendants' motion only raises narrow challenges to Bexar County's ADA liability.**

Defendants' motion for summary judgment correctly notes Bexar County, as the movant, bears the initial burden to demonstrate the absence of a genuine issue of material fact. "'If the moving party fails to meet [its] initial burden, the motion must be denied, regardless of the nonmovant's response.'" *Matson v. Sanderson Farms, Inc.*, 388 F. Supp. 3d 853, 868 (S.D. Tex. 2019) (quoting *Pioneer Expl., L.L.C. v. Steadfast Ins. Co.*, 767 F.3d 503, 511 (5th Cir. 2014)).

Defendants' motion does not dispute the first element of liability – that Mr. Mosely was a qualified individual within the meaning of the ADA. [11] Nor does it dispute Bexar County may be

---

[11] Third Amended Complaint (D.E. 100), para. 85, 99.

held liable under the ADA and RA for the acts of its contractors,[12] such as Defendants Johnson and Bennett as employees University Health System,[13] for their administration of medical services in Bexar County's jail. Nor does it dispute Plaintiffs' allegation that Defendants Johnson and Bennett discriminated against Mr. Mosely within the meaning of the ADA and RA.[14]

On these items, Bexar County has not met its initial burden on summary judgment.

### 2. Discriminatory purpose

The ADA and RA prohibit an entity from denying a person the "benefits of services, programs, or activities for which the public entity is responsible" or otherwise discriminating against a person on the basis for their disability. *Melton v. Dallas Area Rapid Transit*, 391 F.3d at 671–72. Discriminatory intent can be proven with direct evidence. *See Fortenberry v. City of Wiggins, Mississippi*, No. 1:16CV320-LG-RHW, 2018 WL 8809236, at *5 (S.D. Miss. Feb. 5, 2018). For instance, take the words of Defendants' expert Dr. Holmes:

> A.   Okay.  My opinion is this [Mr. Mosley] is one of my bridge people.
>
> Q.   What do you mean by that?
>
> A.   Just somebody that comes in. You're not too sure of their history because they can't tell you the truth or don't know the truth and you assume that they're a drinker and so you start treating them.
>
> Q.   Okay. And I -- I think I probably know what you mean, but rather than make assumptions myself, when you say "bridge people," what are you making reference to?

---

[12] *See Huffman v. Univ. Med. Ctr. Mgmt. Corp.*, No. CV 17-4480, 2017 WL 4960268, at *4 (E.D. La. Nov. 1, 2017) (discussing LSU's ADA liability arising from collaboration with two other state agencies "for the purpose of providing healthcare services that Defendant LSU is authorized to provide") (citing *Ivy v. Williams*, 781 F.3d 250, 255–58 (5th Cir. 2015), *vacated and remanded sub nom. Ivy v. Morath*, 137 S. Ct. 414 (2016)). *See also* Order Denying Motion to Dismiss, 9 (D.E. 73) (noting a correctional facility's medical services are within scope of the ADA) (citing *Pa. Dep't of Corr. v. Yeskey*, 524 U.S. 206, 210 (1998))

[13] Third Amended Complaint (D.E. 100), para. 86 ("Under the ADA and RA, Defendant Bexar County is liable for the actions of its employees and contractors, including the actions of Defendants Johnson and Bennet, who were employees of Bexar County's contractor, University Health System").

[14] Third Amended Complaint (D.E. 100), paras. 87, 88, 101, 103. *See* Order Denying Motion to Dismiss, 8-10 (D.E. 73) (this Court's review of Plaintiffs' ADA claims against Bexar County arising from Johnson's actions).

> A.   People that live under the bridge. They're alcoholics, they're psych -- they're schizophrenics -- and/or schizophrenic, and/or depressed, and/or PTS, post-traumatic syndrome. The bridge is their roof.

Holmes Dep. 19:25 – 20:22.[15]

But direct evidence of discriminatory intent is not required. "Necessarily, an invidious discriminatory purpose may often be inferred from the totality of the relevant facts." *See King v. Munoz*, No. No. A-16-CA-131-SS, 2017 WL 4547170 *3 (W.D. Tex. Oct. 12, 2017) (Sparks, J.) (citing *Washington v. Davis*, 426 U.S. 229, 242 (1976)). Discriminatory purpose can, for instance, be inferred from a defendant's departure from normal procedure. *See Fortenberry*, 2018 WL 8809236, at *6. Evidence that Defendants acted with deliberate indifference to Mr. Mosley's medical needs is itself sufficient evidence for a jury to infer they harbored animus toward him.

When Mr. Mosley was presented to Defendants Johnson and Bennett, he was clearly experiencing outward symptom of alcohol withdrawal.[16] As is described in great detail elsewhere in Plaintiffs' briefing, Defendants Johnson and Bennett, despite their knowledge of Mosley's fall, injury, and symptoms of alcohol withdrawal, including hallucinations, signs of confusion and distorted reality, did not provide Mosley with the proper extent of medical services, including a head-to-toe assessment, an X-ray, or a CT scan.[17] A reasonable jury could conclude this was a deviation from their normal protocol, and as such, infer the deviation was motivated by animus towards Mr. Mosely as a person with alcoholism and/or experiencing alcohol withdrawal.

