**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION**

| | | |
|---|---|---|
| ROBERT MOSLEY JR., VINCENT MOSLEY, FELICIA MOSLEY, | § § | |
| *Plaintiffs*, | § | SA-17-CV-00583-XR |
| | § | |
| v. | § | |
| | § | |
| BEXAR COUNTY, HENRIETTA JOHNSON, SEAN MACAULEY, JOHN BENNETT, | § § § | |
| *Defendants*. | § | |

## ORDER

On this day, the Court considered Defendant Henry Etta Johnson's Motion for Summary Judgment (ECF No. 131), Plaintiffs' Response (ECF No. 174), and Johnson's Reply (ECF No. 180); Defendants Bexar County and Officer Sean MacAuley's Motion for Summary Judgment (ECF No. 132), Plaintiffs' Response (ECF No. 176), and Bexar County and Officer MacAuley's Reply (ECF No. 181); Defendant John Bennett's Motion to Dismiss for Failure to State a Claim (ECF No. 148), Motion to Dismiss Pursuant to FRCP 4(m) (ECF No. 149), Motion for Summary Judgment (ECF No. 150), Plaintiffs' respective responses (ECF Nos. 154, 175, 189), and Bennett's subsequent replies (ECF Nos. 156, 179); and the parties' various motions to strike (ECF Nos. 128, 133, 182, 183, 184), responses (ECF Nos. 135, 137, 186, 187), and replies (ECF No. 141). After careful consideration, the Court issues the following Order.

## BACKGROUND

Robert Mosley, Sr. was a 54-year-old man who, in order to resolve an outstanding warrant related to a 2003 DWI charge, traveled from his home in Arizona to San Antonio, Texas and turned himself in to the Bexar County Sheriff's Office on July 22, 2015. That same day, Mr. Mosley was incarcerated as a pretrial detainee in the Bexar County Adult Detention Center ("BCADC"). Four

days later, on July 26, 2015, Mr. Mosley was declared dead after Defendant MacAuley found him unresponsive in his cell. The autopsy declared his death was caused by "[c]omplications of acetabular fracture with severe retroperitoneal hemorrhage." ECF No. 131-8, Mr. Mosley's Autopsy Report (hereinafter, "Autopsy Report").

Plaintiffs Robert Mosley, Jr., Vincent Mosley, and Felicia Mosley are Mr. Mosley's three children and sole heirs. They bring this suit against Defendants Bexar County, Officer Sean MacAuley, Nurse Henry Etta Johnson, and Nurse John Bennett, alleging violations of Mr. Mosley's rights under the U.S. Constitution and discrimination in violation of the Americans with Disabilities Act and the Rehabilitation Act. All Defendants have moved for summary judgment. The facts, taken in the light most favorable to Plaintiffs, are as follows.

### 1. Mr. Mosley's Intake

Upon turning himself in on July 22, 2015, Mr. Mosley was subject to a medical screening administered around 9:47 p.m. by University Health System ("UHS"), the entity responsible for medical services at BCADC. ECF 131-1, UHS Records on Mr. Mosley (hereinafter, "UHS Records"), at 1. UHS treatment records note Mr. Mosley's vital signs were taken[1] and that he had borderline diabetes based on his blood sugar level. *Id.* at 1–2. Mr. Mosley was "alert" during the screening and reported a history of past treatment for hypertension and "unknown liver disease." *Id.* at 2. Mr. Mosley reported that he was currently on medication, but he did not know the name of it. *Id.* Mr. Mosley also reported that he "drinks 2-3 12oz beers after work" and his "last drink [was] yesterday of three 12oz beers." *Id.* Mr. Mosley was not exhibiting symptoms of withdrawal at the time of his screening. *Id.* As a result of the screening, Mr. Mosley was referred to the "Chronic Care Clinic" based on his hypertension, unknown liver disease, borderline diabetes, and

---

[1] His blood pressure was recorded as 152/82, his pulse at 78 beats per minute, his temperature at 97.3 degrees Fahrenheit, his blood sugar at 73.

unknown medication that he said he took twice daily.[2]  *Id.* at 3.  After his intake, BCADC assigned Mr. Mosley to a two-man cell in the general population of the jail.

### 2. Mr. Mosley's First Visit to Medical

A little over 48 hours later, around 11:55 p.m. on July 24, 2015, a BCADC officer referred Mr. Mosley to medical/mental health because of his "bizarre" behavior.  ECF No. 163-1, Psychological Evaluation Request.  The officer noted that Mr. Mosley "seem[ed] confused and unaware of what he's doing," was "seeing things that isn't [sic] there," and had a "short memory." *Id.*  The supervisor on duty commented that Mr. Mosley was "hallucinating and confused."  *Id.* Mr. Mosley was referred to mental health, and medical records confirm that the reason for his referral was "bizarre" behavior reported by his cellmate, who said Mr. Mosley was "stomping out bug[s] that are not really there."  UHS Records 4, 6.

Mr. Mosley arrived at medical around 12:47 a.m. on July 25, 2015.  *Id.* at 4.  He was first evaluated by Manuel Reynosa, a licensed vocational nurse ("LVN Reynosa").  LVN Reynosa took Mr. Mosley's vitals, noted his history (including alcohol use, hypertension, and diabetes), and observed that Mr. Mosley was "[a]lert and oriented," his skin was warm to the touch, and he was ambulating without difficulty.  *Id.* at 4.  LVN Reynosa notified his supervisor, and referred Mr. Mosley to the physician assistant on duty, Peter Forsberg, a licensed physician assistant ("PA Forsberg").  Around 1:06 a.m., Mr. Mosley was seen by PA Forsberg.  PA Forsberg noted Mr. Mosley's reported alcohol use of 2-3 cans of beer daily, observed no tremors and that Mr. Mosley was "[q]uiet."  *Id.* at 6.  Mr. Mosley told PA Forsberg he was "looking for a particular officer who said he would be released from jail if he would come here from AZ."  *Id.*  PA Forsberg noted in his records that he was "[not] certain, but it is suspected that this [inmate] may drink a bit more

---

[2] As a result of his initial screening, Mr. Mosley was referred to BCADC's Chronic Care Clinic in "2-3 days."  He never actually visited or was treated in the Chronic Care Clinic before his death.

than he lets on." *Id.* PA Forsberg performed a physical exam of Mr. Mosley, noting that he demonstrated no distress at the time; under musculoskeletal, he observed "without any significant abnormalities,"; under neurological, he noted "Restless. No tremors."; under psychiatric, he wrote "Seems slow to reply to questions. Not answering with a clear reply. Tangential thoughts." *Id.* at 7. PA Forsberg concluded that Mr. Mosley exhibited "[p]ossible Mental Status Changes" and was a "[p]ossible heavy alcohol drinker." *Id.* PA Forsberg recommended Mr. Mosley be moved to a "detox pod," and prescribed 2mg of Lorazepam twice a day for five days. *Id.* LVN Reynosa administered Mr. Mosley's first dose of Lorazepam at 1:25 a.m. ECF No. 165-1, UHS Medication Administration Record.

### 3. Mr. Mosley Suffers an Injury in the Detox Unit

After this assessment, around 1:30 to 2:30 a.m., Mr. Mosley was moved to an eight-man cell in the detox unit. UHS Records 7. The detox unit consists of two rows of cells and a dayroom, and a unit officer is always assigned to oversee the unit. After arriving in the detox unit, Mr. Mosley slept. He was still sleeping around 9:00 a.m. when a nurse brought a medicine cart to the detox unit, so he missed his next scheduled dose of Lorazepam. UHS Medication Administration Record (showing no dosage administered at 9:00 a.m. on July 25, 2015).

Sometime around 3:00 p.m., Mr. Mosley apparently suffered an injury, either from falling or being pushed.[3] ECF 174-2, pp. 42–47, Bexar County Sheriff's Office Criminal Investigations

---

[3] Mr. Mosley reported to Nurse Weber around 7:00 p.m. on July 25 that he "[f]ell and could have fractured my hip." UHS Records 8. Defendant Johnson recorded in her notes on July 25 around 8:15 p.m. that she "was informed by Sgt. that inmate was pushed yesterday by another inmate and today inmate was lying on cell floor and complained of right leg pain and he could not put weight on it." *Id.* at 10. The police investigation following Mr. Mosley's death found no evidence that another inmate pushed Mr. Mosley. Stubbs Report ("Inmate Mosley fell on July 25th and was taken to medical, but was brought back very quickly and did not get up from the floor until the code was called on July 26th.") Defendant Johnson maintains that she would not have written in her notes that a Sergeant told her that Mr. Mosley was pushed unless that had actually happened.

Division Report on Mr. Mosley's Death (hereinafter, "Stubbs Report");[4] UHS Records 8 ("Code 1 called by officer claiming inmate was pushed/fell on previous shift and has not moved since.") Between 3:00 p.m. and 6:20 p.m., Mr. Mosley complained of back and leg pain to the BCADC unit officer on duty, Officer Ponton, at least twice. ECF No. 174-4, pp. 170–254, Ponton Deposition (hereinafter, "Ponton Dep."), 31:18–22.[5] From the time Officer Ponton's shift started at 3:00 p.m. until 6:20 p.m., he did not see Mr. Mosley move from where he was laying on his mat on the floor of his cell. Ponton Dep. 32:24–33:2.[6] At 6:20 p.m., Officer Ponton called medical to report Mr. Mosley's complaints. Ponton Dep. 33:3–17. According to Officer Ponton, medical personnel told him "if you think it's that bad, then you call the Code 1." Ponton Dep. 34:3–4.

Officer Ponton did call a Code 1—the only method for a unit officer to obtain immediate, non-emergency medical attention for an inmate. Ponton Dep. 34:6; ECF No. 174-2, p. 34, Officer Ponton Facility Incident Report (hereinafter "Ponton Report") ("I…initiated Code 1 due to the fact that Inmate Mosley…claimed he could not get up.") A few minutes later, Corporal Candy Guerra[7] ("Corporal Guerra") came to the unit to assist Officer Ponton. Ponton Report. Medical personnel—Registered Nurse Amber Weber ("Nurse Weber") and Medical Assistant Michael Smith ("MA Smith")—responded to the Code 1, arriving at Mr. Mosley's cell at approximately 6:26 p.m. UHS Records 8–9; Ponton Report.