---

[15] Betty Vestal, who University Health Services presented as a representative at in Rule 30(b)(6) deposition, expressed a skepticism complaints of injuries, saying: "Oftentimes they can be asking for an x-ray – it's called secondary gain. They want to go to the third floor for a reason." Vestal Dep. 126:11-16. Nurse Weber explained her wariness about detoxing inmates asking for care as a form of manipulation. See Weber Dep. 108:-3-6 ("This was common behavior for an alcohol detox even for an inmate. And sometimes they would do things to manipulate getting out of their home unit") and 110:14-20 ("Q. And you said it's kind of commonly known, right, by UHS staff that, in general, some inmates can be manipulative to try to get out of their cell to come to medical, correct? A. Yes.")

[16] Nurse Weber, who collected Mr. Mosley from his cell and took him to Johnson and Bennett in medical, reported she spoke to him, and although he knew his name, he did not know where he was, and he thought he was at home. Ex. 9 UHS 0019-21. He thought that she was someone else, and he called her by that person's name. Ex. 33 Weber Dep. 86:16-87:4. Half of the things he said did not make sense to her. Ex. 33 Weber Dep. 89:2-12.

[17] *See* Order Denying Motion to Dismiss, 9 (D.E. 73)

A reasonable jury could conclude Defendant Johnson knew a patient complaining about severe hip or knee pain after a fall is showing signs of potential hip fracture, and that hip fractures are serious and deadly. Johnson had over 40 years of nursing experience. Ex. 11 Johnson Dep. 8:2-13. She had extensive experience in general medicine. Ex. 11 Johnson Dep. 8:19-25, 9:03-05, 9:25-10:1. Mr. Mosley presented with severe knee pain, inability to support his weight, swelling to his right knee, and he reported that he could have a hip fracture. Ex. 2 UHS 0018-0021.[18] Yet neither she nor Defendant Bennett provided Mr. Mosley any medication to address what he reported as "10 out of 10" pain.[19] Two hours later when Johnson sent him back to his cell, Mr. Mosley was still in so much pain that he could barely walk. Ex. 12 Guerra Dep. 85-17-86:22. Officers assisted him the entire way back to his cell and laid him down on his mat on the floor of his cell. *Id*. Officer Guerra observed Mr. Mosley could not walk without help. *Id*. Defendant Johnson admits she knew that pain, inability to walk, and swelling were all symptomatic of a hip fracture, and she admitted that she could not know with certainty whether Mr. Mosely had a hip fracture until an x-ray was done (Ex. 11 Johnson Dep. 36:21-37:8), but regardless, did not contact the on-call provider to request an x-ray. Ex. 2 UHS 0021-22. A reasonable jury could conclude that Johnson's decision to return Mr. Mosley to his cell when he was still in so much pain he could not walk without assistance, and her knowing failure to take a secure an x-ray as essential diagnostic step for

---

[18] Defendant Johnson failed to so much as treat Mr. Mosley's hypertension appropriately, which is also so significant a deviation from normal protocol to suggest animus. Despite two elevated readings, Johnson did not give him any blood pressure medication. Medical Director Whiteley admitted they failed to treat his hypertension after these two elevated readings. Ex. Whiteley Dep. 110:3-9, 122:2-9, 124:20-125:3. Bennett testified that the 149/102 reading by RN Weber followed by the 176/110 reading by Johnson an hour later should have led Johnson to initiate protocol and treatment for elevated blood pressure. Ex. 10 Bennett Dep. 86:19-87:25. UHS's 30(b)(6) witness Betty Vestal testified that based on his report of hypertension they should have checked his blood pressure daily for five days; they did not. Ex. 35 Vestal Dep. 38:14-39:9. She agreed that the elevated blood pressure readings should have led to a call to the on-call provider, which also did not happen. Ex. 35 Vestal Dep. 66:6-11; 67:8-25; 70:5-21.

[19] The medical record contains no documentation of pain medication, which would be required. Indeed, UHS Medical Director Whiteley stated that Johnson and Bennett had failed to give Mr. Mosley medication for his "10 out of 10" pain. Ex. Whiteley Dep. 122:22-123:9.

symptom of a potentially hip fracture, deviated so greatly from her training and experience that it was motivated by animus.

Further, as is described in the previous sections on Defendant MacAuley's deliberate indifference to Mr. Mosely's medical needs, MacAuley, despite his knowledge of Mr. Mosley's condition, declined to take steps to protect, such as more closely observing Mosley or calling 911, to provide Mosley with proper medical care. A reasonable jury could infer this was a deviation from normal protocol, and the deviation was motivated by animus towards Mr. Mosely as a person with alcoholism and/or experiencing alcohol withdrawal.