---

[4] "Inmates in the cell at the time express[ed] to [investigating detectives] that [Mosley] had been exhibiting bizarre behavior due to his detox, and that he fell at some point around shift change between 1st and 2nd shift on July 25th." Stubbs Report 5. Shift change is at 3:00 p.m. Ponton Dep. 28:8–14.

[5] Q: So, between [6:20 p.m.] that you called a Code 1 and the time that you had come in at 3:00, he had complained at least a couple times? A: Twice, I'd say.

[6] Q: So, between the time that you came in and the time the Code 1 was called, you don't remember him ever getting up off that mattress on the floor, right? A: No.

[7] Corporal Guerra's legal last name during the relevant time period in 2015 was "Jenkins," so she is referred to in some documents and testimony as "Candy Jenkins."

When they arrived, Mr. Mosley was laying on his mat on the floor of his cell and "refuse[d] to move." UHS Records 9. Mr. Mosley told Nurse Weber he had injured his leg, that his leg hurt, and that was why he could not get up. ECF No. 174-3, pp. 585–751, Weber Deposition (hereinafter "Weber Dep.") 96:14–15. Mr. Mosley was "moving around on the ground," "[r]olling, pivoting…like a toddler on the floor." Weber Dep. 87:8–14. His vitals were not within normal limits,[8] and he had swelling and warmth in his right knee. UHS Records 9; Ponton Report ("[Medical personnel] informed me that Inmate Mosley's vitals were high."). Nurse Weber reported Mr. Mosley was "talking and…alert and oriented to person," but he also "state[d] he is at home and cannot say where he is." UHS Records 9. Mr. Mosley thought Nurse Weber was someone else named "Irma," called her by that name, and asked her "several times for a beer." Weber Dep. 86:21–24. Nurse Weber recorded that Mr. Mosley had "even and unlabored" respirations and "[n]o acute distress observed at this time." UHS Records 9. Nurse Weber "didn't know if [Mr. Mosley] could or could not walk." Weber Dep. 101:18–19. She tried to bargain with him and offered him a beer if he would get into the wheelchair, but he still did not get up. Weber Dep. 87:5–7 ("And I said, I'll get you a beer if you get in my chair and I'll take you downstairs. And then he wouldn't get in there.") While in the cell, Mr. Mosley never stood up on his own and had to be lifted into the wheelchair by both Nurse Weber and MA Smith. Weber Dep. 86:1 ("I remember that he would not get up."), 86:8–15,[9] 87:15–16.[10] Mr. Mosley was brought to the medical unit by wheelchair at approximately 6:39 p.m. Ponton Report.

---

[8] Mr. Mosley's blood pressure was 149/102. His pulse was 97 beats per minute.

[9] A: [W]e picked him up, put him in the chair and took him downstairs to further assess him. Q: Do you remember if you picked him up with Michael [Smith] and put him in the chair? A: We both picked him up. Q: It took both of you to pick him up and put him into the wheelchair? A: A very tall man.

[10] Q: But he never got up by himself? A: At that time, no.

### 4.      Mr. Mosley's Last Visit to Medical

In medical, Nurse Weber "reassessed" Mr. Mosley, including taking his vitals again. Weber Dep. 87:23.  She noted that his chief complaint was "[p]ain to right hip and knee."  UHS Records 8.  On a full body diagram, she circled the area from Mr. Mosley's right hip to his right knee.  *Id.* at 9; Weber Dep. 98:11–22.  She checked his pedal pulse, which she noted as "strong…bilaterally."  UHS Records 9.  At the time of her assessment of Mr. Mosley, Nurse Weber thought it was possible that Mr. Mosley had a hip fracture.  Weber Dep. 83:2–9,[11] 88:8–20,[12] 92:1–4.[13]  As a result of her assessment, Nurse Weber wrote a referral for Mr. Mosley to the UHS Provider Clinic within one to two days for "Swelling +1 and pain 10 out of 10 to right knee."[14] UHS Records 8.  Her referral noted that Mr. Mosley told her he "[f]ell and could have fractured my hip."  *Id.*  Nurse Weber issued Mr. Mosley an ice compress, administered his detox medications, and (because her shift was supposed to end at 7:00 p.m.) gave a shift report to the oncoming staff "to monitor" Mr. Mosley.  *Id.*  Defendant Johnson, a licensed vocational nurse, and Defendant Bennett, a registered nurse, were the oncoming staff for the shift beginning at 7:00 p.m.  As part of her shift report, Nurse Weber told Defendant Johnson about Mr. Mosley, including

---

[11] Q: Apart from this medical chart, do you have an independent memory of seeing Mr. Mosley on the night of the 25th? A: I do.  Q: And what do you remember? A: Him laying on the floor in his cell talking to me and Michael…about his fracture.

[12] "So [I] give [Defendant Johnson] her report. And said, you know, this is what he's doing, said this is what I saw…I don't know if you want to keep him down here or put him in the infirmary and get him checked out because he's saying that he broke his knee, [he] broke his hip. He was saying a lot of things. He was saying it hurt… And so at that time, we didn't know."

[13] Q: So at the time you take him up in the wheelchair, it's a possibility [in] your mind that he may actually have a hip fracture, right?  A: Yes.

[14] According to Nurse Weber, a referral to a provider was standard for every inmate that was seen by medical personnel.  *See* Weber Dep. 81:13–20 ("Q: And what is this note saying? A: It's a referral note just for further assessment.  We typically would put them in to make sure that they were seen by a provider, regardless of what happened with them.  We will put in a referral if nothing was going on with the patient.  If they said, 'I got a paper cut,' then we do a referral.  If they said, 'I'm dying,' we do a referral.")

the Code 1 and her assessment of his condition. Weber Dep. 100:8–102:17.[15] Before Nurse Weber's shift ended, Mr. Mosley moved from the wheelchair to a gurney, and when she left he was laying down on the gurney. Weber Dep. 103:20.

When Defendant Johnson took over Mr. Mosley's care, she too performed an assessment of his condition around 8:15 p.m. on July 25. UHS Records 10. Defendant Johnson noted that Mr. Mosley's "chief complaint" was "right leg pain." *Id.* She took his vitals, which were still not within normal limits. *Id.*[16] In her treatment record, she noted that Mr. Mosley was complaining of right leg pain, that he "stated [he] fell on center block yesterday." *Id.* Defendant Johnson wrote that she "was informed by [a sergeant] that [Mr. Mosley] was pushed yesterday by another inmate and today [Mr. Mosley] was lying on [his] cell floor and complained of right leg pain and he could not put weight on it." *Id.* At the time of her assessment, Mr. Mosley had "right leg swelling noted but no redness," "no bruising," and his leg was "cool" and "dry to touch." *Id.* According to Defendant Johnson's notes, Mr. Mosley was "able to move [his] leg" and had a "pedal pulse." *Id.* She also noted that Mr. Mosley was "detoxing" and "drinks several cans of beer daily." *Id.* As part of her assessment "objective," Defendant Johnson planned to refer Mr. Mosley's case to her supervisor (Defendant Bennett) and monitor him in the medical unit. UHS Records 10.

Mr. Mosley stayed in the medical unit, laying on a stretcher, for approximately two hours. After that, Defendant Johnson noted that Mr. Mosley had "slept more than two hours [on the] stretcher," and although he had previous complaints of right leg pain he was "now noted to be moving his right foot then his leg without complaining of any pain." UHS Records 11. Defendant

---

[15] "I do know that I told her, you know, I didn't feel comfortable leaving him up in the cell. And that's why I brought him downstairs, because I wasn't sure what was wrong with him. He was complaining of hip pain, knee pain, leg pain." Weber Dep. 101:14–18.

[16] Mr. Mosley's blood pressure was 176/110, his pulse was 97 beats per minute, and his respiratory rate was 16 respirations per minute.

Johnson manually rechecked Mr. Mosley's vitals.[17]  Defendant Johnson documented her "plan" for Mr. Mosley: "return to unit."  *Id.*  She noted Mr. Mosley "stood on his own," had "no bruising" and "no redness to his right leg," and a "good pedal pulse."  *Id.*

Defendant Johnson noted in her treatment record that she "informed [her] supervisor," Defendant Bennett—the notes do not indicate what she informed him.  *Id.*; ECF No. 174-3, pp. 87–307, Bennett Deposition (hereinafter "Bennett Dep."), 109:2–7.  Other than giving Mr. Mosley a bag of ice for his leg pain, Defendant Bennett did not interact with Mr. Mosley.  Bennett Dep. 98:15–99:12.  Defendants Johnson and Bennett discussed Mr. Mosley, but Defendant Bennett does not recall talking about anything specific other than telling Defendant Johnson he gave Mr. Mosley an ice pack.  Bennett Dep. 99:13–100:11.  Although he does not have an independent recollection of doing so, Defendant Bennett admits that he "must have" approved Defendant Johnson's plan to discharge Mr. Mosley back to his cell.  Bennett Dep. 109:15–110:4.[18]  Before Mr. Mosley was returned to his cell, no medical personnel (1) rotated his legs to see if one was more abducted, (2) compared his two hips to look for displacement, (3) requested an x-ray for Mr. Mosley, (4) escalated Mr. Mosley's case to an available on-call medical provider, or (5) planned to continue to monitor his vitals overnight.  *See* UHS Records 8–11; Bennett Dep. 121:8–122:8.

### 5.     Mr. Mosley Returns to His Detox Cell

Defendant Johnson discharged Mr. Mosley back to his cell around 10:45 p.m. on July 25, 2015.  UHS Records 11.  Defendant Johnson noted in her treatment record that at discharge Mr.

---

[17] According to her manual reading, Mr. Mosley's blood pressure was 143/78 and his pulse was 80 beats per minute. There is no record of what time this manual recheck was conducted.