When Defendant MacAuley came on duty, he was alerted by the prior officer, Kevin Ponton, both verbally (Ex. 14 Ponton Dep. 60:19-24) and in writing (Ex. 13 MacAuley Dep. 134:15-21, 135:13-20; Ex. 14 Ponton Dep. 60:19–61:12; Ex. 7. BCSO000834) that Mr. Mosley had suffered a fall, was taken to medical in a wheelchair, and had been laying on his mattress since he returned from medical. MacAuley testified that because of Ponton's warning, he paid "close[] attention" to him during his shift. Ex. 19 BCSO000836. He observed Mr. Mosley as almost completely immobile over several hours, followed by suddenly beginning to "drag his body around" on the floor toward his cellmates as if "mopping the floor with himself." Ex. 13 MacAuley Dep. 83:19-21; Ex. 16 BSCO000823. He remembers Mr. Mosley "seemed delirious," and he was barely responsive to verbal commands. Ex. 13 MacAuley Dep. 103:20–103:18, 108:18; Ex. 16 BSCO 823. Defendant MacAuley was trained by medical professionals to "[r]ecogniz[e] and respond[] to the need for emergency medical care" (Ex. 27 UHS 0355-0366), but even without training, it would have been a common sense observation that Mr. Mosley was in severe pain, and further, his pain was indicative of an injury requiring medical treatment. Moreover, Mr. Mosley's cellmates directly informed him that Mr. Mosley had asked for 911 to be called. Ex. 13 MacAuley Dep. 151:18-25.

A jury can infer from the obvious nature of Mr. Mosley's symptoms that MacAuley was aware he was in severe pain, which itself required attention; and further, that MacAuley severe pain was indicative of a serious medical need. *Minix,* 2009 WL 819755 at *6. A jury could also infer that MacAuley's refusal to act was at such great deviation from his training and common sense that it was motivated by animus.

### 3. Bexar County's motion inappropriately relies on disputed expert testimony

Bexar County's motion argues, in part, that MacAuley could not have been on notice of Mr. Mosley's need for an accommodation because, according to Defendants' expert witness, Mr. Mosley's fracture most likely caused by a seizure in the early morning hours before his death and "nothing could have saved him."

This is not an appropriate basis for summary judgment. Plaintiffs' pending motion to strike expert testimony (D.E. 133) explains Dr. Holmes' conclusion hinges on speculation and disputed witness testimony. At summary judgment, all disputed facts (including those underlying an expert opinion) should be resolved in favor of the nonmovant, and therefore, Defendants' reliance on Dr. Holmes for summary judgment must be rejected.

Moreover, even if a jury were to conclude Dr. Holmes was correct and Mr. Mosely did experience a seizure in the early morning hours, it could also conclude it was a predictable result of alcohol withdrawal, which Bexar County and UHS staff recognized Mr. Mosley was experiencing. Defendants' response to Mr. Mosley's alcohol withdrawal deviated from UHS's protocol (UHS 227), which calls on staff to alert a provider  immediately to administer an IV drip of Ativan. Defendants' response to Mr. Mosley's symptoms was simply wrong.[20] Under the

---

[20] Medical Director Whiteley indicated by email that PA Forsberg should have sent Mr. Mosley out for alcohol withdrawal treatment to an emergency room or the infirmary since he was having hallucinations and was disoriented. Ex. 5 UHS 2137-2138; Ex. 36 Whiteley Dep. 52:2-7; 87:6-17; 86:6-25. His alcohol withdrawal was so serious that he should not have gone to a detox cell. She testified that she stood by her email. Ex. 36 Whiteley Dep. 95:11-13. Nursing Director Vestal admitted that under the UHS alcohol withdrawal protocol, if a person showed symptoms of delirium tremens—including disorientation and hallucinations—an IV drip of lorazepam (Ativan) should be started to reduce

totality of the circumstances, A jury could also infer that this deviation from protocol was motivated by animus.

## CONCLUSION

For the foregoing reasons, Plaintiffs respectfully request that the Court deny Defendant Bexar County and Defendants' MacAuley's motion for summary judgment in all respects, and allow Plaintiffs' claims to proceed to trial.

DATED: September 20, 2019

Respectfully submitted,

/s/ Brian McGiverin
Brian McGiverin
Texas Bar No. 24067760
brian@lawcenterofaustin.com
DIETZ, LAWRENCE & MCGIVERIN
2221 Hancock Drive
Austin, TX 78756
Telephone: (512) 387-0718
Fax: (512) 597-0805

Ranjana Natarajan
Texas Bar No. 24071013
THE UNIVERSITY OF TEXAS SCHOOL OF
LAW – CIVIL RIGHTS CLINIC
727 East Dean Keeton Street
Austin TX 78705
Tel: 512-232-7222
Email: rnatarajan@law.utexas.edu
On the brief:
Elise Czuchna, Law Student, 2L
Jessica Hallam, Law Student, 2L

ATTORNEYS FOR PLAINTIFFS

CERTIFICATE OF SERVICE

I certify that a true and correct copy of the foregoing has been served on all counsel of record who have appeared in this matter through the Electronic Case Files System of the Western District of Texas.

/s/ Brian McGiverin

---

the risk of seizures, and the provider would consider sending them to the emergency room. Ex. 35 Vestal Dep. 114:14-116:5; 119:1-9; Ex. 4 UHS 227.