[18] Q: And so when it says informed supervisor of the plan and that she's going to discharge him, does that mean that she asked for your approval?  A: Well, I – I would assume so.  You know, she's asking – she's telling me what she's going to do and I guess she wants a yes or no.  Q: And so did you give her a yes or no?  A: I – I'm assuming I said go ahead and – because he did go back…  Q: So you approved that discharge by her?  A: Yes, ma'am, I must have.  Q: Do you have an independent memory of approving it?  A: I can't swear to it, but I must have.

Mosley was in "stable" condition, and that he returned to his cell by walking. *Id.* Both Defendants Johnson and Bennett claim Mr. Mosley walked unassisted from the medical unit back to his cell.[19] Johnson Dep. 146:6–147:8; Bennett Dep. 113:14–114:12. However, Corporal Guerra remembers escorting Mr. Mosley back to his cell from the medical unit, and testified that she and another officer assisted Mr. Mosley. ECF No. 174-4, pp. 389–510, Guerra Deposition (hereinafter "Guerra Dep."), 84:9–86:22. According to Corporal Guerra, Mr. Mosley was still laying on the gurney when she and another officer arrived at the medical unit. *Id.* at 83:14–16. She and the other officer grabbed Mr. Mosley by each arm and walked with him back to his cell. *Id.* at 84:9–11, 86:17–20. Corporal Guerra claims Mr. Mosley "looked like he needed support," and "was walking very slowly…like he was in pain," and "he could barely walk." *Id.* at 85:24–86:10. Corporal Guerra also testified that after helping him back to his cell, she and the other officer helped him down so that he could lay on his mat on the floor. *Id.* at 86:19–87:17.

At 11:00 p.m., a shift change occurred and Defendant MacAuley replaced Officer Ponton as the unit officer of the detox pod. ECF No. 174-4, pp. 512–702, MacAuley Deposition (hereinafter, "MacAuley Dep."), 74:7–10. Both men agree that Officer Ponton gave Defendant MacAuley some information about Mr. Mosley during the shift change. Officer Ponton claims that he told Defendant MacAuley about Mr. Mosley and his Code 1, and that he showed Defendant MacAuley his own report of the Code 1 which Defendant MacAuley read in front of him. Ponton Dep. 60:19–61:12. The Ponton Report stated that Mr. Mosley had claimed he could not get up, that he could not move his leg, and that he was taken to the medical unit by wheelchair. Ponton Report. MacAuley claims that Ponton told him Mr. Mosley "had been having medical troubles,"

---

[19] Defendant Johnson also testified that she does not have any independent memory of seeing Mr. Mosley. Johnson Dep. 148:15–16 ("I do not recall Mr. Mosley."); 150:17–23 ("Q: And I know I've asked this before, but I just want to make sure. You really don't have any memory of Mr. Mosley being in the clinic during this whole thing? A: I really don't. Q: Everything is based on what you see in the record, right? A: That's it.").

that Officer Ponton had called a Code 1 and that "medical cleared inmate Mosley to return to his cell," but he does not remember if he was aware of other specifics about Mr. Mosley's condition. ECF No. 174-2, p. 56, Defendant MacAuley Facility Incident Report (hereinafter, "MacAuley Report"); MacAuley Dep. 90:21–93:24.

Around 1:44 a.m. on July 26, breakfast was served in the detox unit dayroom. MacAuley Dep. 184:2–14; ECF No. 174-2, p. 40, BCADC Logbook Page 222[20] (showing "trays in unit" at 1:44 a.m., "trays out" at 2:17 a.m.). Defendant MacAuley noticed that Mr. Mosley did not get up from his mat on the floor to eat breakfast. MacAuley Dep. 112:23–113:2. MacAuley inquired with other inmates who were not eating breakfast to see if they were going to eat, but he did not do the same for Mr. Mosley. *Id.* at 113:10–114:16.

Sometime around 2:30 a.m., Mr. Mosley's cellmates complained to Defendant MacAuley about Mr. Mosley. MacAuley Report. The other inmates told Defendant MacAuley that Mr. Mosley was dragging himself around on the floor of the cell towards their bunks, that they wanted him to move away, and that Mr. Mosley had asked for 911 to be called. MacAuley Dep. 83:19–21, 103:9–15, 109:13–22; MacAuley Report. Defendant MacAuley told Mr. Mosley to go back to sleep on his mat on the floor. MacAuley Dep. 103:16–18. Mr. Mosley did not respond to Defendant MacAuley at first. *Id.* at 103:20–21. When Defendant MacAuley called Mr. Mosley by his first name, Mr. Mosley looked up, made eye contact, and grunted. *Id.* at 103:21–25. Defendant MacAuley watched Mr. Mosley crawl back to his mat, never attempting to stand or walk. *Id.* at 105:6–19. Defendant MacAuley thought Mr. Mosley seemed delirious and his behavior was "weird," but he did not call a Code 1 at that time. *Id.* at 108:13–19, 110:19–21.

---

[20] The BCADC unit officer logbook is attached to Plaintiffs' Response to Defendant Johnson's Motion for Summary Judgment as separate exhibits. The logbook showing entries between 0010 and 0522, stamped with page number 222, is found at Exhibit 13, ECF No. 174-2, p. 40. The logbook showing entries between 0614 and 1036, stamped with page number 223, is found at Exhibit 15, ECF No. 174-2, p. 49.

Instead, after Mr. Mosley crawled back to his mat, Defendant MacAuley claims that he secured the cell and then called the medical unit "about Inmate Mosley's symptoms."  *Id.* at 110:19–21; MacAuley Report; BCADC Logbook Page 223 ("spoke with med trtment nurse Henrietta Johnson about Inmate Mosley's symptoms").  According to Defendant MacAuley, Defendant Johnson answered the phone.  MacAuley Dep. 121:11–13; MacAuley Report.  He claims Defendant Johnson told him that Mr. Mosley "was complaining about leg issues," that medical had "looked at his leg and it was fine," that Mr. Mosley was just "going through detox" and that his cell in the detox unit "was the right place for him."  MacAuley Dep. 125:2–9; MacAuley Report.

Defendant Johnson, on the other hand, claims that Defendant MacAuley never called her, and that if he had she would have told him to call a Code 1.  Johnson Dep. 114:5–18, 114:24–115:19.  Defendant Bennett also testified that he has no recollection of Defendant Johnson receiving this phone call during their shift, and that if he had been informed of the call he would have initiated a Code 1 for Mr. Mosley to receive immediate medical attention.  Bennett Dep. 130:22–131:7.  Although Defendant MacAuley documented this call in his logbook as occurring at approximately 2:30 a.m., he did not make the entry until later that morning, after he had found Mr. Mosley unresponsive.  MacAuley Dep. 117:5–16; BCADC Logbook Page 223 ("late entry" entered after entry at 6:49 a.m. and before entry at 7:00 a.m.).

According to notes found in the investigative file produced by the Bexar County Sheriff's Office, Mr. Mosley again complained of hip pain around 5:00 a.m.  ECF No. 174-2, pp. 51, 53–54.[21]  Those same notes also indicate that at 6:15 a.m., Mr. Mosley told other inmates "someone

---

[21] Defendants Bexar County and MacAuley object to the consideration of these notes, claiming that the author is an unknown declarant and that the notes are hearsay.  The Court finds the notes fall within any number of exceptions to the hearsay rule, including the business records exception, and any hearsay objections to portions of these two exhibits are overruled.  FED. R. CIV. P. 803.

call 911." *Id.*; *but see* MacAuley Dep. 176:4–12 (denying anyone said anything about 911 after his call with Defendant Johnson).

### 6. Mr. Mosley Found Dead

At 7:00 a.m., while performing his rounds before his shift ended, Defendant MacAuley noticed Mr. Mosley lying on his back on the floor, face up, not moving. MacAuley Report; BCADC Logbook Page 223 (entry at 0700 observation of cells 1–8); MacAuley Dep. 173:7–15. Defendant MacAuley opened Mr. Mosley's cell and found him unresponsive. MacAuley Report. Defendant MacAuley ran back to his station, advised the sergeant's office that he needed to initiate a Code 1 Blue, and then initiated the Code 1 Blue. *Id.*; BCADC Logbook Page 223.

Sergeant Kathryn Brown and Lieutenant Marcia Paquel, the area supervisor and shift commander on duty, arrived by 7:03 a.m. with a first aid kit and performed CPR. MacAuley Report; BCADC Logbook Page 223; Brown Dep. 23:20–24:4. Around 7:03 a.m., medical staff arrived in the unit and took over CPR. UHS Records 13. According to UHS medical records, Mr. Mosley was found lying unresponsive on his mat on the cell floor, laying in urine with his eyes closed. *Id.* He was not breathing and had no pulse, and his skin was cold to the touch. *Id.* San Antonio EMS arrived and took over CPR at 7:26 a.m. *Id.* Mr. Mosley was taken by ambulance from BCADC at 7:50 a.m. and transported to Methodist Hospital, where he was declared dead at 1:16 p.m. on July 26, 2015. ECF 174-2, pp. 58–59, Deceased Person Information Form.

The Bexar County Medical Examiner's Office concluded Mr. Mosley's death was caused by "[c]omplications of acetabular fracture with severe retroperitoneal hemorrhage." Autopsy Report. In plain terms, Mr. Mosley suffered an injury in the form of a hip socket fracture which caused internal bleeding, leading to multiorgan failure and death. ECF No. 174-3, pp. 846–941,

Feig[22] Deposition (hereinafter, "Feig Dep.") 31:6–21. The autopsy also found that "[c]oagulopathy; liver cirrhosis; chronic ethanol use" were all contributory conditions. Autopsy Report. The autopsy originally concluded that the "manner of death" was homicide based on Defendant Johnson's statement that Mr. Mosley had been pushed. Feig Dep. 32:6–10; Autopsy Report. However, the manner of death was later amended to "undetermined" after a police investigation found no corroborating evidence for Defendant Johnson's statement. Feig Dep. 32:13–16; Autopsy Report; Stubbs Report.

## DISCUSSION

### I.    LEGAL STANDARDS

#### a.  Summary Judgment Standard

All Defendants have pending motions seeking summary judgment. A court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law. FED. R. CIV. P. 56. The moving party bears the initial burden of informing the court of the basis for the motion and of identifying those portions of the record which demonstrate the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); *Adams v. Travelers Indem. Co.*, 465 F.3d 156, 163 (5th Cir. 2006). To establish that there is no genuine issue as to any material fact, the movant must either submit evidence that negates the existence of some material element of the non-moving party's claim or defense, or, if the crucial issue is one for which the non-moving party will bear the burden of proof at trial, merely point out that the evidence in the record is insufficient to support an essential element of the non-movant's claim or defense. *Lavespere v. Niagara Machine & Tool Works, Inc.*, 910 F.2d 167, 178 (5th Cir. 1990). If the movant carries its initial burden, the burden

---

[22] James A. Feig, M.D., a deputy medical examiner with the Bexar County Medical Examiner's Office, performed Mr. Mosley's autopsy.

shifts to the non-movant to show that summary judgment is inappropriate. *See Fields v. City of S. Hous.*, 922 F.2d 1183, 1187 (5th Cir. 1991). The nonmoving party must "go beyond the pleadings" and designate competent summary judgment evidence "showing that there is a genuine issue for trial." *Adams*, 465 F.3d at 164; *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 585–87 (1986). The parties may satisfy their respective burdens by tendering depositions, affidavits, and other competent evidence. *Topalian v. Ehrman*, 954 F.2d 1125, 1131 (5th Cir. 1992). Mere conclusory allegations, unsubstantiated assertions, improbable inferences, unsupported speculation, and hearsay evidence (unless within a recognized exception) are not competent summary judgment evidence. *Walker v. SBC Servs., Inc.*, 375 F. Supp. 2d 524, 535 (N.D. Tex. 2005) (citing *Eason v. Thaler*, 73 F.3d 1322, 1325 (5th Cir. 1996); *Forsyth v. Barr*, 19 F.3d 1527, 1533 (5th Cir. 1994); *Fowler v. Smith*, 68 F.3d 124, 126 (5th Cir. 1995)).

"A fact is material only if its resolution would affect the outcome of the action." *Wiley v. State Farm Fire & Cas. Co.*, 585 F.3d 206, 210 (5th Cir. 2009). A genuine issue of material fact exists if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *Bayle v. Allstate Ins. Co.*, 615 F.3d 350, 355 (5th Cir. 2010). In other words, for a court to conclude there are no genuine issues of material fact, the court must be satisfied that no reasonable trier of fact could have found for the non-movant. *Anderson*, 477 U.S. at 242.

In making this determination, the Court must view all facts and inferences in the light most favorable to the nonmoving party and resolve all disputed facts in favor of the nonmoving party. *Boudreaux v. Swift Transp. Co., Inc.*, 402 F.3d 536, 540 (5th Cir. 2005). The court should review all the evidence in the record, giving credence to the evidence favoring the non-movant as well as the "evidence supporting the moving party that is uncontradicted and unimpeached, at least to the

extent that evidence comes from disinterested witnesses." *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 151 (2000). A court "may not make credibility determinations or weigh the evidence" in ruling on a motion for summary judgment. *Id.* at 150; *Anderson*, 477 U.S. at 254–55. "Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge." *Id.*, 477 U.S. at 255; *International Shortstop, Inc. v. Rally's*, 939 F.2d 1257, 1263 (5th Cir. 1991); *Moore v. Willis Indep. Sch. Dist.*, 233 F.3d 871, 874 (5th Cir. 1990) ("[T]he court must review all of the evidence in the record but make no credibility determinations or weigh any evidence.")

### b. Constitutional Claims

#### i. Section 1983

Plaintiffs' constitutional claims against Defendants Johnson, Bennett, and MacAuley in their individual capacities are brought under 42 U.S.C. § 1983. Section 1983 "is not itself a source of substantive rights," but creates a cause of action against any person who, under color of state law, violates a plaintiff's federal constitutional or statutory rights. 42 U.S.C. § 1983; *Baker v. McCollan*, 443 U.S. 137, 144, n.3 (1979). A plaintiff must establish two elements under a Section 1983 claim: (1) a constitutional violation; and (2) that the defendants were acting under color of state law when they committed the constitutional violation. *Whitley v. Hanna*, 726 F.3d 631, 638 (5th Cir. 2013). Section 1983 also requires a showing of proximate causation, which is evaluated under a common law standard. *Murray v. Eagle*, 405 F.3d 278, 290 (5th Cir. 2005).

#### ii. Failure to Provide Care for a Serious Medical Need

In this case, Plaintiffs claim that Defendants Johnson and Bennett (nurses on duty during Mr. Mosley's visit to the medical unit) and Defendant MacAuley (the unit officer in charge of the detox unit the morning Mr. Mosley was found dead) violated Mr. Mosley's Fourteenth

Amendment right to adequate medical care. While convicted prisoners have a right to be free from cruel and unusual punishment under the Eighth Amendment, pretrial detainees like Mr. Mosley have a "right to be free from punishment altogether," which flows from the due process guarantees of the Fourteenth Amendment. *See Colle v. Brazo Cty.*, 981 F.2d 237, 244 (5th Cir. 1993); *Estate of Henson v. Wichita Cty., Tex.*, 795 F.3d 456, 462 (5th Cir. 2015). The procedural and substantive due process guarantees of the Fourteenth Amendment provide that no state shall "deprive any person of life, liberty, or property, without due process of law." *Olabisiomotosho v. City of Houston*, 185 F.3d 521, 525–26 (5th Cir. 1999) (citing U.S. CONST. amend. XIV, § 5).

The Fifth Circuit has recognized that "a pretrial detainee's due process rights are said to be 'at least as great as the Eighth Amendment protections available to a convicted prisoner,'" with one "crucial" distinction: "[t]he State cannot punish a pretrial detainee." *Hare v. City of Corinth*, 74 F.3d 633, 639 (5th Cir. 1996) (quoting *City of Revere v. Mass. Gen. Hosp.*, 463 U.S. 239, 244 (1983) and citing *Bell v. Wolfish*, 441 U.S. 520, 535 (1979)). The "proper inquiry" when "evaluating the constitutionality" of the treatment of a pretrial detainee is whether that treatment "amount[s] to punishment of the detainee." *See Hare*, 74 F.3d at 639 (citing *Bell*, 441 U.S. at 535).

The Fifth Circuit has also cautioned that "[t]he State's exercise of its power to hold detainees and prisoners…brings with it a responsibility under the U.S. Constitution to tend to essentials of their well-being." *Hare*, 74 F.3d at 638–39.

> [W]hen the State by the affirmative exercise of its power so restrains an individual's liberty that it renders him unable to care for himself, and at the same time fails to provide for his basic human needs—e.g., food, clothing, shelter, medical care, and reasonable safety—it transgresses the substantive limits on state action set by the Eighth Amendment and the Due Process Clause. The affirmative duty to protect arises not from the State's knowledge of the individual's predicament or from its expressions of intent to help him, but from the limitation which it has imposed on his freedom to act on his own behalf.

*Id.* at 639 (quoting *DeShaney v. Winnebago County Dep't of Social Servs.*, 489 U.S. 189, 200 (1989)). "Hence, since pretrial detainees and convicted state prisoners are similarly restricted in their ability to fend for themselves, the State owes a duty to both groups that effectively confers upon them a set of constitutional rights that fall under the Court's rubric of 'basic human needs.'" *Hare*, 74 F.3d at 639.

Thus, it is well-established law that the state owes a duty to "provide…pretrial detainees…with basic human needs, including medical care and protection from harm, during their confinement." *Id.* at 650. The legal standard used to measure the due process rights of a pretrial detainee depends on whether a challenge is brought to the constitutionality of a "condition of confinement" or to "an episodic act or omission of an individual officer." *Henson*, 795 F.3d at 462. Claims for failure to provide medical care "are generally brought as episodic-acts-or-omissions claims," as here, where Plaintiffs "implicate the acts or omissions of individuals" rather than the jail's system of providing medical care. *Id.* at 463.

A "state jail official's liability for episode acts or omissions cannot attach unless the official had subjective knowledge of a substantial risk of serious harm to a pretrial detainee but responded with deliberate indifference to that risk." *Hare*, 74 F.3d at 650. In other words, a plaintiff bringing a failure-to-provide-medical-care claim against a prison official must demonstrate that the official acted or failed to act with deliberate indifference to a pretrial detainee's serious medical needs. *Hunt v. Pierson*, 730 F. App'x 210, 212 (5th Cir. 2018). "A serious medical need is one for which treatment has been recommended or for which the need is so apparent that even laymen would recognize that care is required." *Gobert v. Caldwell*, 463 F.3d 339, 345 (5th Cir. 2006).

Deliberate indifference is "an extremely high standard to meet." *Hunt*, 730 F. App'x at 212. It is a subjective standard that "requires that prison officials have actual knowledge of a

serious risk of harm and then consciously disregard[] that risk." *Randle v. Lockwood*, No. 6:17-CV-084-RP, 2017 WL 892493, at *8 n.5 (W.D. Tex. Mar. 6, 2017); *see also Hunt*, 730 F. App'x at 212 (citing *Farmer v. Brennan*, 511 U.S. 825, 837 (1994)). Mere "failure to alleviate a significant risk that [the official] should have perceived, but did not" is insufficient to show deliberate indifference. *Domino v. Texas Dep't of Crim. Justice*, 239 F.3d 752, 756 (5th Cir. 2001) (citing *Farmer*, 511 U.S. at 838). The "official must both be aware of facts from which an inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Domino*, 239 F.3d at 755 (citing *Farmer*, 511 U.S. at 837). The "official's knowledge of a substantial risk of harm may be inferred if the risk was obvious." *Easter v. Powell*, 467 F.3d 459, 463 (5th Cir. 2006).

Deliberate indifference may be "manifested by prison doctors in their response to the prisoner's needs or by prison guards in intentionally denying or delaying access to medical care or intentionally interfering with the treatment once prescribed." *Estelle v. Gamble*, 429 U.S. 97, 104–05 (1976). But, "an incorrect diagnosis…unsuccessful treatment, medical malpractice, and acts of negligence do not constitute deliberate indifference." *Hunt*, 730 F. App'x at 213; *Domino*, 239 F.3d at 756; *Johnson v. Treen*, 759 F.2d 1236, 1238 (5th Cir. 1985). Similarly, "[a]ctions and decisions by officials that are merely inept, erroneous, ineffective, or negligent do not amount to deliberate indifference." *Alderson v. Concordia Parish Correctional Facility*, 848 F.3d 415, 420 (5th Cir. 2017) (citing *Alton v. Tex. A&M Univ.*, 168 F.3d 196, 201 (5th Cir. 1999)). "Rather, the plaintiff must show that the officials 'refused to treat him, ignored his complaints, intentionally treated him incorrectly, or engaged in any similar conduct that would clearly evince a wanton disregard for any serious medical needs.'" *Domino*, 239 F.3d at 756 (quoting *Johnson*, 759 F.2d

at 1238). "To reach the level of deliberate indifference, official conduct must be 'wanton,' which is defined to mean 'reckless.'" *Alderson*, 848 F.3d at 420 (citing *Johnson*, 759 F.2d at 1238).

### iii. Qualified Immunity

Defendants Bennett and MacAuley urge that they are entitled to qualified immunity.[23] Government officials sued under Section 1983 in their individual or personal capacity may assert qualified immunity, which "shield[s] them from civil damages liability as long as their actions could reasonably have been thought consistent with the rights they are alleged to have violated." *Anderson v. Creighton*, 483 U.S. 635, 638 (1987). So, "whether an official protected by qualified immunity may be held personally liable for an allegedly unlawful official action generally turns on the 'objective legal reasonableness' of the action assessed in light of the legal rules that were 'clearly established' at the time it was taken." *Id.* (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818–19 (1982)).

A government official may assert qualified immunity by "plead[ing] his good faith and establish[ing] that he was acting within the scope of his discretionary authority." *Salas v. Carpenter*, 980 F.2d 299, 306 (5th Cir. 1992). In the Fifth Circuit, once qualified immunity is asserted, the burden shifts to the plaintiff to show that immunity does not bar recovery. *Rosas v. Bexar County*, 5:14-CV-1082-DAE, 2015 WL 1955406, at *3 (W.D. Tex. Apr. 29, 2015) (citing *Salas*, 980 F.2d at 306). Thus, "[a] qualified immunity defense alters the typical summary judgment burden of proof in that once the defense is pleaded by an official, the burden shifts to the plaintiff to rebut the defense by establishing a genuine fact issue as to whether the official's

---

[23] Both Defendants MacAuley and Johnson asserted qualified immunity at the motion to dismiss phase. ECF Nos. 63, 64. The Court denied both motions, holding that Defendants MacAuley and Johnson's entitlement to qualified immunity depended "on difficult factual questions that would benefit from a more developed record." ECF No. 73 at 14, 15. Defendant Bennett has also asserted qualified immunity in his pending Motion to Dismiss (ECF No. 148). Unlike Defendant MacAuley, Defendant Johnson has not reasserted qualified immunity in her present motion as a basis for summary judgment, so the Court will not consider this argument. *See supra* Section II.a., n.23.

allegedly wrongful conduct violated clearly established federal law." *Hunt*, 730 F. App'x at 215–16. Even though it is the plaintiff's burden to negate qualified immunity, all inferences are still drawn in his favor. *Id.* at 216 (citing *Brown v. Callahan*, 623 F.3d 249, 259 (5th Cir. 2010)). A court determining whether a defendant is entitled to qualified immunity conducts a two-step inquiry: (1) whether an official's conduct violated a plaintiff's constitutional right and (2) whether that right was clearly established at the time of the violation. *Whitley*, 726 F.3d at 638. A court may rely on either of these two prongs in its analysis. *Id.*

### c. Disability Discrimination Claims

Plaintiffs bring their claims against Defendant Bexar County under the Americans with Disabilities Act ("ADA") and the Rehabilitation Act ("RA"). Both the ADA and the RA prohibit discrimination on the basis of disability and require public entities (or private entities receiving federal funding) to provide reasonable accommodations to assist disabled persons in accessing public programs and services. 42 U.S.C. §§ 12101 *et seq.*; 29 U.S.C. §§ 701 *et seq*; *Griffin v. United Parcel Serv., Inc.*, 661 F.3d 216, 222 (5th Cir. 2011). Establishing a *prima facie* case of disability discrimination[24] requires a plaintiff to prove (1) that he had a qualifying disability; (2) that he was excluded from participation in, or is being denied benefits, services, programs, or other activities for which a public entity is responsible, or was otherwise discriminated against by the public entity; and (3) that such exclusion, denial of benefits, or discrimination was because of his disability. *See Melton v. Dall. Area Rapid Transit*, 391 F.3d 669, 671–72 (5th Cir. 2004).

A disability is "a physical or mental impairment that substantially limits one or more of the major life activities" of an individual. 29 C.F.R. 1630.2(g)(1)(i). A substantial impairment is "one

---

[24] Claims under both the ADA and the RA are analyzed similarly—the difference being that the ADA applies only to public entities while the RA applies to any federally funded programs or activities, whether public or private. *See Frame v. City of Arlington*, 657 F.3d 215, 223 (5th Cir. 2011); *Kemp v. Holder*, 610 F.3d 231, 234 (5th Cir. 2010). Jurisprudence interpreting either statute is applicable to both. *Kemp*, 610 F.3d at 234.

that limits an individual's ability to perform a major life activity as compared to most people in the general population." 29 C.F.R. 1630.2(j)(1)(ii). Major life activities are those activities that are of central importance to daily life including things like "caring for oneself, performing manual tasks, seeing, hearing, eating, sleeping, etc." *Hale v. King*, 642 F.3d 492, 500 (5th Cir. 2011). "[S]ubstance addiction is not a per se disability…courts must employ an individual assessment to determine whether claimant's addiction substantially limited one of his major life activities compared to most people in the general population." *Garza v. City of Donna*, No. 7:16-CV-00558, 2017 WL 2861456, at *6 (S.D. Tex. July 5, 2017).

## II.     ANALYSIS

### a.  Defendant Johnson's Motion for Summary Judgment

Plaintiffs claim that Defendant Johnson violated Mr. Mosley's rights under the Fourteenth Amendment by failing to provide care for a serious medical need. Specifically, Plaintiffs allege that "Defendant Johnson consciously disregarded danger to which Mr. Mosley was exposed, and was deliberately indifferent to Mr. Mosley's serious medical need," in three different ways: (1) "by failing to assess and triage Mr. Mosley's hip fracture and internal hemorrhaging when he was first brought to the medical clinic," (2) "by failing to monitor his vital signs over the next few hours," and (3) "by failing to assess and triage Mr. Mosley after Defendant MacAuley called her around 3:00 a.m." on the day Mr. Mosley died. ECF No. 100, Third Amended Complaint (hereinafter "Compl.") ¶ 91.

In her Motion for Summary Judgment, Defendant Johnson argues that she is entitled to judgment as a matter of law because:

> the evidence is overwhelming and uncontroverted and it establishes that Mosley did not have a fracture when he was seen in the medical unit, that Johnson appropriately evaluated and treated Mosley, that she was not deliberately indifferent and that Mosley's death was

caused by a severe acetabular fracture and subsequent bleeding which occurred shortly before his death.

Def. Johnson's Mot. for Summ. J. ¶ 10. Defendant Johnson's only argument is, essentially, that she has satisfied her summary judgment burden by "asserting the absence of facts supporting the elements of the plaintiffs' theory of recovery." *Id.* ¶ 9 (citing *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1076, n.16 (5th Cir. 1994)). In support of this argument, Defendant Johnson's motion devotes over five pages to arguing that it is "uncontroverted" that Mr. Mosley did not have a fracture before his first visit to the medical unit. Def. Johnson's Mot. for Summ. J. ¶¶ 11–17. According to Defendant Johnson, because "[a]ll evidence shows that Mosley did not have the fracture at the time Johnson examined him…Plaintiffs [sic] claims against Johnson for deliberate indifference should be dismissed." *Id.* ¶ 18.

Defendant Johnson has failed to carry her summary judgment burden for two reasons. First, there are genuine issues of material fact related to whether Mr. Mosley had a hip fracture at the time of Defendant Johnson's assessment. Defendant Johnson attempts to point to an absence of dispute by relying on her proffered expert's opinion that Mr. Mosley "could not have had a fracture when he was seen in the medical unit," and that "the most likely cause of Mosley's acetabular fracture was either a seizure or an attack from another inmate, which occurred after Mosley returned to his cell following Johnson's examination." *Id.* ¶ 12. According to Defendant Johnson, this evidence is "uncontroverted."[25] The Court disagrees. There are genuine disputes

---

[25] The claim that Defendant Johnson's proffered expert's opinion is "uncontroverted" is misplaced. The expert, Dr. Peter Holmes, testified that Mr. Mosley could not have sustained the fracture he did before his first visit to the medical unit, that his fracture was likely caused by a seizure or an attack from another inmate which occurred after Mr. Mosley returned to his cell, and that Mr. Mosley probably died within an hour of sustaining the fracture and could not have been saved. Def. Johnson's Mot. for Summ. J. ¶ 12. The opinion of Defendant Johnson's proffered expert is just that: an opinion. It does not constitute "uncontroverted" evidence, especially in light of documents and testimony that support Plaintiffs' contentions that Mr. Mosley suffered an injury before his last visit to the medical unit and that he did not stand or walk after being returned to his cell.

Both sides have asked the Court to strike portions of the others' expert's testimony. ECF Nos. 128, 133. Plaintiffs argue that Dr. Holmes' testimony (1) that Mr. Mosley's hip fracture was caused by a seizure, (2) that Mr. Mosley died

about whether Mr. Mosley was able to walk at the time Defendant Johnson discharged him back to his cell and the level of pain Mr. Mosley was experiencing at the time of his discharge. There is no dispute that Mr. Mosley did not stand or walk again after he returned to his cell. From these facts, a reasonable jury could infer that Mr. Mosley sustained a hip fracture before his last visit to the medical unit and conclude that Defendant Johnson was deliberately indifferent to Mr. Mosley's serious medical needs at the time of that visit.

Second, even if there was no dispute regarding Mr. Mosley's condition at the time Defendant Johnson first assessed him, there remains a glaring dispute about the alleged 3:00 a.m. phone call from Defendant MacAuley to the medical unit on the day Mr. Mosley died. Defendant MacAuley claims that he called the medical unit about Mr. Mosley's continued symptoms, that Defendant Johnson answered the phone, and that Defendant Johnson assured him that Mr. Mosley was simply going through detox and his cell was "the right place for him." Defendant Johnson,

---

of blood loss within an hour of his hip fracture, (3) that nothing could have saved Mr. Mosley given his rate of blood loss, (4) regarding Mr. Mosley's experience of pain and his ability to express his sensations of pain; and (5) about the point in time that Mr. Mosley broke his hip, is all unreliable and inadmissible under the standard laid out in *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993). Defendants respond that Dr. Holmes' testimony on these points is based on his experience as an orthopedic surgeon and his review of Mr. Mosley's medical records. ECF No. 135. Plaintiffs' arguments against the reliability of Dr. Holmes' testimony boil down to arguments questioning the evidence he relies on to form his opinions. Defendants Johnson, MacAuley, and Bexar County ask that the testimony of Plaintiffs' proffered expert, Sheryl Ann Innerarity, FNP, be struck "because it is biased and unreliable, lacks a sufficient foundation and is without probative value." ECF No. 128 ¶ 4. Moving Defendants do not specify which portions of Innerarity's testimony they wish struck. Their arguments, too, are essentially attacks on the evidence Innerarity relied on to form her opinion—documents and testimony that support the hypothesis that Mr. Mosley sustained his hip fracture before he visited the medical unit. As a general rule "questions relating to the bases of an expert's opinion affect the weight to be assigned to the opinion rather than its admissibility and should be left to the jury's consideration." *Viterbo v. Dow Chem. Co.*, 826 F.2d 420, 422 (5th Cir. 1987). Neither expert's opinions are so "fundamentally unsupported" as to offer no assistance to the jury. *Id.* Rather, the opinions are supported by conflicting underlying evidence, which the jury, not the Court, must resolve in this case.

Plaintiffs also argue the first two items of Dr. Holmes' testimony (that Mr. Mosley's hip fracture was caused by a seizure and that Mr. Mosley died of blood loss within an hour of his hip fracture) should be excluded under Rule 37(c) for Defendants' failure to disclose this information prior to Dr. Holmes' deposition. ECF No. 133 at 10, 13. Rule 37(c) provides for sanctions in the event a party "fails to provide information or identify a witness as required by Rule 26(a) or (e). Fed. R. Civ. P. 37(c). The Court agrees with Defendants that they timely complied with their Rule 26 obligations ahead of the August 15, 2019 deadline set out in the Scheduling Order governing this case. Rule 26 therefore provides no basis for sanctions under Rule 37 and no reason for the Court to strike Dr. Holmes' testimony.

For these reasons, the Court DENIES both parties' motions to strike the other's expert testimony. (ECF Nos. 128, 133).

on the other hand, claims the phone call never occurred. This dispute necessarily involves a credibility determination between the testimony of Defendant MacAuley and Defendant Johnson, which squarely falls in the purview of the jury, not the Court. *Reeves*, 530 U.S. at 151; *Anderson*, 477 U.S. at 254–55.

Notably, Defendant Johnson completely fails to address the phone call in her Motion for Summary Judgment (addressing it only in her Reply). Defendant Johnson has thus failed to meet her summary judgment burden to establish the absence of a genuine factual dispute on this issue. In any case, Defendant Johnson's argument in her Reply that "even if the call did happen" she was not deliberately indifferent is unavailing. A complete refusal or failure to respond to a detainee's medical needs meets even the "extremely high standard" of deliberate indifference. *Hunt*, 730 F. App'x at 212; *Domino*, 239 F.3d at 756 (deliberate indifference may be shown where an official "refused to treat" a detainee, "ignored his complaints," or exhibited other wanton disregard for serious medical needs). Resolving the factual disputes surrounding the phone call in Plaintiffs' favor, a reasonable jury could find that Defendant Johnson's failure to adequately respond to Defendant MacAuley's call constituted deliberate indifference to Mr. Mosley's serious medical needs.[26] Defendant Johnson's Motion for Summary Judgment (ECF No. 131) is therefore DENIED.

---

[26] Defendant Johnson argues in her Reply that she is entitled to qualified immunity. ECF No. 180 ¶ 15. Defendant Johnson failed to raise this defense in her summary judgment motion. For this reason, Plaintiffs have moved to strike this portion of Defendant Johnson's Reply, or in the alternative for leave to file a sur-reply. ECF No. 183. Defendant Johnson responded to Plaintiffs' Motion to Strike, arguing that because she pled qualified immunity in her Answer, it "was not raised for the first time" in her Reply. ECF No. 188 ¶ 4. Because qualified immunity was not raised as a basis for Defendant Johnson's summary judgment motion, the Court will consider this argument waived for the purposes of summary judgment. In any event, qualified immunity would be denied for the same reasons summary judgment is improper. Accordingly, Plaintiffs' Motion to Strike (ECF No. 183) is GRANTED and their request for leave to file a sur-reply is DISMISSED as moot.

### b. Defendant Bennett's Motions

Plaintiffs claim that Defendant Bennett violated Mr. Mosley's rights under the Fourteenth Amendment by failing to provide care for a serious medical need. Specifically, Plaintiffs allege that Defendant Bennett "consciously disregarded danger to which Mr. Mosley was exposed, and was deliberately indifferent to Mr. Mosley's serious medical need," in two ways: (1) "failing to independently assess and triage Mr. Mosley's hip fracture and internal hemorrhaging after receiving a referral from Defendant Johnson," and (2) "failing to monitor Mr. Mosley's vital signs after he was discharged from the medical clinic." Compl. ¶ 94.

### i. Motion to Dismiss Pursuant to Rule 4(m)

Defendant Bennett has moved to dismiss these claims for failure to properly and timely effect service (ECF No. 149). According to Defendant Bennett, Plaintiffs failed to properly and timely serve him under Rule 4(m) without good cause. Def. Bennett's Mot. to Dismiss Pursuant to Rule 4(m) ¶ 8. The Court accepted Plaintiffs' Third Amended Complaint, which added Defendant Bennett as a defendant, on November 19, 2018. *See* ECF Nos. 99 (Order Granting Motion for Leave to File Third Amended Complaint), 100 (Third Amended Complaint). Federal Rule of Civil Procedure 4(m) required Plaintiffs to serve Defendant Bennett no later than February 17, 2019. FED. R. CIV. P. 4(m). Plaintiffs did not request a summons be issued as to Defendant Bennett until August 5, 2019. ECF No. 138. Defendant Bennett was served on August 8, 2019. ECF No. 151. Plaintiffs have argued in their response that good cause exists for their failure to timely serve Defendant Bennett: namely, Plaintiffs mistakenly believed that Defendant Bennett had waived service due to the conduct of counsel for Defendants Bennett and Johnson. ECF No. 154. In the alternative, Plaintiffs ask that if this Court does not find good cause that the Court exercise its discretion to allow late service upon Defendant Bennett. *Id.* at 2.

Under Rule 4(m), if a plaintiff shows good cause for failure to timely effect service, a district court "must" extend time for service beyond the 90-day time limit prescribed by the Rule. *See* FED. R. CIV. P. 4(m); *Thompson v. Brown*, 91 F.3d 20, 21 (5th Cir. 1996). But even "[i]f good cause does not exist, the court may, in its discretion, decide whether to dismiss the case without prejudice or extend time for service." *Id.*

In this case, the Court will exercise its discretion to allow the late service upon Defendant Bennett. Defendant Bennett faces no prejudice as a result of the late service, considering his counsel—the same as counsel for Defendant Johnson—has participated fully in this case, including discovery.[27] Defendant Bennett was represented by his current counsel during his deposition. And, Defendant Bennett has the benefit of a fully developed record and has filed two other dispositive motions now pending before the Court. *See* ECF Nos. 148, 150. Defendant Bennett's Motion to Dismiss Pursuant to Rule 4(m) (ECF No. 149) is therefore DENIED.

## ii. Defendant Bennett's Entitlement to Qualified Immunity

Defendant Bennett also moves to dismiss under Rule 12(b)(6) and for summary judgment. ECF Nos. 148, 150.[28] The Court will evaluate Defendant Bennett's qualified immunity in light of the fully developed summary judgment record.

---

[27] In Defendant Bennett's Reply (ECF No. 156), he points to only two potential items in discovery that he has not participated in: (1) "Bennett sent the Plaintiffs no written discovery, and Plaintiffs never sent Bennett written discovery," and (2) "Bennett has never designated an expert witness." ECF No. 156 ¶ 13. Plaintiffs never serving written discovery upon Defendant Bennett is a disadvantage to Plaintiffs alone, not a source of prejudice for Defendant Bennett. And any prejudice Defendant Bennett might have suffered as a result of missing the deadlines for serving written discovery upon Plaintiffs and for designating an expert could have been cured by a motion for extension of time. These issues are mooted, however, by the Court's rulings on Defendant Bennett's other dispositive motions.

[28] Plaintiffs have moved to strike the portion of Defendant Bennett's Reply in support of his motion for summary judgment, arguing that he raises the defense of qualified immunity for the first time in reply. ECF No. 182. Unlike in the case of Defendant Johnson, though, Defendant Bennett raised his entitlement to qualified immunity in a motion still pending before this Court: his Motion to Dismiss (ECF No. 148). Plaintiffs indeed responded to Defendant Bennett's qualified immunity arguments in their response to his motion to dismiss (ECF No. 189), but only did so relying on allegations in their Complaint rather than the summary judgment record. The Court will therefore DENY Plaintiffs' Motion to Strike (ECF No. 182), but GRANT their request to file a sur-reply. The Clerk shall file Plaintiffs' Sur-Reply (ECF No. 182-1).

In order for Plaintiffs to defeat Defendant Bennett's claim of qualified immunity, they must "establish[] a genuine fact issue as to whether his conduct violated clearly established federal law." *Hunt*, 730 F. App'x at 215–16. This requires the Court to evaluate (1) whether Defendant Bennett's conduct violated a plaintiff's constitutional right and (2) whether that right was clearly established at the time of the violation. *Whitley*, 726 F.3d at 638. The Court may rely on either of these prongs in its analysis: that is, if the Court finds the Plaintiffs cannot establish a fact issue as to one of the prongs, Defendant Bennett is entitled to qualified immunity and the Court need not evaluate the second prong. *Id.*

Here, the record lacks evidence that Defendant Bennett was deliberately indifferent to Mr. Mosley's serious medical needs. Even if Defendant Bennett's conduct was objectively unreasonable, there is no evidence that he was subjectively aware of Mr. Mosley's needs and deliberately indifferent to them. *Domino*, 239 F.3d at 756 ("failure to alleviate a significant risk that [the official] should have perceived, but did not" is insufficient to show deliberate indifference). Bennett was acting in a supervisory capacity only.[29] He had no personal interaction with Mr. Mosley other than providing him an ice pack. His failure to perform an assessment independent of Defendant Johnson's is "[a]t most" a matter of medical malpractice. *Estelle*, 429 U.S. at 107. Conduct that is "inept, erroneous, ineffective, or negligent" does "not amount to deliberate indifference." *Alderson*, 848 F.3d at 420. Even taking the facts in the light most favorable to Plaintiffs, as the Court must here, Defendant Bennett's actions do not rise to the level of "refus[ing] to treat" Mr. Mosley, "ignor[ing] his complaints, [or] intentionally treat[ing] him

---

[29] "A supervisor is not personally liable for his subordinate's actions in which he had no involvement." *Abbott v. Town of Livingston*, No. CV 16-00188-BAJ-EWD, 2018 WL 1095557, at *4 (M.D. La. Feb. 27, 2018) (citing *Anderson v. Pasadena Indep. Sch. Dist.*, 184 F.3d 439, 443 (5th Cir. 1999)).

incorrectly" that could satisfy the "extremely high standard" of deliberate indifference. *Domino*, 239 F.3d at 756; *Hunt*, 730 F. App'x at 212.

Deliberate indifference is an essential element for Plaintiffs to establish that Defendant Bennett violated Mr. Mosley's constitutional right to medical care. The summary judgment record shows that Plaintiffs cannot establish a fact issue on this element.[30] Defendant Bennett is therefore entitled to qualified immunity, and the claims against him are DISMISSED. Defendant Bennett's Motion to Dismiss (ECF No. 148) is GRANTED on this basis; his Motion for Summary Judgment (ECF No. 150) is DISMISSED as moot.

### c. Defendants Bexar County and MacAuley's Motion for Summary Judgment

#### i. Defendant MacAuley

Plaintiffs claim that Defendant MacAuley violated Mr. Mosley's rights under the Fourteenth Amendment by failing to provide care for a serious medical need. Specifically, Plaintiffs argue that "Defendant MacAuley consciously disregarded danger to which Mr. Mosley was exposed, and was deliberately indifferent to Mr. Mosley's serious medical needs" by (1) failing "to seek additional medical assistance for Mr. Mosley, whom he knew had recently suffered a serious injury and whom he observed showing signs of severe pain and symptoms of alcohol withdrawal" and (2) failing "to call 9-1-1 when Mr. Mosley requested it." Compl. ¶ 96.

In his Motion for Summary Judgment, Defendant MacAuley argues he is entitled to judgment as a matter of law because the record lacks evidence for a factfinder to conclude

---

[30] In their response to Defendant Bennett's motion (ECF No. 189), Plaintiffs notably fail to raise any genuine issue of fact as to Defendant Bennett's subjective knowledge of Mr. Mosley's serious medical needs. *See* ECF No. 189 at 18-20. In parts, Plaintiffs seem to raise allegations that relate to Defendant Johnson instead of Defendant Bennett. *Id.* at 19-20 (arguing "Defendant Johnson's inaccurate note in Mr. Mosley's medical record that he was able to walk and stand, when in fact he was not, suggests a degree of wanton conduct that supports an inference of subjective knowledge.") The allegations that actually relate to Defendant Bennett are insufficient to demonstrate the subjective knowledge required to show deliberate indifference.

Defendant MacAuley acted with deliberate indifference towards Mr. Mosley. Def. MacAuley's Mot. for Summ. J. ¶ 21. Defendant MacAuley urges that (1) he lacked actual knowledge of Mr. Mosley's potential internal bleed, (2) there is no evidence that Mr. Mosley had an obvious serious medical need, and (3) even if a constitutional violation occurred, he is entitled to qualified immunity. *Id.* ¶ 24, 36, 38.

Several genuine factual disputes preclude summary judgment in Defendant MacAuley's favor. First, there are genuine issues of material fact related to Defendant MacAuley's actual knowledge of Mr. Mosley's condition. Defendant MacAuley argues he had no reason to suspect Mr. Mosley had suffered a fracture. But Officer Ponton claims that at the time Defendant MacAuley took over during shift change, he watched Defendant MacAuley review his report on Mr. Mosley's Code 1, which explained that Mr. Mosley had been sent to the medical unit because he "claimed he could not get up," and that Mr. Mosley had told Officer Ponton "that he could not move his leg." Ponton Report; Ponton Dep. 60:19–61:12. Defendant MacAuley admits that Mr. Mosley's cellmates were complaining about him around 2:00 a.m., and that he saw Mr. Mosley dragging himself across the floor. MacAuley Dep. 83:19–21. He admits that when he tried to speak to Mr. Mosley, he was unresponsive and only able to respond with a "grunt," and that he thought Mr. Mosley was delirious and his behavior was "weird." *Id.* at 103:24–25, 108:13–19. Defendant MacAuley also admits that during his eight-hour shift, he never saw Mr. Mosley stand or walk. *Id.* at 105:6–19. There is evidence that Mr. Mosley was again complaining about hip pain at 5:00 a.m., and that he asked his cellmates to call 9-1-1 at 6:15 a.m. ECF No. 174-2, pp. 51, 53–54. Taking the evidence in the light most favorable to Plaintiffs, a reasonable jury could infer that Defendant MacAuley had actual subjective knowledge of Mr. Mosley's serious medical need, or at the very least that Mr. Mosley's need was sufficiently obvious to support a finding of

deliberate indifference. *See Easter*, 467 F.3d at 463 (finding that an "official's knowledge of substantial risk of harm may be inferred if the risk was obvious"); *Gobert*, 463 F.3d at 345 ("A serious medical need is one…for which the need is so apparent that even laymen would recognize that care is required.").

Second, the factual dispute surrounding the alleged 3:00 a.m. call placed by Defendant MacAuley to the medical unit is material to the claims against him. If a jury believes that he placed the call, that finding could support the conclusion that he was responsive, rather than deliberately indifferent, to Mr. Mosley's apparent medical needs.[31] If, on the other hand, a jury believes Defendant Johnson's testimony that the call never took place, this could support a finding that Defendant MacAuley ignored Mr. Mosley's complaints or engaged in "similar conduct that would clearly evince a wanton disregard for any serious medical needs." *Domino*, 239 F.3d at 756. The resolution of this factual dispute involves the weighing of two defendants' conflicting testimony, and is the job of the jury, not the Court. *Reeves*, 530 U.S. at 151; *Anderson*, 477 U.S. at 254–55.

Finally, the Court notes that even reversing the summary judgment standard and resolving the above factual issues in Defendant MacAuley's favor, a reasonable jury could still return a verdict against him. Defendant MacAuley does not dispute that he was the unit officer in charge of the detox unit from 11:00 p.m. until 7:00 a.m. the morning Mr. Mosley was found dead. Given this undisputed fact, the argument advanced in his motion that "there must be some evidence that [Mr. Mosley's acetabular] fracture existed when Mr. Mosley returned to [his cell] from the medical unit" in order for Plaintiffs to prevail against Defendant MacAuley seems nonsensical. Even if a

---

[31] It could also support a finding that Defendant MacAuley was aware, at least by 3:00 a.m., that Mr. Mosley was facing a serious medical need. Defendant MacAuley argues that the fact that he allegedly placed this phone call shows he was not indifferent to Mr. Mosley, but even "mere delay of medical care" from the time Defendant MacAuley knew of Mr. Mosley's need to the time of the call can constitute a violation if there is a showing of deliberate indifference resulting in substantial harm. *Easter*, 467 F.3d at 463.

jury concludes Mr. Mosley's fracture was not sustained until after he returned to his cell, it is undisputed that Mr. Mosley at some point did sustain a fracture before Defendant MacAuley found him unresponsive at 7:00 a.m. Defendants' own expert testimony that once Mr. Mosley sustained such the fracture he would "have had a gross shortening, external rotation of the leg, screaming in agony" could lead a reasonable jury to conclude that Defendant MacAuley was deliberately indifferent to Mr. Mosley's serious medical needs, regardless of what time he sustained the fracture. *See* Holmes Dep. 157:5–7.

In light of these factual disputes, Plaintiffs have met their burden to defeat Defendant MacAuley's claim of qualified immunity by "establishing a genuine fact issue as to whether his conduct violated clearly established federal law." *Hunt*, 730 F. App'x at 215–16. Since *Hare*, it has been clearly established law that government officials owe a duty to "provide…pretrial detainees…with basic human needs, including medical care and protection from harm, during their confinement." *Hare*, 74 F.3d at 650. Prison guards who "intentionally deny[] or delay[] access to medical care" exhibit deliberate indifference to a detainee's serious medical needs, and may be held liable for violating the detainee's constitutional rights. *Estelle*, 429 U.S. at 104–05. Taking the facts in the light most favorable to Plaintiffs, a reasonable jury could find Defendant MacAuley liable for failing to provide care for Mr. Mosley's serious medical needs. Thus, Defendant MacAuley is not entitled to qualified immunity. For the same reasons, he has also failed to carry his summary judgment burden to demonstrate an absence of a genuine issue of material fact. *Celotex Corp.*, 477 U.S. at 323. Defendant MacAuley's Motion for Summary Judgment (ECF No. 132) is therefore DENIED.

ii. Defendant Bexar County

Plaintiffs claim that Defendant Bexar County discriminated against Mr. Mosley on the basis of his disability in violation of the Americans with Disabilities Act (ADA) and the Rehabilitation Act (RA). Compl. ¶¶ 98–103. Specifically, Plaintiffs claim that Defendant Bexar County is liable for the actions of its employees and contractors, including Defendants Johnson, Bennett, and MacAuley, Compl. ¶ 100, and they allege that:

(1) Defendants Johnson and Bennett discriminated against Mr. Mosley by failing to provide the same medical assessment and referral to see a doctor for a serious injury that they would provide to other inmates who are not experiencing alcohol withdrawal;
(2) Defendants Johnson and Bennett demonstrated animus toward Mr. Mosley on account of his alcohol withdrawal symptoms of hallucinations and a distorted reality by:
    a. Failing to conduct a thorough physical assessment of Mr. Mosley,
    b. Failing to refer Mr. Mosley to a doctor for necessary medical treatment, and
    c. Dismissing Mr. Mosley's statements of severe pain and inability to walk;
(3) Defendant MacAuley knowingly declined to take reasonable steps to monitor Mr. Mosley, and act on the warning signs he saw and heard because of animus toward Mr. Mosley on account of his alcohol withdrawal symptoms; and Defendant MacAuley took fewer cautionary steps than he otherwise would have for other inmates who are not experiencing alcohol withdrawal.

Compl. ¶¶ 101–102.

Plaintiffs' claims against Defendant Bexar County are for disparate treatment in violation of the ADA/RA.[32] A claim for disparate treatment requires Plaintiffs "to show that the [defendant] had a discriminatory intent or motive for its action." *Fortenberry v. City of Wiggins, Miss.*, No. 1:16CV320-LG-RHW, 2018 WL 8809236, at *5 (S.D. Miss. Feb. 5, 2018) (citing *Tex. Dep't of Hous. & Cmty. Affairs v. Inclusive Communities Project, Inc.*, 135 S. Ct. 2507, 2513 (2015)); *see also Washington v. Collier*, Civil Action No. 2:18-CV-221, 2018 WL 8996273, at *10 (S.D. Tex. Oct. 30, 2018) (citing *Delano-Pyle v. Victoria County*, 302 F.3d 567, 574 (5th Cir. 2002))

---

[32] Plaintiffs explicitly deny that they are making a reasonable accommodation claim. ECF No. 184-1 at 3 ("Though Bexar County appears to read Plaintiffs' claims as brought under an accommodation-theory, Plaintiffs do not claim that Bexar County failed to provide Mr. Mosley reasonable accommodations for his disability.")

("Intentional discrimination is required in order to recover compensatory damages under the ADA and RA.")

Summary judgment is appropriate because Plaintiffs have failed to establish a genuine fact issue as to whether Defendant Bexar County intentionally discriminated against Mr. Mosley on the basis of his disability.[33]  Discriminatory intent can be proven with direct evidence.  *Fortenberry v. City of Wiggins, Miss.*, No. 1:16CV320-LG-RHW, 2018 WL 8809236, at *5 (S.D. Miss. Feb. 5, 2018).  However, Plaintiffs point to no direct evidence that any of the Defendants' actions were motivated by discrimination against Mr. Mosley based on his alcoholism.[34]  Plaintiffs also argue, without legal support, that discriminatory intent can be "inferred from the totality of the relevant facts," including "from a defendant's departure from normal procedure."  Pl.'s Resp. to Defs' Bexar County and MacAuley's Mot. for Summ. J. 28.[35]  Even if that were the case, Plaintiffs point to no facts supporting an inference of disability discrimination, either.

Plaintiffs argue that "[e]vidence that Defendants acted with deliberate indifference to Mr. Mosley's medical needs is itself sufficient evidence for a jury to infer they harbored animus toward him."  *Id.*  The Court disagrees.  Even if a jury finds that Defendants Johnson and/or MacAuley

---

[33] The Court assumes *arguendo* that Mr. Mosley suffered from or was perceived to have suffered from an alcohol use disorder, and that his condition was a qualifying disability under the ADA/RA.  Defendant Bexar County also does not dispute, for the purposes of summary judgment, that "Mr. Mosley's alcoholism could have made him a qualifying individual" under the ADA/RA.  Bexar County Reply, ECF No. 181 ¶ 16.  The parties use the term "alcoholism" throughout their briefing, and so will the Court for the sake of brevity.

[34] In their discussion of direct evidence in their response and opposition to Defendant Bexar County's motion for summary judgment, Plaintiffs point only to a statement by Defendants' expert, Dr. Holmes, where he refers to "bridge people."  ECF No. 176 at 27.  Statements by Defendants' retained expert, who was not involved in any way with Mr. Mosley, are irrelevant to establishing Defendant Bexar County's intentional discrimination.

[35] Plaintiffs cite to two cases for these propositions.  First, they cite *King v. Munoz*, which recognized that "an invidious discriminatory purpose may often be inferred from the totality of the relevant facts" in the context of a selective enforcement or prosecution claim under the Fourteenth Amendment.  This standard is inapposite for a claim of disability discrimination under the ADA/RA.  Second, they cite *Fortenberry* for the proposition that "departure from normal procedure" can support an inference of discriminatory intent.  But *Fortenberry* instead held that in a disability discrimination claim based on direct evidence of discriminatory intent, departure from normal procedure is one "relevant consideration."

(or any employee or contractor of Defendant Bexar County) displayed deliberate indifference toward Mr. Mosley, that indifference could be motivated by any number of conceivable factors: laziness, ill-will towards all detainees, racial bias, etc. To argue that Defendants were motivated by animus towards Mr. Mosley's <u>disability</u>, Plaintiffs only repeat that the Defendants were aware of Mr. Mosley's alcoholism; that they were aware of his serious medical needs; and that they failed to adequately respond to those needs. *Id.* at 28–31.

Plaintiffs' claims that a reasonable jury could conclude the actions of Defendants Johnson, Bennett, and MacAuley were motivated by animus are not supported by summary judgment evidence. Ultimately, Plaintiffs' only support for their claim that Defendant Bexar County intentionally discriminated against Mr. Mosley because of his alcoholism amounts to nothing more than "[m]ere conclusory allegations, unsubstantiated assertions, improbable inferences, [and] unsupported speculation." *Walker*, 375 F. Supp. 2d at 535. This is insufficient to defeat summary judgment. Defendant Bexar County's Motion for Summary Judgment (ECF No. 32) is therefore GRANTED.[36]

## CONCLUSION

For the reasons stated herein, Defendant Johnson's Motion for Summary Judgment (ECF No. 131) is DENIED; Defendant Bennett's Motion to Dismiss Pursuant to Rule 4(m) (ECF No.

---

[36] Plaintiffs moved to strike certain portions of Bexar County's Reply, or in the alternative for leave to file a sur-reply (ECF No. 184). Specifically, Plaintiffs request the Court to strike three "new arguments" they allege Defendants Bexar County and MacAuley raised for the first time in their Reply: (1) that MacAuley was not the only officer to check on or speak to inmates in the detox unit during his shift the night Mr. Mosley died; (2) that disability discrimination under the ADA and RA can only be established by showing that a defendant failed to provide reasonable accommodations; and (3) that Bexar County is not liable for acts of UHS employees under the ADA and RA. Of these, only the final argument is one raised for the first time on reply. The first is simply Defendants' argument regarding the admissibility of evidence raised by Plaintiffs in their opposition to the Motion for Summary Judgment. The second is a mischaracterization of Defendants' legal arguments in their Motion for Summary Judgment and Reply: Defendants do not argue that failure to accommodate is the <u>only</u> way to prove disability discrimination under the ADA/RA. They simply argue that they properly accommodated Mr. Mosley. Accordingly, the Court will DENY Plaintiffs' Motion to Strike (ECF No. 184), but GRANT Plaintiffs' request to file a sur-reply. The Clerk shall file Plaintiffs' Sur-Reply (ECF No. 184-1).

149) is DENIED, his Motion to Dismiss for Failure to State a Claim (ECF No. 148) is GRANTED, and his Motion for Summary Judgment (ECF No. 150) is DISMISSED as moot; Defendants Bexar County and MacAuley's Motion for Summary Judgment (ECF No. 132) is GRANTED as to Bexar County and DENIED as to Defendant MacAuley.

Additionally, Defendants Johnson, MacAuley, and Bexar County's Joint Motion to Strike Testimony of Sheryl Ann Innerarity, FNP (ECF No. 128) is DENIED; Plaintiffs' Motion to Strike Expert Testimony (ECF No. 133) is DENIED. Plaintiffs' Motion to Strike a Portion of Defendant Bennett's Reply (ECF No. 182) is DENIED, but Plaintiffs' request for leave to file a sur-reply is GRANTED; Plaintiffs' Motion to Strike a Portion of Defendant Johnson's Reply (ECF No. 183) is GRANTED, and Plaintiffs' request for leave to file a sur-reply is DISMISSED as moot; and Plaintiffs' Motion to Strike a Portion of Defendants Bexar County and MacAuley's Reply (ECF No. 184) is DENIED, but Plaintiffs' request for leave to file a sur-reply is GRANTED.

The Clerk shall file Plaintiffs' Sur-Reply to Defendant Bennett's Reply (ECF No. 182-1) and Plaintiffs' Sur-Reply to Defendant Bexar County and MacAuley's Reply (ECF No. 184-1). The Clerk is DIRECTED to DISMISS the claims against Defendant Bennett in their entirety, and to enter judgment in favor of Defendant Bexar County.

It is so ORDERED.

SIGNED this 5th day of February, 2020.

_____
XAVIER RODRIGUEZ
UNITED STATES DISTRICT JUDGE